1  Gregg S. Kleiner, State Bar No. 141311
   Charles P. Maher, State Bar No. 124748
2  RINCON LAW LLP
3  268 Bush Street, Suite 3335
   San Francisco, CA 94104
4  Telephone No.:  415-672-5991
   Facsimile No.:  415-680-1712
5  E-mail:      gkleiner@rinconlawllp.com
                cmaher@rinconlawllp.com
6
7  Counsel for PAUL MANSDORF,
   Trustee in Bankruptcy
8                   UNITED STATES BANKRUPTCY COURT

9                   NORTHERN DISTRICT OF CALIFORNIA

10                      SAN FRANCISCO DIVISION

11  In re                                  Case No. 23-30250 HLB
                                           Chapter 7
12  THE SAN FRANCISCO ART INSTITUTE,       Hon. Hannah L. Blumenstiel
        a California nonprofit
13      public benefit corporation,
                                           **MOTION FOR AUTHORITY TO:**
14                                         **(I) SELL ESTATE'S INTEREST IN**
             Debtor.                       **PERSONAL PROPERTY;**
15                                         **(II) ASSUME AND ASSIGN ESTATE'S**
                                           **INTEREST IN REAL PROPERTY LEASE;**
16                                         **(III) AMEND NON-RESIDENTIAL REAL**
                                           **PROPERTY LEASE;**
17                                         **(IV) PAY CURE AMOUNT TO**
                                           **LANDLORD; AND**
18                                         **(V) PAY COMMISSIONS AND RELATED**
                                           **COSTS OF SALE**
19                                         **(Lease for 800 Chestnut Street,**
                                           **San Francisco, California and**
20                                         **Mural by Diego Rivera**
                                           **and Other Personal Property)**
21
22                                         Date:     December 21, 2023
                                           Time:     10:00 a.m.
23                                         Place:    Zoom Video Conference or
                                                     AT&T Conference Call
24
25
26
27
28

# TABLE OF CONTENTS

I.    SUMMARY ............................................................................................................... 2

II.   BACKGROUND ...................................................................................................... 3

      A.    Chestnut Campus ....................................................................................... 3

      B.    The Lease ................................................................................................... 4

      C.    The Mural ................................................................................................... 5

      D.    The Chapter 7 Bankruptcy ......................................................................... 6

      E.    Marketing of the Real Property ................................................................. 7

III.  THE PURCHASE AND SALE AGREEMENT ...................................................... 8

      A.    The Transaction with the Buyer ................................................................ 8

      B.    Purchase Agreement, Costs and Commissions .......................................... 9

      C.    Assumption and Assignment of the Lease ............................................... 11

      D.    Agreement Concerning Transfer of Real Property and Sale Proceeds .... 13

      E.    Mural, Personal Property, Litigation Claims and Sales Tax ................... 14

      F.    Good Faith Finding and No Successor Liability ...................................... 16

      G.    Overbid ..................................................................................................... 18

IV.   CONCLUSION AND PRAYER ........................................................................... 19

# TABLE OF AUTHORITIES

**Cases**

*Cmty. Thrift & Loan v. Suchy (In re Suchy)*,
    786 F 2d. 900, 902 (9th Cir. 1985)..................................16-17

*In re Circle K Corp.*,
    127 F.3d 904, 909 (1997) ..................................................... 13

*In re P.R.T.C., Inc.*,
    177 F.3d 774 (9th Cir. 1999) ................................................ 16

*In re Windmill Farms, Inc.*,
    841 F.2d 1467, 1471 (9th Cir. 1988) ...................................... 5

*McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*,
    89 Cal.App.4th 746, 753 (2001) .......................................... 17

**Statutes**

11 U.S.C. § 105(a) ...................................................... 1, 17, 18

11 U.S.C. § 363 ............................................................. 17, 18

11 U.S.C. § 363(b) ................................................................. 1

11 U.S.C. § 363(d)(4)(A)(i) ................................................... 11

11 U.S.C. § 365(a) ................................................................. 1

11 U.S.C. § 365(b) ................................................................. 1

11 U.S.C. § 365(b)(1) ........................................................... 12

11 U.S.C. § 365(c)(3) ........................................................... 12

11 U.S.C. § 365(f) ................................................................. 1

11 U.S.C. § 548(a)(1)(B) ...................................................... 16

Bankruptcy Rule 6004(h) ...................................................... 18

Bankruptcy Local Rule 9014-1 ........................................... 1, 19

Federal Rules of Bankruptcy Procedure 6006(a) ....................... 1

Federal Rule of Civil Procedure Rule 62(a) ............................. 18

Paul Mansdorf, the Chapter 7 Trustee ("**Trustee**") of the bankruptcy estate of The San Francisco Art Institute ("**Debtor**") files this motion pursuant to 11 U.S.C. §§ 105(a), 363(b) and (m), and 365(a), (b) and (f), and Federal Rules of Bankruptcy Procedure 6006(a) and 9014, for an order authorizing him to: (A) enter into a "Purchase and Sale Agreement and Escrow Instructions" ("**Agreement**") by and between (i) the Trustee and the Regents of the University of California, a California public corporation (the "**UC Regents**"), and (ii) BM-AI, LLC, a Delaware limited liability company, or its assigns ("**Buyer**"); (B) enter into amendments of the Debtor's lease with the UC Regents; (C) assume and assign a pre-petition non-residential real property lease, as amended, to the Buyer as required under provisions of the Agreement; (D) pay a cure amount to the UC Regents due under the Debtor's lease; and (E) pay commissions and other costs of sale as required in the Agreement.

The sale to the Buyer is subject to overbid, as set forth in this Motion. The Trustee at the Buyer's request is seeking a finding from the Court (i) that the Buyer is a buyer in good faith in accordance with Section 363(m) of the Bankruptcy Code and is entitled to all the protections provided to a good faith buyer under 11 U.S.C. § 363(m); and (ii) Buyer is not and shall not be considered, construed, or otherwise understood to be a successor in interest to the Debtor and is not assuming or otherwise liable for the debts of the Debtor.

This Motion is supported by the Declaration of Paul Mansdorf in Support of Motion for Authority to: (I) Sell Estate's Interest in Personal Property; (II) Assume and Assign Estate's Interest in Real Property Lease; (III) Amend Non-Residential Real Property Lease; (IV) Pay Cure Amount to Landlord; and (V) Pay Commissions and Related Costs of Sale (Lease for 800 Chestnut Street, San Francisco, California and Mural by Diego Rivera and Other Personal Property) ("**Mansdorf Declaration**"), the Declaration of Thomas X. Christian in Support of Trustee's Motion to Sell Estate's Interest in 800 Chestnut Street, San Francisco, California, the Declaration of Lynn Feintech in Support of Motion for Authority to: (I) Sell Estate's Interest in Personal Property; (II) Assume and Assign Estate's Interest in Real Property Lease; (III) Amend Non-Residential Real Property Lease; (IV) Pay Cure Amount to Landlord; (V) Pay Commissions and Related Costs of Sale

1

("**Feintech Declaration**"), the pleadings in this case and other evidence and documents that may be presented to the Court at or before the hearing.

## I. SUMMARY

As explained in detail in this Notice and the concurrently filed motion, the Agreement is complicated. At the center of the Agreement are the Debtor's primary assets: (i) a non-residential real property lease between the Debtor, as tenant, and the UC Regents as landlord, covering approximately 1.74 acres of land improved by two (2) buildings, including all fixtures and other improvements located thereon or thereunder, having an address of 800 Chestnut Street, San Francisco, California (the "**Chestnut Campus**"); and (ii) certain personal property located on the Chestnut Campus, *including* a mural by Diego Rivera entitled "The Making of a Fresco Showing the Building of a City" (1931) ("**Mural**"). As discussed below, the Debtor has an option under the lease to purchase the Chestnut Campus, and pursuant to the terms of the lease, it presently owns the Mural.

If the Trustee is authorized by the Bankruptcy Court to enter into the Agreement, and assuming there is no overbid:

> (i) the Trustee will enter into amendments to the lease and assume and assign the Debtor's right, title and interest in the Chestnut Campus lease to the Buyer;

> (ii) following the Buyer taking an assignment of the lease, the UC Regents will sell the Chestnut Campus to the Buyer for $22.5 million;

> (iii) concurrently, the Buyer will pay to the Debtor's estate the sum of $7.5 million for all other rights and personal property of the Debtor and its estate to be sold under the Agreement, including the Mural and *de minimis* personal property located in the building, certain general intangibles, and certain litigation rights (all described below);

> (iv) the Trustee will pay $1.5 million to the UC Regents to cure arrears owed to the UC Regents under the lease; and

(v)     the Trustee will pay certain closing costs associated with the sale, including a sale commission to the estate's broker, and one-half of any sales taxes associated with the sale of the Mural and other personal property.

If the sale is approved and no overbids are received, the Trustee anticipates that the estate will receive approximately $5,200,000 in net proceeds, after paying a lease cure payment to the UC Regents and related costs of sale. The Trustee seeks authority to enter into and consummate the Agreement.

## II.     BACKGROUND

### A.     Chestnut Campus

Through July 2022, the Debtor operated for over 150 years as an accredited arts education institute. For almost 100 years, the Debtor's primary campus and administrative office has been located at the Chestnut Campus. The Chestnut Campus is comprised of two buildings. The first was built in 1926 ("**Original Building**") and an addition was constructed in the late 1960s ("**Addition**"). While the Chestnut Campus was the home of the Debtor for almost a century, the Debtor owned the underlying real property for a short period of time. From 1926 when the Original Building was constructed through 2010, the Chestnut Campus was under the control of the UC Regents pursuant to the terms of the Searles Trust dated November 15, 1906 ("**Trust**"). In 1977, the San Francisco Board of Supervisors designated the Original Building a historical landmark. The Trustee is informed that the designation, among other things, prohibits the owner from altering the exterior envelope of the Original Building, greatly limiting the development potential of the Chestnut Campus. In addition, the Chestnut Campus is presently zoned such that the only – non-residential use for the Chestnut Campus is as an "<u>accredited</u>" post-secondary education institution.

In 2010, the Trust was modified and the UC Regents transferred fee title for the Chestnut Campus to the Debtor. Pursuant to the Trust, the UC Regents retained a residual beneficial interest in the Chestnut Campus.

In June 2016, the Debtor entered into a long-term lease at the Fort Mason Center to be a second campus. The Fort Mason space required substantial tenant improvements that the Fort Mason

Center could not afford to advance but was willing to underwrite with a note in favor of the Debtor if the Debtor advanced the costs. The Trustee understands that, in order to finance the tenant improvements and to pay ongoing obligations, the Debtor borrowed $18 million from Boston Private & Trust Company and secured the loan with a deed of trust against the Chestnut Campus. The Fort Mason Center transaction greatly contributed to the Debtor's ultimate demise. By July 2020, tuition revenue had greatly declined and the Debtor was in default on its obligations to Boston Private. Boston Private commenced a non-judicial foreclosure on its deed of trust against the Chestnut Campus and scheduled a foreclosure trustee's sale for October 2020.

The Trustee understands that, just prior to the foreclosure sale, the UC Regents negotiated a transaction with Boston Private to avert the loss of the UC Regents' residual interest in the Chestnut Campus. The UC Regents paid the Debtor's obligation to Boston Private and took an assignment of the deed of trust recorded in favor of Boston Private. The Debtor was required to execute a deed in lieu of foreclosure in favor of the UC Regents, resulting in the UC Regents becoming the owner of the Chestnut Campus.

**B.      The Lease**

Concurrent with the UC Regents re-acquisition of the Chestnut Campus, the UC Regents entered into a triple-net lease of the real property with the Debtor as the tenant, and the UC Regents as the landlord, with an effective date of October 30, 2020 ("**Lease**"). The Lease has been amended multiple times. The Lease allowed the Debtor to continue operating and provided it with an option to repurchase the Chestnut Campus as described in the following paragraph.

Subject to certain prorations and adjustments, the option could be exercised under the Lease in two ways: (i) a restricted option, which would require the Debtor to pay to the UC Regents an amount equal to the UC Regents' bank debt on the Chestnut Campus, $18,943,756.48, plus 8% annual interest accrued from October 30, 2020 through the date of closing, plus rental arrears and other fees (the "**Restricted Option**"); or (ii) an unrestricted option, which would require the Debtor to pay to the UC Regents the sum of $40 million (the "**Unrestricted Option**"). The Restricted Option would require the transfer and conveyance of the Chestnut Campus from the UC Regents to the Debtor by a grant deed that includes covenants and restrictions that run with the land. Included

among the restrictions was the requirement that the Chestnut Campus be operated as a school for the instruction in the fine arts. Further, to exercise either option, the Lease must not be in default, which requires payment of past due rent and other amounts due under the Lease. The Debtor's ability to exercise either purchase option under the Lease shall be referred to as the "**UC Purchase Option**".

After the Lease commenced, the Debtor continued to struggle. It worked with the University of San Francisco ("**USF**") as a possible merger partner and borrowed $6 million from USF, which loan was secured by the Debtor's beneficial interest in the Fort Mason note. It also borrowed $1.5 million from Lighthouse Immersive San Francisco, Corp., a possible sub tenant of the Fort Mason lease. Student enrollment declined which resulted in a steep reduction in revenue. According to the former registrar of students, enrollment was as follows: 41 students in the fall of 2020, 70 students in the fall of 2021, and 62 students in the spring/summer semester 2022. The Debtor was unable to satisfy its obligations under the Lease and under the Fort Mason lease. In 2022, Debtor defaulted under the Fort Mason Center lease. In January 2023, the Fort Mason Center landlord served a three-day notice to quit or pay rent. The Debtor owed the Fort Mason Center landlord in excess of $750,000 at that time and could not cure the default. As a result, the Fort Mason Center lease terminated as a matter of law weeks before it filed its Chapter 7 petition. *In re Windmill Farms, Inc.*, 841 F.2d 1467, 1471 (9th Cir. 1988).

### C. The Mural

Under the provisions of the Lease, the UC Regents acknowledged that the Mural is the personal property of the Debtor. The Lease contains multiple provisions by which the Debtor can remove the Mural from the premises; provided, among other things, that the Lease is in effect and the Debtor is not in default of the terms of the Lease. According to an appraisal that the Debtor obtained for the Mural, at or near the time that the Lease was entered into, the Mural had an appraised value of approximately $50 million. The Mural, which is approximately 22 feet high and 30 feet wide, was, according to the contemporaneous notes of Timothy Pflueger at the time the Mural was created, designed to be removed from the Original Building. However, unlike another Diego Rivera mural in San Francisco that has been moved a number of times, the Mural has never

been moved and it is unclear if it can be removed without causing material damage to the Mural or to the Original Building. Moving the Mural would cost several million dollars.

A sale of the Mural was considered by the Debtor as a possible means of survival. In 2021, in response to attempts by the Debtor to sell the Mural to a third party, whom the Trustee understands was going to remove the Mural from the Chestnut Campus to a location outside of San Francisco, the Board of Supervisors and the San Francisco Planning Commission passed an ordinance by which the Mural was designated a historical landmark (Landmark #85) under the San Francisco Planning Code. While the proposed designation of the Mural as a landmark took place over the course of many months, it does not appear that the Debtor took material action to oppose this designation, or otherwise appeal the designation. Although the designation of the Mural as a landmark may have been inappropriate (i.e., because the ordinance that underlies the designation only concerns exterior features of a building and the Mural is housed inside of the Original Building), the designation appears to have significantly diminished the market value of the Mural. The Trustee communicated with the San Francisco Museum of Modern Art and the Fine Art Museums of San Francisco to solicit an offer for purchase of the Mural. Neither organization responded with an offer. The Trustee has been in contact with national and international brokers of art. To date, the Trustee has not received a proposal to purchase the Mural.

**D.      The Chapter 7 Bankruptcy**

The Debtor ceased paying any rent to the UC Regents under the Lease. In July 2022, the Debtor ceased all educational operations and terminated almost all of its faculty and staff and paid salary and benefits obligations in full. It had only three or four employees left who dealt with the minimum remaining operations. The Chestnut Campus had on-site 24-hour security service and continued to accrue obligations under the Lease for the payment of liability insurance, as well as to continue basic services such as gas, electricity, water, janitorial services, repairs, maintenance, and trash removal.

The Debtor filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code on April 19, 2023 ("**Petition Date**"). The continuing maintenance and security obligations under the Lease

required the Trustee to obtain a Section 721 order from the Bankruptcy Court to operate the property at a cost of roughly $50,000 to $75,000 per month in post-petition operating expenses.

As of the Petition Date, the Debtor owed approximately $500,000 in pre-petition rent to the UC Regents. Because of the Debtor's pre-petition breaches of the Lease, the UC Regents could have sought and obtained relief from the automatic stay to terminate the Lease. The UC Regents, however, did not do that. Instead, within days after the Petition Date, representatives of the UC Regents met with the Trustee and his professionals at the Chestnut Campus and reached an agreement to allow the Trustee limited time to market the Chestnut Campus and Mural for sale, provided progress was made in securing a buyer and conditioned upon the Trustee paying the Debtor's operating expenses, excluding rent.

Paying the expenses proved to be anything but simple. The Debtor's schedules provide that it has in excess of $2.7 million in cash and cash equivalents in accounts it characterized as "restricted donor funds." Although the Debtor characterized the funds in the accounts as restricted, it appears that, prior to the Petition Date, the Debtor used the funds for operating expenses. Over the objections of the California Attorney General, the Trustee was able to secure Bankruptcy Court authorization to borrow the Debtor's cash in one account to pay roughly $225,000 of operating expenses through August 2023. After August 31, 2023, the Trustee has funded the expenses with unrestricted funds he received post-petition.

### E.       Marketing of the Real Property

In May 2023, with the approval of the UC Regents, the Trustee obtained Bankruptcy Court authorization to engage Cushman & Wakefield as the estate's real estate brokers ("**Broker**").  After the Broker was engaged, the Trustee worked with the Broker's agent on a press release and in the day-to-day marketing of the Property. The link for the press release had over 460 distinct views, and resulted in approximately 15 published online articles about the Trustee's proposed sale of the Chestnut Campus and the Mural. The Broker's agent has shown the Property to no fewer than 25 distinct prospective purchasers and conducted approximately 80 site visits. While the Trustee received expressions of interest in the Chestnut Campus from multiple parties, the majority of the initial term sheets he received were proposals for the acquisition of the Chestnut Campus and the

1  Mural for under $20 million. Because of the provisions of the UC Purchase Option, these proposals

2  were not acceptable.

3  In May 2023, representatives of the Buyer contacted Trustee's counsel with an expression

4  of interest in purchasing the Chestnut Campus and the Mural. The Buyer began conducting due

5  diligence for the Property in June 2023. The Buyer, many of its representatives, and well over a

6  dozen contractors and building professionals went to the Chestnut Campus – sometimes two or three

7  times per week. While the Buyer conducted its due diligence, the Trustee continued to market the

8  Property to others. In September 2023, the Trustee executed a term sheet by which a potential buyer

9  agreed to pay $38 million for the Chestnut Campus and the Mural. Unfortunately, the potential buyer

10 failed to tender a deposit or take other actions to proceed with a purchase.

11 **III.    THE PURCHASE AND SALE AGREEMENT**

12 **A.    The Transaction with the Buyer**

13 In July 2023, the Buyer circulated a non-binding term sheet to the Trustee and to

14 representatives of the UC Regents. Among other things, the term sheet noted problems with the

15 Property, including the need to make material updates to the plumbing and electrical systems, along

16 with glazing and other structural improvements required to make the Chestnut Campus compliant

17 with various provisions of law and functional in the 21st century. The Buyer also advised the Trustee

18 that it had evaluated the Mural with its own professionals and had found highly dubious a $50

19 million valuation of the Mural. While the Buyer noted that the Mural was difficult to value given a

20 number of issues, it further noted that value indications it had received for the Mural were $5 million

21 or less given the Buyer's views on its location, immovability, and other issues. The Buyer further

22 advised the Trustee and the UC Regents that it could not go forward with the acquisition of the

23 Chestnut Campus until the zoning for the Property was updated. While the Buyer is interested in

24 resurrecting the Chestnut Campus to be an art institute and place of artistic learning, the Buyer was

25 unwilling to purchase the Property with the current zoning restriction which permits operation of

26 only an accredited art institute.

27 In September 2023, with the agreement of the UC Regents and notice to the Trustee, the

28 Buyer began the process of seeking to update the zoning for the Chestnut Campus through a

legislative process with the San Francisco Board of Supervisors and other local agencies. Under the provisions of the Agreement, an express condition of the Buyer's acquisition of the Chestnut Campus is the "creation of the Special Use District" for the Chestnut Campus that is part of an ordinance introduced on September 5, 2023, before the San Francisco Board of Supervisors to update the zoning for the Property so that it can also be used as an *unaccredited* arts institute (in addition to its present zoning permissions). According to the Buyer, it anticipates that the zoning legislation will be approved and could be signed into law by the Mayor of San Francisco by early December 2023. However, even though legislation should be effective by late-December 2023, appeal periods under California law run through April 2024. As further described below, the Buyer negotiated for an extended closing date to satisfy or waive conditions relate to such appeal periods.

### B. Purchase Agreement, Costs and Commissions

After over three months of arms-length negotiations between the Buyer, Trustee and the UC Regents, the parties entered into the Agreement. Because the Debtor's interest in the Chestnut Campus is based on provisions in the Lease that allow it to exercise an option to purchase the real property, the Agreement is more complicated than a typical real property sale. In order to consummate a sale of the Chestnut Campus to the Buyer, the Agreement provides for the amendment to the Lease (the sixth amendment) that allows the Trustee to assume and assign the Debtor's right, title and interest in the Lease (and, with it, the option to purchase the Chestnut Campus) to the Buyer. A true and correct copy of the sixth amendment to the Lease is attached as Exhibit C to the Agreement. In turn, the Buyer will be taking an assignment of the Lease and the UC Regents will directly sell its right, title and interest in and to the Chestnut Campus to the Buyer for $22,500,000 in cash. The sale of the Chestnut Campus will be consummated through an escrow. The $22,500,000 payment to the Buyer to acquire the Chestnut Campus constitutes a significant reduction of the amount the estate would be required to pay under the Lease to exercise the UC Purchase Option, assuming the purchase is made using the Restricted Option.

The Trustee calculates that the cost to exercise the UC Purchase Option on or about February 29, 2024, would be approximately $24,496,555.16, plus sums necessary to cure arrears under the lease.[1]

Concurrent with the Buyer's acquisition of the Chestnut Campus, the Buyer will pay to the Trustee, for the benefit of the Debtor's estate, $7,500,000 for the Mural and other personal property located at the Chestnut Campus, certain intangibles, and certain litigation rights.[2] From the $7,500,000 in proceeds paid to the Trustee for the estate's personal property, the Trustee will pay $1,500,000 to the UC Regents to cure arrears owed to the UC Regents for the Debtor's pre- and post-petition obligations under the Lease.

From the estate's interest in the personal property sale proceeds, the Trustee will pay certain closing costs associated with the sale, including the commission of the Broker, $337,500, and one-half of any sales tax associated with the sale of the Mural and other personal property. For its part, the Buyer has agreed to pay the real estate transfer taxes to the City and County of San Francisco up to the amount of $1,320,000. In San Francisco, payment of such real estate transfer tax is typically the obligation of the seller of real property. The San Francisco transfer tax is estimated at $1,237,500. In addition, Buyer shall be solely responsible for and shall pay any and all commissions or fees, if any, that may be due Buyer's consultant, JLL Capital Markets, whether such amount is determined by order of a Court, agreement of Buyer and JLL Capital Markets, or otherwise. The bankruptcy estate will be responsible for payment of its Broker's commission, 1.5% of the gross purchase price for the real property (i.e., $337,500), which sums will be paid from the personal property sale proceeds. The Buyer's agreement to shoulder the cost of the real estate transfer tax up to $1,320,000, one-half of the personal property sales tax, and the commissions or fees, if any, that

---

[1] The Restricted Option requires the Debtor to (i) bring the Lease current through payment of back rent and other amounts under the Lease amounting to not less than $1,500,000; and (ii) pay to the UC Regents the sum of $18,943,756.48 in principal plus 8% interest per annum from October 30, 2020 through February 29, 2024, the estimated closing date. Total accrued interest during this period is approximately $5,552,798.68. As discussed in the Overbid Section, if there is an overbid, the UC Regents shall receive up to an additional $1 million in sale proceeds.

[2] Additional details, below in Section entitled: "Mural, Personal Property and Litigation Claims."

may be due Buyer's consultant, JLL Capital Markets, has a value to the estate up to approximately $1,462,500.

The Agreement contemplates the sale closing on or before February 29, 2024. However, as discussed in the prior section, the Buyer has reserved the right in the Agreement to extend the time for satisfaction or waiver of the zoning-related condition at section 4.1.4 of the Agreement to as late as the end of April 2024 ("**Extended Closing Date**"). The Agreement provides that if the Buyer seeks to extend the closing date beyond February 29, 2024, it must (i) provide to the Trustee and the UC Regents written notice of its intention to extend the closing date by February 14, 2024, (ii) reimburse the Trustee the estate's actual operating expenses[3] in the amount of $2,444.07 for each day of the Extended Closing, and (iii) instruct the escrow holder to *unconditionally* deliver from the Buyer's $3 million deposit the sum of $375,000 to the Trustee and $1,125,000 to the UC Regents. If the sale closes, the Buyer will receive a credit for the $1.5 million released from escrow against the $30 million aggregate purchase price.

### C. Assumption and Assignment of the Lease

On August 18, 2023, the Bankruptcy Court authorized the Trustee to extend the deadline for the Trustee to assume / assume and assign / reject the Lease from August 17, 2023, through and including October 30, 2023. On November 15, 2023, more than 210 days will have elapsed since the Petition Date. After that date, the Trustee would have virtually no ability to compel the UC Regents to allow a further extension to assume/ assign / reject the Lease. 11 U.S.C. § 363(d)(4)(A)(i). On October 27, 2023, the Trustee filed a notice and motion seeking Bankruptcy Court authorization to extend the time by which the Trustee must assume / assign / reject the Lease from October 30, 2023 through and including February 29, 2024. The hearing on the motion to extend time is set for December 7, 2023. If the Buyer provides notice of an Extended Closing Date, the Trustee and the UC Regents will need to enter into another stipulation to extend the deadline for the Trustee to assume / assume and assign / reject the Lease from February 29, 2024, to a date on or

---

[3] If the Buyer provides notice of an Extended Closing Date, it is required to reimburse the UC Regents its carrying costs for the real property.

after the Extended Closing Date. If that is necessary, the Trustee will file a motion seeking Court authorization to enter into the stipulation on or before February 29, 2024.

The Lease was set to expire on October 30, 2023, unless the Trustee and the UC Regents entered into an agreement to extend the term of the Lease. Lease extensions are conditioned upon the Debtor not being in default. A lessee of a non-residential real property lease cannot assume or assume or assign a lease without curing defaults under the lease and the lease at the time of assumption and assignment must still be in effect. 11 U.S.C. §§ 365(b)(1) and (c)(3). The Debtor is in default, because, among other things, it has failed to pay pre- and post-petition rent to the UC Regents. As an accommodation to the Trustee, on October 30, 2023, the parties entered into a Fourth Amendment to the Lease, which amendment is subject to notice to creditors provided herein and Bankruptcy Court approval. A true and correct copy of the Fourth Amendment is attached as Exhibit B to the Mansdorf Declaration. In light of the Buyer's option to extend the closing date to mid-April 2024, the UC Regents and the estate have also entered into Fifth Amendment to the Lease, which amendments extends the term of the Lease until five (5) business days after the Extended Closing Date. A true and correct copy of the Fifth Amendment is attached as Exhibit C to the Mansdorf Declaration. The Fifth Amendment to the Lease is subject to notice to creditors provided herein and Bankruptcy Court approval.

The Fourth and Fifth Amendments effectively continues the *status quo* under the Lease by allowing the Trustee and the UC Regents time to consummate a sale of the Chestnut Campus and the Mural to the Buyer or an overbidder, while requiring the Trustee to continue to pay operating expenses until the sale of the Chestnut Campus closes. The Fourth and Fifth Amendments require the Trustee, among other things, to: (i) provide proof of insurance for the real property to the UC Regents by no later than November 28, 2023; and (ii) obtain an order authorizing the Trustee to enter into an agreement to sell the real property or assign the Lease by not later than January 12, 2024. Under the provisions of the Fourth and Fifth Amendments, if the Bankruptcy Court has not entered an order authorizing the sale of the real property or the assignment of the Lease by January 12, 2024, the deadline for the Trustee to assume / assume and assign / reject the Lease shall be January 31, 2024. In other words, absent a further extension by the UC Regents, if the Trustee has

not obtained an order authorizing the sale of the real property and/or the assignment of the Lease by January 12, 2024, it is very likely that the Trustee will be unable to realize value for creditors from the Chestnut Campus. *In re Circle K Corp.*, 127 F.3d 904, 909 (1997) ("…bankruptcy court had the power to permit the Debtors to extend the leases without first curing the defaults.")

Provided the Bankruptcy Court authorizes the Trustee to enter into the Agreement, authorizes the Trustee to enter into the Fourth and Fifth Amendments to the Lease, and assuming that the Chestnut Campus is re-zoned, the Buyer will consummate its purchase of the real property through an escrow that is currently open at Chicago Title Company. Because the bankruptcy estate's interest in the real property is dependent on its ability to exercise the purchase option under the Lease, the Debtor's estate could have been forced to purchase the Chestnut Campus from the UC Regents, and immediately grant its interest in the Chestnut Campus under a separate escrow to the Buyer. To avoid this convoluted process, under the Agreement and the sixth amendment to the Lease, the UC Regents have agreed that it will directly convey its fee interest in the Chestnut Campus to the Buyer; *provided, however*, that it will not be responsible for any of the costs of sale associated with the Chestnut Campus, that it would be paid $22,500,000 for its interest in the real property from the escrow,  and that the Trustee would cure the Debtor's pre and post-petition defaults under the Lease (i.e., $1.5 million).

### D.    Agreement Concerning Transfer of Real Property and Sale Proceeds

As noted above, under the provisions of the Lease, the UC Regents could seek up to $24,496,555, plus payment of the cure amount from the Debtor's estate in order to allow the Trustee to exercise the UC Purchase Option. However, over the course of many months of negotiation between the Trustee and the UC Regents, the UC Regents agreed to accept $22,500,000 as consideration for the UC Purchase Option, plus $1,500,000 for the cure amount; provided that a sale is consummated with the Buyer.

If, however, the purchaser of the assets (including the Buyer) agreed to pay in excess of $22.5 million for the Chestnut Campus, the UC Regents require the estate to deliver to it an additional portion of the consideration it receives from the buyer, with the UC Regents to receive 80% of each dollar in excess of $22.5 million paid for the assets in an amount not to exceed $1

million. For example, if a hypothetical buyer agreed to pay $23,500,000 for the assets, the UC Regents would receive $23.3 million (i.e., $22.5 million plus $800,000) plus the Cure Amount and the Trustee would receive an additional $200,000. If a hypothetical buyer paid $23,750,000 for the assets, the UC Regents would receive $23.5 million ($22.5 million plus $1 million) plus the Cure Amount, and the Trustee would receive an additional $250,000. At any price higher than $23,7570,000 paid for the assets, the UC Regents portion would not receive any "extra" amount over the $1 million. In addition, the UC Regents have required that an overbidder must enter into an agreement that is "materially the same" as the Agreement. The Trustee understands that, without this additional consideration, the UC Regents may not enter into a direct sale of the Chestnut Campus to an overbidder and, instead, will require the Trustee to exercise the UC Purchase Option directly with the UC Regents and then enter into a separate escrow to sell the Chestnut Campus to the overbidder. At a minimum, an 'indirect' sale will result in the estate incurring in excess of $1.2 million in transfer taxes that would arise from what might be described as a "double escrow." The details concerning the estate's proposed agreement with the UC Regents concerning sale proceeds generated from the sale of the Chestnut Campus are set forth in the Revised Agreement Concerning Transfer of Chestnut Campus and Sale Proceeds ("**Proceeds Agreement**"), a copy of which is attached as Exhibit D to the Mansdorf Decl. The Trustee seeks authorization to enter into the Proceeds Agreement.

### E. Mural, Personal Property, Litigation Claims and Sales Tax

Under the terms of the Lease, the Mural is property of the bankruptcy estate so long as the Lease is in effect. While the Mural was designed to be removed from the Original Building, the Trustee is advised that removing the Mural could cost as much as $5 million or more, plus costs that would be associated with repairing the walls and roof of the Original Building after extraction of the Mural. As previously noted, the Debtor obtained a pre-petition appraisal of the Mural at $50 million. The Trustee has not received a stand-alone offer to purchase the Mural, and has been told by art dealers that the high end fine art market has softened substantially this year. This may be due in part to the City of San Francisco designating the Mural as a landmark, which may have resulted in making certain interested buyers uncomfortable with the prospect of litigation and political fallout

from seeking to purchase the Mural and move it out of San Francisco. Regardless, the Buyer's offer to purchase the Mural as part of the Agreement is the Trustee's only option to secure value through a sale of the Mural and other personal Property located at the Chestnut Campus. Under the terms of the Agreement, the Buyer will pay to the Trustee the sum of $7.5 million for the Mural and other tangible and intangible property owned by estate and split the payment of the sales tax that arises from the sale.

In addition to the Mural, the Buyer is to acquire other personal property consisting of art-related items (easels, presses, kilns, etc.) that are located throughout the Chestnut Campus. In May 2023, the Trustee engaged West Auctions to evaluate the personal property located at the Chestnut Campus. West Auctions estimated that, after deducting estimated costs of sale, all of the personal property located at the Chestnut Campus (excluding the contents of the library and the Mural) would likely result in net sale proceeds to the estate of between $100,000 to $110,000. Under the provisions of the Agreement, the Buyer does not want all of the personal property located at the Chestnut Campus. Some of the personal property at the Chestnut Campus is likely to have no value, and the Trustee will file a notice of intent to abandon that personal property and obtain authority to pay to dispose of it as economically as possible. The Trustee will further engage West Auctions to evaluate items that the Buyer has excluded to determine if the sale of these items by auction is a viable alternative to simply disposing of them. Such a sale would be subject to notice and Court approval.

In addition to the tangible "art items" of personal property, the Buyer also seeks to acquire the Debtor's library (*e.g.*, the books, catalogues, ephemera, prints, etc.) at the Chestnut Campus. In October 2023, the Trustee met with a third-party art book re-seller. The re-seller provided the Trustee with a purchase offer of $12,000 for the library, with the proviso that it would take the purchaser up to 120 days to remove the library stock out of the building.

The Agreement provides for the sale to the Buyer of any intellectual property still owned by the Debtor. The Trustee is not aware of a market for such intellectual property or the trade names or trademarks of the Debtor.

The Agreement provides for the Buyer to acquire the estate's litigation claims against the SFAI Legacy Foundation + Archive ("**Legacy Foundation**"), which currently holds an interest in

certain "archival" documents and information that was once owned by the Debtor ("**Archives**") and certain of the Debtor's intellectual property, including trademarks and trade names ("**Archival IP**"). Based on documents reviewed by the Trustee, in November of 2022, the Debtor entered into an agreement with the Legacy Foundation to transfer to it the Archives and the Archival IP for no consideration. The Trustee understands that this was done in an effort to ensure that the Archives and the Archival IP would be preserved for future use and for posterity. The Trustee believes that the agreement under which the Legacy Foundation received the Archives and the Archival IP can be avoided as a fraudulent transfer pursuant to 11 U.S.C. § 548(a)(1)(B), as the Debtor received no consideration in exchange for these items. The Trustee believes that the cost of pursuing litigation against the Legacy Foundation is likely to be greater than any sums that the bankruptcy estate might realize from the transferred assets. Under the provisions of the Agreement, the Trustee has agreed to convey any claims he has against the Legacy Foundation to the Buyer; provided, however, that to the extent that the Buyer pursues claims against the Legacy Foundation and obtains a monetary recovery, the Buyer will remit 50% of the recovery to the Trustee for the benefit of the Debtor's bankruptcy estate. See, *In re P.R.T.C., Inc.,* 177 F.3d 774 (9th Cir. 1999).

The foregoing tangible and intangible property shall be referred to as the "**Mural and Related Property**." The Trustee anticipates that the sale of some or all of the Mural and Related Property may result in the imposition of sales tax. The current rate of sales tax in San Francisco is 8.63% and is typically paid by the purchaser. If the entire $7.5 million the Trustee receives for the Mural and Related Property is subject to sales tax, the total tax would be approximately $647,250. Under the Agreement, the Buyer and Trustee have agreed to each pay one-half of the sales tax owed on the Mural and Related Property – approximately $323,625 each. The Trustee seeks authorization from the Court to pay its portion of the sales tax that is due and owing.

### F. Good Faith Finding and No Successor Liability

At the Buyer's request, the Trustee is seeking a finding that the Buyer is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code. Typically, lack of good faith is shown by "…fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Cmty. Thrift & Loan v. Suchy (In re Suchy)*, 786

Case: 23-30250   Doc# 129   Filed: 11/22/23   Entered: 11/22/23 05:28:12   Page 19 of 22

F 2d. 900, 902 (9th Cir. 1985). The relevant focus of a good faith purchaser inquiry under Section 363(m) is good faith during the course of the sale proceedings. *Id.* The Trustee, the UC Regents and the Buyer negotiated the terms of the Agreement in good faith and at arms' length for over three months. During these negotiations each of the Trustee, the UC Regents, and the Buyer was separately represented by competent and experienced counsel. Absent receipt of an overbid offer after this Notice has been filed and served, no other parties have made a material offer to purchase the Chestnut Campus or the Mural and Related Property (excluding the $12,000 offer for the contents of the library, and the $38 million LOI where a would-be purchaser failed to follow through). No consideration other than that disclosed in the Agreement will be given to any party to the Agreement. The Trustee believes that the aggregate $30 million sale price represents the fair market value for the Chestnut Campus or the Mural and Related Property. To the extent a creditor disagrees, the Trustee is offering that creditor and other parties the opportunity to submit overbids. In part, the opportunity for overbids is to confirm that the Trustee's sale is at fair market value. There is no evidence of fraud, collusion between the Buyer and other parties who might be interested in purchasing the Chestnut Campus or the Mural and Related Property, or any attempt to take grossly unfair advantage of other bidders. The Trustee, the UC Regents and the Buyer submit that a good faith purchaser determination is warranted. Mansdorf Decl., ¶49; Feintech Declaration ¶¶ 6-10.

Section 105(a) of the Bankruptcy Code permits this Court to issue orders necessary to carry out the provisions of the Bankruptcy Code, such as in furtherance of a sale and lease assignment under Sections 363 and 365. At the Buyer's request, the Trustee is also seeking a provision in the sale order that Buyer shall not be considered, construed, or otherwise understood to be a successor in interest to the Debtor and is not assuming or otherwise liable for the debts of the Debtor. Buyer has indicated that such findings are critically important to Buyer in the circumstances of this case, as set forth more specifically in the Declaration of Ms. Feintech filed contemporaneously herewith in support of the motion. Such declaration also sets forth certain factual predicates to support the requested findings. *See McClellan v. Northridge Park Townhome Owners Ass'n, Inc.*, 89 Cal.App.4th 746, 753 (2001). ("The general rule is 'where one corporation sells or transfers all of its assets to another corporation, the latter is not liable for the debts and liabilities of the former

unless (1) the purchaser expressly or impliedly agrees to such assumption, (2) the transaction amounts to a consolidation or merger of the two corporations, (3) *the purchasing corporation is merely a continuation of the selling corporation*, or (4) the transaction is entered into fraudulently to escape liability for debts. [Citations.]'" (cites omitted).

As made clear in the Agreement, the Buyer has not, in any way, agreed to assume any of the Debtor's liabilities. Except for the assumption of the Lease, the Agreement expressly provides that the Buyer is not taking on any of the Debtor's liabilities. Agreement, Section 1.7. The Buyer is a separate entity completely unrelated to the Debtor and is not "a continuation" or successor of the Debtor. Finally, the sale of the assets through the Agreement, pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to noticed motion to creditors and Bankruptcy Court approval is not a transaction that is entered into fraudulently to escape liability for debts.

The Trustee seeks authorization to include a provision in the order authorizing the Trustee to enter into the Agreement and provide that it is effective upon entry, and the stay imposed by Rule 62(a) of FRCP and/or Bankruptcy Rule 6004(h) shall not apply.

**G.    Overbid**

The sale of the Chestnut Campus and the Mural and Related Property is subject to higher and better offer. Any party interested in making an overbid must make their overbid on terms materially similar to the Agreement and remain subject to the approval by prompt determination by the UC Regents.

While the cash purchase price for the assets is $30 million, the actual value being conveyed under the Agreement is equal to at least approximately $31,462,500. This figure includes the cash purchase price for the Chestnut Campus and the Mural and Related Property of $30 million, $1,237,500 in real estate transfer taxes that the Buyer has agreed to pay, and the Buyer's agreement to be solely responsible for all sums owed to its consultant, JBL. The Trustee has concluded that the minimum overbid price that the estate would consider for the Chestnut Property and the Mural and Related Property to be $33,000,000.

Any party seeking to make an overbid must, **by no later than 12:00 noon, Pacific Time, December 14, 2023**: (i) deliver its overbid offer, which bid must be materially similar to the

Agreement, to the Trustee's Broker- Cushman & Wakefield of California, Inc. Thomas X. Christian (tom.christian@cushwake.com), or Timothy Garlick (tim.garlick@cushwake.com) and to the Trustee at paul@mansdorftrustee.com and Trustee's counsel at gkleiner@rinconlawllp.com; (ii) provide that its overbid offer does not contain any contingencies, whatsoever, including, but not limited to, any loan contingencies and inspection contingencies, and acknowledge that they are purchasing the assets "as is, where is" with all faults and defects, with no representations or warranties; and (iii) deliver to the Trustee, by wire transfer,[4] a deposit in the amount of $3 million, which deposit will be applied to the purchase price if the overbidder is successful. The Trustee and his professionals will evaluate the overbid and, if appropriate, set an overbid auction by Zoom videoconference on **December 18, 2023 at 10:00 a.m. P.T.**, or such date and time as the Trustee concludes is mutually agreeable between the Trustee, the UC Regents, the Buyer and the overbidder, which date is prior to December 19, 2023. Prior to the commencement of the auction, the Trustee shall announce the auction rules, and may amend, modify or alter any bid procedure, rule or provision as the Trustee deems necessary, just or appropriate.

Should you oppose the relief described above, Rule 9014-1 of the Bankruptcy Local Rules require you to file written opposition with the Clerk of the United States Bankruptcy Court, Northern District of California, San Francisco Division, at 450 Golden Gate Avenue, Mail Box 36099, San Francisco, CA 94102 and serve your written opposition on counsel for the Trustee on or before the 14th day before the December 21, 2023 hearing date.

## IV. CONCLUSION AND PRAYER

WHEREFORE the Trustee prays for an order authorizing the relief described above.

DATED:   November 22, 2023          RINCON LAW LLP

By:   */s/ Gregg S. Kleiner*
_____
GREGG S. KLEINER
Counsel for PAUL MANSDORF,
Chapter 7 Trustee

---

[4] Wire transfer instructions may be obtained from Trustee's counsel at gkleiner@rinconlawllp.com.