Gregg S. Kleiner, State Bar No. 141311
Charles P. Maher, State Bar No. 124748
RINCON LAW LLP
268 Bush Street, Suite 3335
San Francisco, CA 94104
Telephone Nos.: 415-672-5991
Facsimile No.: 415-680-1712
E-mail:    gkleiner@rinconlawllp.com
              cmaher@rinconlawllp.com

Counsel for PAUL MANSDORF,
Trustee in Bankruptcy

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| In re<br><br>THE SAN FRANCISCO ART INSTITUTE,<br>    a California nonprofit<br>    public benefit corporation,<br><br>              Debtor. | Case No. 23-30250 HLB<br>Chapter 7<br>Hon. Hannah L. Blumenstiel<br><br>**DECLARATION OF PAUL MANSDORF IN SUPPORT OF MOTION FOR AUTHORITY TO:**<br>**(I) SELL ESTATE'S INTEREST IN PERSONAL PROPERTY;**<br>**(II) ASSUME AND ASSIGN ESTATE'S INTEREST IN REAL PROPERTY LEASE;**<br>**(III) AMEND NON-RESIDENTIAL REAL PROPERTY LEASE;**<br>**(IV) PAY CURE AMOUNT TO LANDLORD; AND**<br>**(V) PAY COMMISSIONS AND RELATED COSTS OF SALE**<br>**(Lease for 800 Chestnut Street, San Francisco, California and**<br>**Mural by Diego Rivera and Other Personal Property)**<br><br>Date:        December 21, 2023<br>Time:       10:00 a.m.<br>Place:      Zoom Video Conference or<br>              AT&T Conference Call |

1

I, Paul Mansdorf, declare as follows:

1. I am serving as Chapter 7 Trustee of the estate of the above Debtor. This declaration is filed in support of my motion made for an order authorizing me to: (A) enter into a "Purchase and Sale Agreement and Escrow Instructions" ("**Agreement**"), by and between (i) the bankruptcy estate and the Regents of the University of California, a California public corporation (the "**UC Regents**"), and (ii) BM-AI, LLC, a Delaware limited liability company, or its assigns ("**Buyer**"); (B) enter into amendments of the Debtor's lease with the UC Regents; (C) assume and assign a pre-petition non-residential real property lease, as amended, to the Buyer as required under provisions of the Agreement; (D) pay a cure amount to the UC Regents due under the Debtor's lease; and (E) pay commissions and other costs of sale as required in the Agreement. A true and correct copy of the Agreement is attached hereto as **Exhibit A**. The sale to the Buyer is subject to overbid, as set forth in the Motion.

2. As explained in detail in the Motion, the Agreement is complicated. At the center of the Agreement are the Debtor's two primary assets: (i) a non-residential real property lease between the Debtor, as tenant, and the UC Regents as landlord, covering real property commonly referred to as 800 Chestnut Street, San Francisco, California (the "**Chestnut Campus**"); and (ii) certain personal property located on the Chestnut Campus, including a mural by Diego Rivera entitled "The Making of a Fresco Showing the Building of a City" (1931) ("**Mural**"). The Debtor has an option under the lease to purchase the Chestnut Campus, and pursuant to the terms of the lease, it owns the Mural.

3. If I am authorized by the Bankruptcy Court to enter into the Agreement, and assuming there is no overbid:

   a. I will enter into amendments to the lease and assume and assign the Debtor's right, title and interest in the Chestnut Campus lease to the Buyer;

   b. following the Buyer taking an assignment of the lease, the UC Regents will sell the Chestnut Campus to the Buyer for $22.5 million;

   c. concurrently, the Buyer will pay to the Debtor's estate the sum of $7.5 million for all other rights and personal property of the Debtor and its estate to be

sold under the Agreement, including the Mural and *de minimis* personal property located in the building, certain general intangibles, and certain litigation rights;

d.   I will pay $1.5 million to the UC Regents to cure arrears owed to the UC Regents under the lease; and

e.   I will pay certain closing costs associated with the sale, including a sale commission to the estate's broker, and one-half of any sales taxes associated with the sale of the Mural and other personal property.

4.   If the sale is approved and no overbids are received, I anticipate that the estate will receive approximately $5,200,000 in net proceeds, after paying a lease cure payment to the UC Regents and related costs of sale.

5.   I am informed and believe and on that basis state that through July 2022, the Debtor operated for over 150 years as an accredited arts education institute. For almost 100 years, the Debtor's primary campus and administrative office has been located at the Chestnut Campus. The Chestnut Campus is comprised of two buildings. The first was built in 1926 ("**Original Building**") and an addition was constructed in the late 1960s ("**Addition**"). While the Chestnut Campus was the home of the Debtor for almost a century, the Debtor owned the underlying real property for a short period of time. From 1926 when the Original Building was constructed through 2010, the Chestnut Campus was under the control of the UC Regents pursuant to the terms of the Searles Trust dated November 15, 1906 ("**Trust**").

6.   In 1977, the San Francisco Board of Supervisors designated the Original Building a historical landmark. I am informed and believe and on that basis state that the designation, among other things, prohibits the owner from altering the exterior envelope of the Original Building, greatly limiting the development potential of the Chestnut Campus. In addition, the Chestnut Campus is presently zoned such that the only non-residential use for the Chestnut Campus is as an "accredited" post-secondary education institution.

7. In 2010, the Trust was modified and the UC Regents transferred fee title for the Chestnut Campus to the Debtor. Pursuant to the Trust, the UC Regents retained a residual beneficial interest in the Chestnut Campus.

8. In June 2016, the Debtor entered into a long-term lease at the Fort Mason Center to be a second campus. I am informed and believe and on that basis state that the Fort Mason space required substantial tenant improvements that the Fort Mason Center could not afford to make but was willing to underwrite the cost with a note in favor of the Debtor if the Debtor funded the improvements. I further understand that, in order to finance the tenant improvements and to pay ongoing obligations, the Debtor borrowed $18 million from Boston Private Bank & Trust Company and secured the loan with a deed of trust against the Chestnut Campus.

9. I am informed and believe and on that basis state that the Fort Mason Center transaction greatly contributed to the Debtor's ultimate demise. Monthly debt service on the Boston Private loan and rent obligations at the Fort Mason Center were more than the Debtor could afford. By July 2020, enrollment was down and tuition revenue had declined; the Debtor went into default on its obligations to Boston Private. Boston Private commenced a non-judicial foreclosure on its deed of trust against the Chestnut Campus and scheduled a foreclosure trustee's sale for October 2020.

10. I understand that, just prior to the foreclosure sale, the UC Regents negotiated a transaction with Boston Private to avert the loss of the UC Regents' residual interest in the Chestnut Campus. The UC Regents paid the Debtor's obligation to Boston Private and took an assignment of the deed of trust recorded in favor of Boston Private. The Debtor was required to execute a deed in lieu of foreclosure in favor of the UC Regents, resulting in the UC Regents becoming the owner of the Chestnut Campus.

11. Concurrent with the UC Regents re-acquisition of the Chestnut Campus, the UC Regents entered into a triple-net lease of the real property with the Debtor as the tenant, and the UC Regents as the landlord, with an effective date of October 30, 2020 ("**Lease**"). The Lease has been amended multiple times. The Lease allowed the Debtor to continue operating and provided it with an option to repurchase the Chestnut Campus as described in the following paragraph. However, the

4

Lease also contained some burdensome provisions that created difficulty for the Debtor and the estate at the end of the three-year term.

12.     Subject to certain prorations and adjustments, the option could be exercised under the Lease in two ways: (i) a restricted option, which would require the Debtor to pay to the UC Regents an amount equal to the UC Regents' bank debt on the Chestnut Campus, $18,943,756.48, plus 8% annual interest accrued from October 30, 2020 through the date of closing, plus rental arrears and other fees (the "Restricted Option"); or (ii) an unrestricted option, which would require the Debtor to pay to the UC Regents the sum of $40 million (the "Unrestricted Option"). The Restricted Option would require the transfer and conveyance of the Chestnut Campus from the UC Regents to the Debtor by a grant deed that includes covenants and restrictions that run with the land. Included among the restrictions was the requirement that the Chestnut Campus be operated as a school for the instruction in the fine arts. Further, to exercise either option, the Lease must not be in default, which requires payment of past due rent and other amounts due under the Lease. The Debtor's ability to exercise either purchase option under the Lease shall be referred to as the "**UC Purchase Option**".

13.     After the Lease commenced, the Debtor continued to struggle. It worked with the University of San Francisco ("**USF**") as a possible merger partner and borrowed $6 million from USF, which loan was secured by the Debtor's beneficial interest in the Fort Mason note. The Debtor failed to repay the USF loan and USF has filed the largest claim against the Debtor's estate. The Debtor also borrower $1.5 million from Lighthouse Immersive San Francisco, Corp., a possible sub tenant of the Fort Mason lease. The Debtor failed to repay the Lighthouse loan, too.

14.     I have been informed by the former registrar of students that Student enrollment declined, and that enrollment was as follows: 41 students in the fall of 2020, 70 students in the fall of 2021, and 62 students in the spring/summer semester 2022.

15.     Based on documents I have reviewed, it is clear that the Debtor was unable to satisfy its obligations under the Lease and under the Fort Mason lease. In 2022, the Debtor defaulted under the Fort Mason Center lease. In January 2023, the Fort Mason Center landlord served a three-day notice to quit or pay rent. The Debtor owed the Fort Mason Center landlord in excess of $750,000

at that time and could not cure the default. As a result, the Fort Mason Center lease terminated weeks before the Debtor filed its Chapter 7 petition.

16.     The Debtor's Bankruptcy schedules list the Fort Mason lease with a $23,081,272 book value, less a $21,940,374 financing liability. However, because the Fort Mason lease was terminated prior to the petition date, the Fort Mason lease was not an asset of the estate and had no value.

17.     I have read the Lease. Under the provisions of the Lease, the UC Regents acknowledged that the Mural is the personal property of the Debtor. The Lease contains multiple provisions by which the Debtor can remove the Mural from the premises; provided, among other things, that the Lease is in effect and the Debtor is not in default of the terms of the Lease. According to an appraisal that the Debtor obtained for the Mural, at or near the time that the Lease was entered into, the Mural had an appraised value of approximately $50 million. The Mural, which is approximately 22 feet high and 30 feet wide, was, according to the contemporaneous notes of architect Timothy Pflueger at the time the Mural was created, designed to be removed from the Original Building. However, unlike another Diego Rivera mural in San Francisco that has been moved a number of times, the Mural has never been moved and it is unclear if it can be removed without causing material damage to the Mural or to the Original Building. I believe that moving the Mural would cost several million dollars.

18.     A sale of the Mural was considered by the Debtor as a possible means of survival. In 2021, in response to attempts by the Debtor to sell the Mural to a third party, whom I understand was going to remove the Mural from the Chestnut Campus to a location outside of San Francisco, the Board of Supervisors and the San Francisco Planning Commission passed an ordinance designating the Mural a historical landmark (Landmark #85) under the San Francisco Planning Code. While the proposed designation of the Mural as a landmark took place over the course of many months, it does not appear that the Debtor took material action to oppose this designation, or otherwise appeal the designation. Although the designation of the Mural as a landmark may have been inappropriate (*i.e.*, because the ordinance that underlies the designation only concerns exterior

6

1    features of a building and the Mural is housed inside of the Original Building), the designation

2    appears to have significantly diminished the market value of the Mural.

3         19.    Starting in late April 2023, the estate directly communicated with representatives of

4    the San Francisco Museum of Modern Art to solicit an offer for purchase of the Mural. After several

5    weeks of discussions, the SFMOMA advised it was not interested in acquiring the Mural.

6         20.    The estate also reached out to representatives of the Fine Art Museums of San

7    Francisco to solicit an offer for purchase of the Mural. In early July 2023 I met with the Head

8    Paintings Conservator at Fine Arts Museums of San Francisco and a senior curator from the museum

9    at the Chestnut Campus to allow them to evaluate the Mural. Several weeks after this meeting I

10   received an email informing me that the Fine Arts Museums would not make a proposal. I was

11   advised they had concerns about acquiring the Mural "…including the fact that removal would

12   damage the work, the significant cost, and the work's designation as a landmark in 2021." I have

13   been in contact with national and international brokers of art. I had numerous discussions with an

14   art broker who specializes in Latin American artists. To date, I have not received a proposal to

15   purchase the Mural.

16        21.    In July 2022, the Debtor ceased all educational operations and terminated almost all

17   of its faculty and staff and paid salary and benefits obligations in full. It had only three or four

18   employees left who dealt with the minimum remaining operations. The Chestnut Campus had on-

19   site 24-hour security service and continued to accrue obligations under the Lease for the payment

20   of liability insurance, as well as to continue basic services such as gas, electricity, water, janitorial

21   services, repairs, maintenance, and trash removal.

22        22.    The Debtor filed a Voluntary Petition under Chapter 7 of the Bankruptcy Code on

23   April 19, 2023. Because of the continuing maintenance and security obligations under the lease, I

24   sought and obtained a Section 721 order from the Bankruptcy Court to operate the property at a cost

25   of roughly $50,000 to $75,000 per month in post-petition operating expenses.

26        23.    As of the Petition Date, the Debtor owed approximately $500,000 in pre-petition rent

27   to the UC Regents. Because of the Debtor's pre-petition breaches of the Lease, the UC Regents

28   could have sought and likely obtained relief from the automatic stay to terminate the Lease. The UC

Regents, however, did not do that. Instead, within days after the Petition Date, representatives of the UC Regents met with me and my professionals at the Chestnut Campus and we reached an agreement to allow me limited time to market the Chestnut Campus and Mural for sale, provided progress was made in securing a buyer and conditioned upon the estate paying the Debtor's operating expenses, excluding rent.

24.     Paying the expenses proved to be anything but simple. The Debtor's schedules provide that it has in excess of $2.7 million in cash and cash equivalents in accounts it characterized as "restricted donor funds." Although the Debtor characterized the funds in the accounts as restricted, it appears that, prior to the Petition Date, the Debtor used the funds for operating expenses. Over the objections of the California Attorney General, I was able to secure temporary authorization to borrow the Debtor's cash in one account to pay roughly $225,000 of operating expenses through August 2023. After August 31, 2023, the estate has funded the expenses with unrestricted funds received post-petition.

25.     In May 2023, with the approval of the UC Regents, I obtained Bankruptcy Court authorization to engage Cushman & Wakefield as the estate's real estate brokers ("**Broker**"). After the Broker was engaged, I worked with the Broker's agent on a press release, an offering memorandum, and in the day-to-day marketing of the Property. While I received expressions of interest in the Chestnut Campus from multiple parties, the majority of the initial term sheets received were proposals for the acquisition of the Chestnut Campus and the Mural for under $20 million. These proposals were not acceptable.

26.     In May 2023, representatives of the Buyer contacted my counsel with an expression of interest in purchasing the Chestnut Campus and the Mural. The Buyer began conducting due diligence for the Property in June 2023. While the Buyer conducted its due diligence, I continued to market the Property to others. In September 2023, I executed a term sheet by which a potential buyer agreed to pay $38 million for the Chestnut Campus and the Mural. The potential buyer failed to tender a deposit or take other actions to proceed with a purchase.

27.     In July 2023, the Buyer circulated a non-binding term sheet to me and to representatives of the UC Regents. Among other things, the term sheet noted problems with the

Property, including the need to make material updates to the plumbing and electrical systems, along with glazing and other structural improvements required to make the Chestnut Campus compliant with various provisions of law and functional in the 21st century. The Buyer also advised me that it had evaluated the Mural with its own professionals and had found highly dubious a $50 million valuation of the Mural. While the Buyer noted that the Mural was difficult to value given a number of issues, it further noted that value indications it had received for the Mural were $5 million or less given the Buyer's views on its location, immovability, and other issues. The Buyer further advised me and the UC Regents that it could not go forward with the acquisition of the Chestnut Campus until the zoning for the Property was updated. While I was told that the Buyer is interested in resurrecting the Chestnut Campus to be an art institute and place of artistic learning, the Buyer was unwilling to purchase the Property and subject to the current zoning restriction which permits operation of only as an accredited art institute.

28.     In August 2023, the Buyer circulated a term sheet to me and to representatives of the UC Regents. The term sheet noted serious problems with the Property, including the need to make material updates to the plumbing and electrical systems, along with glazing and structural improvements required to make the Chestnut Campus compliant with provisions of the ADA and functional in the 21st century. The Buyer informed me and the UC Regents that it estimated that it would cost in excess of $50 million to renovate the Chestnut Campus excluding architectural fees, engineering fees and permits. The Buyer also advised me that it had evaluated the Mural and concluded that the Mural had a value of roughly $5 million to $7 million. The Buyer also advised me and the UC Regents that it could not go forward with the acquisition of the Chestnut Campus until the zoning for the Property was changed.  As I understand it, while the Buyer is interested in resurrecting the Chestnut Campus to be a place of artistic learning, the Buyer was unwilling to purchase the Property with the current zoning restriction which permits operation of only an accredited art institute.

29.     In September 2023, with the agreement of the UC Regents and notice to me, the Buyer began the process of seeking to update the zoning for the Chestnut Campus through a legislative process with the San Francisco Board of Supervisors and other local agencies. Under the

provisions of the Agreement, an express condition of the Buyer's acquisition of the Chestnut Campus is the "creation of the Special Use District" for the Chestnut Campus that is part of an ordinance introduced on September 5, 2023, before the San Francisco Board of Supervisors to update the zoning for the Property so that it can also be used as an *unaccredited,* arts institute educational building (in addition to its present zoning permissions). According to the Buyer, it anticipates that the zoning legislation will be approved and could be signed into law by the Mayor of San Francisco by early December 2023. However, even though legislation should be effective by late-December 2023, I am informed that appeal periods under applicable California law runs through April 2024.

30.     After over three months of arms-length negotiations among me, the Buyer, and the UC Regents, the parties entered into the Agreement. Because the Debtor's interest in the Chestnut Campus is based on provisions in the Lease that allow it to exercise an option to purchase the real property, the Agreement is more complicated than a typical real property sale. In order to consummate a sale of the Chestnut Campus to the Buyer, the Agreement provides for an amendment to the Lease (the sixth amendment) that allows the estate to assume and assign the Debtor's right, title and interest in the Lease (and, with it, the option to purchase the Chestnut Campus) to the Buyer. A true and correct copy of the sixth amendment to the Lease is attached as Exhibit C to the Agreement. The Buyer will be taking an assignment of the Lease and the UC Regents will directly sell its right, title and interest in and to the Chestnut Campus to the Buyer for $22,500,000 in cash. The sale of the Chestnut Campus will be consummated through an escrow.

31.     The $22,500,000 payment to the Buyer to acquire the Chestnut Campus constitutes a significant reduction of the amount the estate is required to pay under the Lease to exercise the Restricted Option. I calculate that the cost to exercise the Restricted Purchase Option on or about February 29, 2024, would be approximately $24,500,000, plus sums necessary to cure arrears under the lease.[1]

---

[1] The Restricted UC Purchase Option requires the Debtor to pay to (i) bring the Lease current through payment of back rent and other amounts under the Lease amounting to not less than $1,500,000; and (ii) the UC Regents the sum of $18,943,756.48 in principal, plus 8% interest per annum from October 30, 2020 through February 29, 2024, the estimated closing date. Total accrued

10

32. Concurrent with the Buyer's acquisition of the Chestnut Campus, the Buyer will pay $7,500,000 for the Mural and other personal property located at the Chestnut Campus, certain intangibles, and certain litigation rights. From the $7,500,000 in proceeds paid to the estate for its personal property, I will pay $1,500,000 to the UC Regents to cure arrears owed to the UC Regents for the Debtor's pre- and post-petition obligations under the Lease.

33. From the estate's interest in the personal property sale proceeds, I will pay certain closing costs associated with the sale, including the commission of the Broker, $337,500, and one-half of any sales tax associated with the sale of the Mural and other personal property. For its part, the Buyer has agreed to pay the other half of the sales tax and the transfer taxes to the City and County of San Francisco up to the amount of $1,320,000. In San Francisco, payment of the transfer tax is typically the obligation of the seller of real property. The San Francisco transfer tax is estimated at $1,237,500.

34. The Buyer has agreed to be solely responsible for and shall pay any and all commissions or fees, if any, that may be due Buyer's consultant, JLL Capital Markets, whether such amount is determined by order of a Court, agreement of Buyer and JLL Capital Markets, or otherwise. The bankruptcy estate's payment of its Broker's commission (1.5 percent of the gross purchase price) will be paid from the personal property sale proceeds. The Buyer's agreement to shoulder the cost of the transfer tax and be solely responsible for payments to JLL has a value to the estate of up to $1,462,500.

35. The Agreement contemplates the sale closing on or before February 29, 2024. However, as discussed above, the Buyer has reserved the right in the Agreement to not proceed with the sale if the re-zoning of the Chestnut Campus is appealed or otherwise challenged, which could be as late as April 30, 2024 ("**Extended Closing**"), which date, I'm told, depends on the date the Mayor signs the legislation. The Agreement provides that if the Buyer seeks to extend the closing date beyond February 29, 2024, it must (i) provide to me and the UC Regents written notice of its

---

interest during this period is approximately $5,552,798.68. If there is an overbid, the UC Regents shall receive up to an additional $1 million in sale proceeds.

intention to extend the closing date by February 14, 2024, (ii) reimburse the estate's actual operating expenses[2] in the amount of $2,444.07 for each day of the Extended Closing, and (iii) instruct the escrow holder to *unconditionally* deliver from the Buyer's $3 million deposit the sum of $375,000 to the estate and $1,125,000 to the UC Regents. If the sale closes, the Buyer will receive a credit for the $1.5 million released from escrow against the $30 million aggregate purchase price.

36.     On August 18, 2023, the Bankruptcy Court authorized the extension of the deadline to assume, assume and assign, or reject the Lease from August 17, 2023, through and including October 30, 2023.  On October 27, 2023, my counsel filed a notice and motion seeking Bankruptcy Court authorization to extend the time from October 30, 2023 through February 29, 2024. The hearing on the motion to extend time is set for December 7, 2023. If the Buyer provides notice of an Extended Closing, the UC Regents and I will need to enter into another stipulation to extend the deadline for me to assume, assume and assign, or reject the Lease from February 29, 2024, to a date on or after the Extended Closing.

37.     The Lease was set to expire on October 30, 2023, unless the UC Regents and the estate entered into an agreement to extend the term of the Lease. Lease extensions are conditioned upon the Debtor not being in default. The Debtor is in default under the Lease because, among other things, it has failed to pay pre- and post-petition rent to the UC Regents. As an accommodation, on October 30, 2023, the UC Regents and the estate entered into a Fourth Amendment to the Lease, which amendment is subject to notice to creditors provided herein and Bankruptcy Court approval. A true and correct copy of the Fourth Amendment is attached as **Exhibit B**. In light of the Buyer's option to extend the closing date, the UC Regents and the estate have also entered into Fifth Amendment to the Lease, which amendments extends the term of the Lease until five (5) business days after the Extended Closing. A true and correct copy of the Fifth Amendment is attached as **Exhibit C**.

---

[2] If the Buyer provides notice of an Extended Closing Date, it is required to reimburse the UC Regents its carrying costs for the real property.

38.     The Fourth and Fifth Amendments effectively continues the *status quo* under the Lease by allowing the UC Regents and me time to consummate a sale of the Chestnut Campus and the Mural to the Buyer or an overbidder, while requiring the estate to continue to pay operating expenses until the sale of the Chestnut Campus closes. The Fourth and Fifth Amendments require the estate, among other things, to: (i) provide proof of insurance for the real property to the UC Regents by no later than November 28, 2023; and (ii) obtain an order authorizing the estate to enter into an agreement to sell the real property or assign the Lease by not later than January 12, 2024. Under the provisions of the Fourth and Fifth Amendments, if the Bankruptcy Court has not entered an order authorizing the sale of the real property or the assignment of the Lease by January 12, 2024, the deadline for the estate to assume, assume and assign, or reject the Lease shall be January 31, 2024. In other words, absent a further extension by the UC Regents, if I have not obtained an order authorizing the sale of the real property and/or the assignment of the Lease by January 12, 2024, it is very likely that I will be unable to realize value for creditors from the Chestnut Campus.

39.     Provided the Bankruptcy Court: (a) authorizes me to enter into the Agreement; and (b) authorizes me to enter into the Fourth and Fifth Amendments to the Lease, and assuming that the Chestnut Campus is re-zoned, the Buyer will consummate its purchase of the real property through an escrow that is currently open at Chicago Title Company. Because the bankruptcy estate's interest in the real property is dependent on its ability to exercise the purchase option under the Lease, the Debtor's estate could have been forced to purchase the Chestnut Campus from the UC Regents, and immediately grant its interest in the Chestnut Campus under a separate escrow to the Buyer. To avoid this convoluted process, under the Agreement and the sixth amendment to the Lease, the UC Regents have agreed that it will directly convey its fee interest in the Chestnut Campus to the Buyer; *provided, however*, that it will not be responsible for any of the costs of sale associated with the Chestnut Campus, that it would be paid $22,500,000 for its interest in the real property from the escrow, and that I would cure the Debtor's pre and post-petition defaults under the Lease by way pf a payment of $1.5 million.

40.     As noted above, under the provisions of the Lease, the UC Regents could seek up to $24,500,000 from the estate in order to allow me to exercise the UC Purchase Option. However,

over the course of many months of negotiation between me and the UC Regents, the UC Regents agreed to accept $22,500,000 as consideration for the UC Purchase Option, plus $1,500,000 for the cure amount; provided that a sale is consummated with the Buyer.

41. If, however, the purchaser of the assets (including the Buyer) agreed to pay in excess of $22.5 million for the assets, the UC Regents require the Debtor's estate to deliver to it an additional portion of the consideration it receives from the buyer, with the UC Regents to receive 80% of each dollar in excess of $22.5 million paid for the assets in an amount up to an additional $1 million. For example, if a hypothetical buyer agreed to pay $23,500,000 for the assets, the UC Regents would receive $23.3 million (*i.e.*, $22.5 million plus $800,000) plus the Cure Amount and the estate would receive an additional $200,000. If a hypothetical buyer paid $23,750,000 for the assets, the UC Regents would receive $23.5 million ($22.5 million plus $1 million) plus the Cure Amount, and the estate would receive an additional $250,000. At any price higher than $23,750,000 paid for the assets, the UC Regents portion would not receive any "extra" amount over the $1 million.

42. In addition, the UC Regents have required that an overbidder must enter into an agreement that is "materially the same" as the Agreement. I understand that, without this additional consideration, the UC Regents may not enter into a direct sale of the Chestnut Campus to an overbidder and, instead, may require me to exercise the UC Purchase Option directly with the UC Regents and then enter into a separate escrow to sell the Chestnut Campus to the overbidder. At a minimum, an 'indirect' sale will result in the estate incurring in excess of $1.2 million in transfer taxes. The details concerning the estate's proposed agreement with the UC Regents concerning sale proceeds generated from the sale of the Chestnut Campus are set forth in the Revised Agreement Concerning Transfer of Chestnut Campus and Sale Proceeds ("**Proceeds Agreement**"), a copy of which is attached as **Exhibit D**.

43. Under the terms of the Lease, the Mural is property of the bankruptcy estate so long as the Lease is in effect. While the Mural was designed to be removed from the Original Building, I am advised that removing the Mural could cost $5 million or more, plus costs that would be associated with repairing the walls and roof of the Original Building after extraction of the Mural.

As I previously mentioned, the Debtor obtained a pre-petition appraisal of the Mural at $50 million. I have not received a stand-alone offer to purchase the Mural, and have been told by art dealers that the high end fine art market has softened substantially this year. This may be due in part to the City of San Francisco designating the Mural as a landmark, which may have resulted in making certain interested buyers uncomfortable with the prospect of litigation and political fallout from seeking to purchase the Mural and move it out of San Francisco. Regardless, in my opinion, the Buyer's offer to purchase the Mural as part of the Agreement is my only option to secure value through a sale of the Mural and other personal Property located at the Chestnut Campus. Under the terms of the Agreement, the Buyer will pay to estate the sum of $7.5 million for the Mural and other tangible and intangible property owned by estate and split the payment of the sales tax that arises from the sale.

44.     In addition to the Mural, the Buyer is to acquire other personal property consisting of art-related items (easels, presses, kilns, etc.) that are located throughout the Chestnut Campus. In May 2023, I engaged West Auctions to evaluate the personal property located at the Chestnut Campus. West Auctions estimated that, after deducting estimated costs of sale, all of the personal property located at the Chestnut Campus (excluding the contents of the library and the Mural) would likely result in net sale proceeds to the estate of between $100,000 to $110,000. The Buyer does not want all of the personal property located at the Chestnut Campus. Some of the personal property at the Chestnut Campus is likely to have no value, and I will file a notice of intent to abandon that personal property and obtain authority to pay to dispose of it as economically as possible. I will engage West Auctions to evaluate items that the Buyer has excluded to determine if the sale of these items by auction is a viable alternative to simply disposing of them.

45.     In addition to the tangible "art items" of personal property, the Buyer also seeks to acquire the Debtor's library (*e.g.*, the books, catalogues, ephemera, prints, etc.) at the Chestnut Campus. In October 2023, I met with a third-party art book re-seller. The re-seller provided me with a purchase offer of $12,000 for the library, with the proviso that it would take the purchaser up to 120 days to remove contents from the building.

46. The Agreement provides for the sale to the Buyer of any intellectual property still owned by the Debtor. I am not aware of a market for such intellectual property or the trade names or trademarks of the Debtor.

47. The Agreement provides for the Buyer to acquire the estate's litigation claims against the SFAI Legacy Foundation + Archive ("**Legacy Foundation**"), which currently holds an interest in certain "archival" documents and information that was once owned by the Debtor ("**Archives**") and certain of the Debtor's intellectual property, including trademarks and trade names ("**Archival IP**"). Based on documents I reviewed, in November of 2022, the Debtor entered into an agreement with the Legacy Foundation to transfer to it the Archives and the Archival IP for no consideration. I believe that the agreement with the Legacy Foundation can be avoided as a fraudulent transfer, as the Debtor received no consideration in exchange for these items. I believe that the cost of pursuing litigation against the Legacy Foundation is likely to be greater than any sums that the bankruptcy estate might realize from the transferred assets. Under the provisions of the Agreement, I have agreed to convey any claims the estate has against the Legacy Foundation to the Buyer; provided, however, that to the extent that the Buyer pursues claims against the Legacy Foundation and obtains a monetary recovery, the Buyer will remit 50% of the recovery to the estate for its benefit.

48. The tangible and intangible property described in paragraphs 42-46 are defined in the sale motion and notice as the "**Mural and Related Property**." The sale of some or all of the Mural and Related Property may result in the imposition of sales tax. The current rate of sales tax in San Francisco is 8.63% and is typically paid by the purchaser. If the entire $7.5 million the estate receives for the Mural and Related Property is subject to sales tax, the total tax would be approximately $647,250. Under the Agreement, the Buyer and I have agreed to each pay one-half of the sales tax owed on the Mural and Related Property – approximately $323,625 each.

49. The Buyer has requested that we seek a finding that it is a good faith purchaser pursuant to Section 363(m) of the Bankruptcy Code. I negotiated the terms of the Agreement with the UC Regents and the Buyer in good faith and at arms' length for over three months. All parties have been represented by experienced counsel. As of the date of this declaration, no other parties have made a material offer to purchase the Chestnut Campus or the Mural and Related Property

excluding the $12,000 offer for the contents of the library, and the $38 million LOI where a would-be purchaser failed to follow through. No consideration other than that disclosed in the Agreement will be given to any party to the Agreement. I believe that the aggregate $30 million sale price represents the fair market value for the Chestnut Campus and the Mural and Related Property. To the best of my information and belief, there is no evidence of fraud, collusion between the Buyer and other parties who might be interested in purchasing the Chestnut Campus or the Mural and Related Property, or any attempt to take grossly unfair advantage of other bidders. I submit that a good faith purchaser determination is warranted.

I declare under penalty of perjury that the above statements are true and that if called as a witness I could and would testify to their truthfulness. This declaration is executed on the 1st day of November 2023 in Berkeley, California.

PAUL MANSDORF

## PURCHASE AND SALE AGREEMENT AND ESCROW INSTRUCTIONS

This PURCHASE AND SALE AGREEMENT AND ESCROW INSTRUCTIONS ("**Agreement**") is dated as of this 21st day of November, 2023, for reference purposes only, and is made by and among Paul Mansdorf, solely in his capacity as the duly appointed Chapter 7 Trustee (the "**Trustee**") for The San Francisco Art Institute, a California non-profit public benefit corporation (the "**SFAI**"), The Regents of the University of California, a California public corporation (the "**UC Regents**" and together with Trustee on behalf of SFAI, the "**Sellers**"), and BM-AI LLC, a Delaware limited liability company ("**Buyer**"). This Agreement shall be effective on the "**Effective Date,**" which is the date on which the last person signing this Agreement shall have signed this Agreement.

**R E C I T A L S :**

This Agreement is entered into on the basis of the following facts, understandings and intentions of the parties:

A.      On April 19, 2023 ("**Petition Date**"), SFAI filed a voluntary petition under chapter 7 of title 11 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**"), which case is proceeding under Case No. 23-30250 (HLB) (the "**Bankruptcy Case**").

B.      UC Regents is the owner of that certain real property located in the City and County of San Francisco, State of California, consisting of approximately 1.74 acres of land improved by two (2) buildings, including all fixtures and other improvements located thereon or thereunder, having an address of 800 Chestnut Street, San Francisco, California, and more particularly described in Exhibit A attached hereto (the "**Real Property**").

C       The Real Property is subject to that certain Triple Net Lease with an effective date of October 30, 2020 by and between SFAI, as tenant, and the UC Regents, as landlord, as amended by that certain First Lease Amendment dated as of April 8, 2022, by that certain Second Amendment to Triple Net Lease dated as of August 31, 2022, by that certain Third Amendment to Triple Net Lease dated as of October 1, 2022, by that certain Fourth Amendment to Triple Net Lease dated as of October 30, 2023 and by that certain Fifth Amendment to Triple Net Lease dated as of November 16, 2023 (as amended, the "**Lease**").

D.      Buyer desires to purchase or assume the Assets (as defined in Section 1.2 below and which include the Real Property and tenant's rights under the Lease as amended by the Sixth Amendment to Lease as defined in Section 4.1.5 below) from the applicable Sellers and Sellers desire to sell or assign the Assets to Buyer, upon the terms and conditions stated in this Agreement.

E.      In order to effectuate the foregoing, Sellers and Buyer desire to enter into this Agreement.

NOW, THEREFORE, in consideration of the foregoing recitals and the mutual covenants, representations, warranties, and agreements of the parties herein contained and other valuable consideration, the parties agree as follows:

**EXHIBIT A**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 18 of 101

1.    SALE AND PURCHASE; TITLE COMPANY.

1.1    General.  Subject to the terms, covenants and conditions of this Agreement, Sellers shall sell or assign to Buyer, and Buyer shall purchase or assume from Sellers, all of the Assets.

1.2    The Assets.  As used in this Agreement, the term "**Assets**" includes all of the items referred to in Subsections 1.2.1 through 1.2.9.

1.2.1    Real Property.  The Real Property and all of UC Regents' right, title and interest, if any, in and to all rights, privileges, tenements, hereditaments, rights-of-way, easements, appurtenances, mineral rights, development rights, air rights, riparian or littoral rights and all other rights belonging or appertaining to the Real Property.

1.2.2    Lease.  All of SFAI's right, title and interest in and to the Lease, as amended by the Sixth Amendment to Lease.

1.2.3    Mural.  All of SFAI's right, title and interest in and to the Diego Rivera mural entitled "The Making of a Fresco Showing the Building of a City" located on the Real Property.

1.2.4    Other Artwork.  All of SFAI's right, title and interest in and to all other artwork and other murals owned or possessed by SFAI as of the Effective Date located on the Real Property as of the Effective Date (excluding the work of art by Alicia McCarthy).

1.2.5    Intellectual Property.  All of SFAI's right, title and interest in and to any and all intellectual property owned by SFAI as of the Effective Date.

1.2.6    Tradenames; Trademarks.  All of SFAI's right, title and interest in and to any and all trade names, trademarks, and logos and any variations thereof of the following owned by SFAI: San Francisco Art Institute, SF Art Institute, SFAI and any predecessor names to any of the foregoing, as of the Effective Date.

1.2.7    Library Inventory.  All of SFAI's right, title and interest in and to any books, manuscripts, folios, memoranda, or other documents located in and comprising the library of SFAI as of the Effective Date.

1.2.8    Other Trustee Property.  All of SFAI's right, title and interest in and to those items of personal property located at the Real Property and listed on Schedule 1.

1.2.9    Archives.  All of SFAI's right, title and interest in and to the Archives, the Archives IP and the Archives Claims, each as defined in Section 1.3.

The Assets other than the Real Property (i.e., the Assets described in Subsections 1.2.2 through 1.2.9) are collectively referred to as the "**Trustee Property**."

1.3    Archives.  SFAI Legacy Foundation + Archive currently alleges that it holds an interest in the archives of SFAI (the "**Archives**") and certain intellectual property, trademarks

EXHIBIT A

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 19 of 101

and tradenames (the "**Archives IP**"). If the Archives and Archives IP are re-conveyed to SFAI's bankruptcy estate in advance of the Closing, the Archives and Archives IP shall be conveyed as a part of the Assets (and Trustee will take all action reasonably requested by Buyer to effect such conveyance). If the Archives and Archives IP are not so conveyed, in advance of Closing, the Buyer may elect to include as purchased Assets any and all causes of action of SFAI or SFAI's bankruptcy estate against SFAI Legacy Foundation + Archive, including any causes of action based on fraudulent conveyance (the "**Archives Claims**"); provided, however that to the extent required by applicable law, to the extent that the Buyer purchases and pursues the Archives Claims and a monetary recovery is obtained, Buyer shall remit fifty percent (50%) of such recovery to the Trustee for the benefit of SFAI's bankruptcy estate.

1.4     Title Company. The purchase and sale of the Assets shall be accomplished through an escrow which Sellers and Buyer have established with Chicago Title Company (the "**Title Company**") at 3620 Happy Valley Road, # 100, Lafayette, California 94549, Attn: Laurie Edwards.

1.5     Excluded Assets. Notwithstanding anything to the contrary in this Agreement, in no event shall Sellers sell, transfer, assign, convey, or deliver or be deemed to sell, transfer, assign, convey or deliver, and Sellers shall retain all right, title and interest to, in and under any of the other properties, rights, interests and assets of Sellers other than the Assets (collectively, the "**Excluded Assets**").

1.6     Assumption of Certain Liabilities. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Closing, in addition to the payment of the Purchase Price in accordance with Section 2.1 Buyer shall assume from each Seller (and from and after the Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Sellers shall irrevocably transfer, assign, convey, and deliver to Buyer, only the following liabilities, without duplication and only to the extent not paid prior to the Closing (collectively, the "**Assumed Liabilities**"): (a) all liabilities relating to amounts required to be paid, or actions required to be taken or not to be taken, by Buyer under this Agreement; and (b) all liabilities agreed to be assumed by Buyer or for which Buyer has agreed to be responsible in accordance with this Agreement.

1.7     Excluded Liabilities. Buyer shall not assume, be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any liabilities of, or action against, any Seller of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing on the Closing Date or arising thereafter as a result of any act, omission, or circumstances taking place prior to the closing, other than the Assumed Liabilities (all such liabilities that are not Assumed Liabilities being referred to collectively herein as the "**Excluded Liabilities**"). The Excluded Liabilities include without limitation all liabilities of Sellers or related to the Assets that: (a) are under, associated with or with respect to any employee claim, former employee claim, independent contractor claim; (b) claims from or related to any collective bargaining agreement, or corresponding or related pension plan obligation; (c) claims filed in the Bankruptcy Case; (d) all liabilities related to Excluded Assets; (e) any tort liabilities of any Seller based on any acts, omissions, or conditions occurring or

**EXHIBIT A**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 20 of 101

existing prior to the Closing Date; (f) all actions against each Seller, any of their respective assets, the Assets and any of their past or present operations or activities; and (g) a cure payment of $1,500,000 under the Lease payable by SFAI's bankruptcy estate to UC Regents (the "**Cure Payment**").

2.     PAYMENT OF PURCHASE PRICE.

2.1     Amount.  The purchase price (the "**Purchase Price**") to be paid by Buyer to Sellers for the Assets is Thirty Million and 00/100 Dollars ($30,000,000.00), allocated to (a) the purchase of the Real Property in the amount of $22,500,000, and (b) the purchase of the Trustee Property in the amount of $7,500,000.  On or before the Closing Date, Trustee and Buyer shall agree on an equitable allocation of the portion of the Purchase Price paid to Trustee pursuant to clause (b) among the various items of the Trustee Property.

2.2     Terms of Payment.  Buyer shall pay the Purchase Price to Sellers as follows:

2.2.1     Deposit.  Within seven (7) business days after the Effective Date, Buyer shall deposit in escrow with the Title Company, by wire transfer, payment in the amount of Three Million and 00/100 Dollars ($3,000,000.00) (the "**Deposit**"), as an earnest money deposit toward the payment of the Purchase Price.  Buyer shall receive credit at the Closing for an amount equal to the Deposit (including any interest earned thereon), which shall be applied against the Purchase Price on the Closing Date (as defined in Section 11.1).  Notwithstanding any provision to the contrary contained in this Agreement, Sellers and Buyer agree that One Hundred Dollars ($100.00) of the Deposit shall be paid to Sellers in all events as consideration for Sellers' execution, delivery and performance of this Agreement, the sufficiency of which is acknowledged by Sellers (the "**Independent Consideration**").  The Independent Consideration is in addition to and independent of any other consideration or payment provided in this Agreement, is nonrefundable, applicable to the Purchase Price, and, notwithstanding any other provision of this Agreement, shall be retained by Sellers if this Agreement terminates for any reason.

2.2.2     Payment of Balance.  The balance of the Purchase Price shall be paid in full, in cash, through escrow at the Closing.

3.     DEPOSIT.

3.1     Handling of Deposit.  Title Company shall deposit the Deposit in an interest-bearing account, and the term "**Deposit**" as used in this Agreement shall include any interest earned thereon.

3.2     Liquidated Damages.  THE PARTIES ACKNOWLEDGE THAT IN THE EVENT OF A MATERIAL DEFAULT BY BUYER OF ITS OBLIGATION TO PURCHASE THE ASSETS, SELLERS' DAMAGES WOULD BE DIFFICULT OR IMPOSSIBLE TO COMPUTE AND THAT THE DEPOSIT MADE BY BUYER REPRESENTS THE REASONABLE ESTIMATE OF SUCH DAMAGES ESTABLISHED BY THE PARTIES THROUGH GOOD FAITH CONSIDERATION OF THE FACTS AND CIRCUMSTANCES SURROUNDING THE TRANSACTION CONTEMPLATED UNDER THIS AGREEMENT

EXHIBIT A
Case: 23-30250   Doc# 129-1   Filed: 11/22/23   Entered: 11/22/23 05:28:12   Page 21 of 101

AS OF THE EFFECTIVE DATE.  IN THE EVENT OF SUCH MATERIAL DEFAULT BY BUYER OF ITS OBLIGATION TO PURCHASE THE ASSETS UNDER THIS AGREEMENT, SELLERS SHALL RETAIN THE DEPOSIT AS THEIR SOLE AND EXCLUSIVE REMEDY AND AS  LIQUIDATED DAMAGES IN LIEU OF ANY OTHER CLAIM OR REMEDY THAT SELLERS MAY HAVE AT LAW OR IN EQUITY (INCLUDING, WITHOUT LIMITATION, SPECIFIC PERFORMANCE) ARISING BY REASON OF SUCH DEFAULT.  THE PARTIES HAVE INITIALED THIS SECTION 3.2 TO ESTABLISH THEIR INTENT SO TO LIQUIDATE DAMAGES.  LIQUIDATED DAMAGES SHALL BE DIVIDED SO THAT THE UC REGENTS RECEIVE SEVENTY-FIVE PERCENT OF THE DEPOSIT ($2,250,000) AND TRUSTEE RECEIVES FOR THE BENEFIT OF SFAI'S BANKRUPTCY ESTATE TWENTY-FIVE PERCENT ($750,000).

Trustee's
Initials: _____          Buyer's
                                          Initials: _____

UC Regent's
Initials: _____

     3.3    <u>Failure to Seek or Obtain Bankruptcy Court  Approval</u>.  Neither the Trustee's decision to seek approval of an alternative offer for all or some of the Assets if required in his fiduciary capacity (an "**Alternative Transaction**") or the decision of the Bankruptcy Court to decline to authorize the Trustee to enter into this Agreement for any reason shall be deemed to be a default on the part of the UC Regents, Trustee or SFAI. In the event that (a) the Bankruptcy Court declines to authorize the Trustee to enter into this Agreement, (b) the Trustee determines to seek approval of an Alternative Transaction and the Alternative Transaction is approved by the Bankruptcy Court, or (c) the Trustee determines to seek approval of an Alternative Transaction and the Alternative Transaction is still pending before the Bankruptcy Court on December 31, 2023, the Agreement shall be null and void in all respects as between the Buyer on the one hand and the UC Regents, the Trustee and SFAI on the other hand and the Deposit shall be fully returned to Buyer.

     3.4    <u>Sellers Default</u>.  If the Bankruptcy Court shall have entered the Sale Order and thereafter either Seller is unable or unwilling to satisfy its obligations under Section 11, such Seller shall be in default hereunder and Buyer may elect, as Buyer's sole and exclusive remedy, to: (a) waive such default and proceed with the Closing; (b) compel specific performance by such defaulting Seller; or (c) terminate this Agreement whereupon Sellers and Buyer will be released of all liability and obligations under this Agreement and the Deposit shall be returned to Buyer. Notwithstanding the foregoing, if the remedy of specific performance is unavailable to Buyer because such defaulting Seller has conveyed the Assets owned by such defaulting Seller or any portion thereof to a third party in breach of such Seller's obligations hereunder, Buyer may pursue an action against such defaulting Seller for monetary damages as a result of such breach.

4.    <u>BUYER'S CONDITIONS PRECEDENT</u>.

**EXHIBIT A**

Case: 23-30250   Doc# 129-1   Filed: 11/22/23   Entered: 11/22/23 05:28:12   Page 22 of 101

AS OF THE EFFECTIVE DATE. IN THE EVENT OF SUCH MATERIAL DEFAULT BY
BUYER OF ITS OBLIGATION TO PURCHASE THE ASSETS UNDER THIS
AGREEMENT, SELLERS SHALL RETAIN THE DEPOSIT AS THEIR SOLE AND
EXCLUSIVE REMEDY AND AS LIQUIDATED DAMAGES IN LIEU OF ANY OTHER
CLAIM OR REMEDY THAT SELLERS MAY HAVE AT LAW OR IN EQUITY
(INCLUDING, WITHOUT LIMITATION, SPECIFIC PERFORMANCE) ARISING BY
REASON OF SUCH DEFAULT. THE PARTIES HAVE INITIALED THIS SECTION 3.2 TO
ESTABLISH THEIR INTENT SO TO LIQUIDATE DAMAGES. LIQUIDATED DAMAGES
SHALL BE DIVIDED SO THAT THE UC REGENTS RECEIVE SEVENTY-FIVE PERCENT
OF THE DEPOSIT ($2,250,000) AND TRUSTEE RECEIVES FOR THE BENEFIT OF SFAI'S
BANKRUPTCY ESTATE TWENTY-FIVE PERCENT ($750,000).

Trustee's
Initials: _____

Buyer's
Initials: _____

UC Regent's
Initials: _____

3.3     Failure to Seek or Obtain Bankruptcy Court Approval. Neither the Trustee's
decision to seek approval of an alternative offer for all or some of the Assets if required in his
fiduciary capacity (an "**Alternative Transaction**") or the decision of the Bankruptcy Court to
decline to authorize the Trustee to enter into this Agreement for any reason shall be deemed to be
a default on the part of the UC Regents, Trustee or SFAI. In the event that (a) the Bankruptcy
Court declines to authorize the Trustee to enter into this Agreement, (b) the Trustee determines
to seek approval of an Alternative Transaction and the Alternative Transaction is approved by
the Bankruptcy Court, or (c) the Trustee determines to seek approval of an Alternative
Transaction and the Alternative Transaction is still pending before the Bankruptcy Court on
December 31, 2023, the Agreement shall be null and void in all respects as between the Buyer on
the one hand and the UC Regents, the Trustee and SFAI on the other hand and the Deposit shall
be fully returned to Buyer.

3.4     Sellers Default. If the Bankruptcy Court shall have entered the Sale Order and
thereafter either Seller is unable or unwilling to satisfy its obligations under Section 11, such
Seller shall be in default hereunder and Buyer may elect, as Buyer's sole and exclusive remedy,
to: (a) waive such default and proceed with the Closing; (b) compel specific performance by
such defaulting Seller; or (c) terminate this Agreement whereupon Sellers and Buyer will be
released of all liability and obligations under this Agreement and the Deposit shall be returned to
Buyer. Notwithstanding the foregoing, if the remedy of specific performance is unavailable to
Buyer because such defaulting Seller has conveyed the Assets owned by such defaulting Seller
or any portion thereof to a third party in breach of such Seller's obligations hereunder, Buyer
may pursue an action against such defaulting Seller for monetary damages as a result of such
breach.

4.     BUYER'S CONDITIONS PRECEDENT.

**EXHIBIT A**

DocuSign Envelope ID: D39AE361-00DE-4CAD-8003-732298E5A332

AS OF THE EFFECTIVE DATE.  IN THE EVENT OF SUCH MATERIAL DEFAULT BY BUYER OF ITS OBLIGATION TO PURCHASE THE ASSETS UNDER THIS AGREEMENT, SELLERS SHALL RETAIN THE DEPOSIT AS THEIR SOLE AND EXCLUSIVE REMEDY AND AS  LIQUIDATED DAMAGES IN LIEU OF ANY OTHER CLAIM OR REMEDY THAT SELLERS MAY HAVE AT LAW OR IN EQUITY (INCLUDING, WITHOUT LIMITATION, SPECIFIC PERFORMANCE) ARISING BY REASON OF SUCH DEFAULT.  THE PARTIES HAVE INITIALED THIS SECTION 3.2 TO ESTABLISH THEIR INTENT SO TO LIQUIDATE DAMAGES.  LIQUIDATED DAMAGES SHALL BE DIVIDED SO THAT THE UC REGENTS RECEIVE SEVENTY-FIVE PERCENT OF THE DEPOSIT ($2,250,000) AND TRUSTEE RECEIVES FOR THE BENEFIT OF SFAI'S BANKRUPTCY ESTATE TWENTY-FIVE PERCENT ($750,000).

Trustee's                                                      Buyer's
Initials:  _____                 Initials:  _____

UC Regent's  _MB_
Initials:  _____

    3.3   <u>Failure to Seek or Obtain Bankruptcy Court  Approval</u>.  Neither the Trustee's decision to seek approval of an alternative offer for all or some of the Assets if required in his fiduciary capacity (an "**Alternative Transaction**") or the decision of the Bankruptcy Court to decline to authorize the Trustee to enter into this Agreement for any reason shall be deemed to be a default on the part of the UC Regents, Trustee or SFAI. In the event that (a) the Bankruptcy Court declines to authorize the Trustee to enter into this Agreement, (b) the Trustee determines to seek approval of an Alternative Transaction and the Alternative Transaction is approved by the Bankruptcy Court, or (c) the Trustee determines to seek approval of an Alternative Transaction and the Alternative Transaction is still pending before the Bankruptcy Court on December 31, 2023, the Agreement shall be null and void in all respects as between the Buyer on the one hand and the UC Regents, the Trustee and SFAI on the other hand and the Deposit shall be fully returned to Buyer.

    3.4   <u>Sellers Default</u>.  If the Bankruptcy Court shall have entered the Sale Order and thereafter either Seller is unable or unwilling to satisfy its obligations under Section 11, such Seller shall be in default hereunder and Buyer may elect, as Buyer's sole and exclusive remedy, to: (a) waive such default and proceed with the Closing; (b) compel specific performance by such defaulting Seller; or (c) terminate this Agreement whereupon Sellers and Buyer will be released of all liability and obligations under this Agreement and the Deposit shall be returned to Buyer. Notwithstanding the foregoing, if the remedy of specific performance is unavailable to Buyer because such defaulting Seller has conveyed the Assets owned by such defaulting Seller or any portion thereof to a third party in breach of such Seller's obligations hereunder, Buyer may pursue an action against such defaulting Seller for monetary damages as a result of such breach.

4.   <u>BUYER'S CONDITIONS PRECEDENT</u>.

4.1     Conditions.  Buyer's obligation to purchase the Assets shall be subject to the satisfaction (or waiver by Buyer in its sole discretion in writing) of each of the conditions precedent specified below in this Section 4.1.

4.1.1     Notice to Creditors.  Not later than five (5) business days after the Effective Date, Trustee shall have served notice of this Agreement to scheduled creditors of SFAI and parties that have requested notice in the Bankruptcy Case.

4.1.2     Approval of Bankruptcy Court.  By December 29, 2023 (which deadline shall be extended by the mutual agreement of the parties), the Bankruptcy Court shall have entered an order approving the sale or assignment of the Trustee Property to Buyer pursuant to sections 365 and 363 of the Bankruptcy Code, including a finding under section 363(m) of the Bankruptcy Court that the Assets were purchased in good faith and finding that Buyer is not a successor of SFAI (the "**Sale Order**") and shall have become final and non-appealable and shall not have been stayed, reversed or modified in a manner not acceptable to Buyer.

4.1.3     No Governmental Prohibition.  On or prior to the Closing Date, no governmental body of competent jurisdiction shall have issued, enacted, entered, promulgated or enforced any order (including any temporary restraining order or preliminary or permanent injunction) or law restraining, enjoining or otherwise prohibiting the Closing that is continuing in effect.

4.1.4     Approval of Special Use District.  On or prior to the Closing Date, the creation of the Special Use District for the Real Property pursuant to Ordinance 230924 introduced on September 5, 2023 before the San Francisco Board of Supervisors permitting Buyer's intended use of the Real Property shall have been finally approved by all applicable governmental agencies and all applicable appeal periods shall have run without the filing of an appeal; provided, however, that, as to any applicable appeal period related to the California Environmental Quality Act, California Public Resources Code § 21000 et seq. (the "**CEQA Appeal Period**"), Buyer shall provide Sellers written notice on or before the date that is fourteen (14) days after the second reading by the San Francisco Board of Supervisors of the proposed legislation creating the Special Use District as to Buyer's determination to waive this condition as to the CEQA Appeal Period. If such written notice indicates Buyer waives this condition as to the CEQA Appeal Period, such notice shall be a binding waiver by Buyer and, if such written notice indicates Buyer does not waive this condition as to the CEQA Appeal Period, Sellers and Buyer shall meet and confer regarding the same within ten (10) days after such written notice.

4.1.5     Lease Amendment.  On or prior to the Closing Date, the UC Regents, as landlord, and Trustee, as tenant, shall have amended the Lease to (a) acknowledge the cure by tenant of any defaults of tenant thereunder or the waiver by landlord of such defaults; (b) revise Section 54 of the Lease to conform the terms and conditions in the existing Lease for the purchase of the Real Property pursuant to the Option (as defined in the Lease) to permit the sale pursuant to this Agreement; and (c) approve the assignment of tenant's interest under the Lease to Buyer, all in the form of the Sixth Amendment to Triple Net Lease attached hereto as Exhibit C (the "**Sixth Amendment to Lease**").

**EXHIBIT A**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 25
of 101

4.1.6   Lease Assumption.  On or prior to the Closing Date, Trustee shall have assumed the Lease as amended by the Sixth Amendment to Lease, in the form of the Assumption of Lease attached hereto as Exhibit D (the "**Lease Assumption**").

4.1.7   Sellers' Performance.  As of the Closing Date, Sellers shall have performed in all material respects each and every agreement to be performed by Sellers pursuant to this Agreement.

4.1.8   Buyer's Title Policy.  As of the Closing Date, the Title Company shall have irrevocably committed to issue, upon payment of its regularly scheduled premium, an ALTA owner's title insurance policy and endorsements in the form of the title commitment attached hereto as Exhibit E  (the "**Title Policy**").

4.1.9   Contracts.  Prior to or contemporaneously with the Closing Date, Sellers shall have terminated or rejected all service, maintenance, security and other contracts affecting the Real Property, with termination effective on the Closing Date.

4.1.10   Sellers' Representations.  All of Sellers' representations and warranties set forth in this Agreement shall be true and correct as of the Closing Date. At the Closing, UC Regents shall deliver to Buyer a certificate certifying that each of UC Regents' representations and warranties contained in this Agreement are true and correct as of the Closing Date.

4.1.11   Condition of Assets at Closing.  As of the Closing Date, (a) all Assets shall be in substantially the same condition as the Closing as of the Effective Date, and (b) all items of personal property located in the Real Property and not included in the Assets shall have been removed from the Real Property without causing damage to the Assets as a result of such removal.

4.1.12   No Litigation.  As of the Closing Date, there shall be no litigation or administrative agency or other governmental proceeding of any kind whatsoever, pending or threatened that challenge the transactions set forth in this Agreement.

4.2   Time for Fulfillment; Right to Terminate.  Sellers shall reasonably cooperate with Buyer and Buyer's efforts to fulfill the conditions precedent set forth in Section 4.1.  Buyer shall use reasonable discretion in determining whether any of such conditions precedent is unsatisfied, except with respect to the condition precedent set forth in Section 4.1.4 for which Buyer's determination may be made in its sole and absolute discretion.  Failure by Buyer to give such notice as to any condition set forth in Section 4.1 shall be conclusively deemed to mean that such condition is satisfied.  If Buyer has provided timely written notice to Sellers that a condition is unsatisfied, the notice shall provide reasonable details explaining why the condition is unsatisfied, and Sellers shall have ten (10) days from receipt of such notice to cure or otherwise satisfy the condition.  If Buyer has given written notice that a condition is unsatisfied and such condition remains unsatisfied following the passage of the cure period, Buyer may either elect to (i) waive any of such conditions and close on the purchase of the Property, or (ii) terminate this Agreement.  In the event of any termination under this Section 4.2, the Deposit shall immediately be returned to Buyer and neither Sellers nor Buyer shall have any further obligations under this Agreement. If there shall be a failure of any of the conditions set forth in Section 4.1, which

**EXHIBIT A**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 26 of 101

failure is caused by either Seller's breach or default hereunder, and such condition(s) is not waived by Buyer, the provisions of Section 3.4 shall apply.

5. <u>INTENTIONALLY DELETED</u>.

6. <u>BANKRUPTCY COURT MATTERS</u>.

6.1 <u>Motion Seeking Approval of Sale</u>. As promptly as practicable after the Effective Date and in any event not later than November 22, 2023, the Trustee shall file with the Bankruptcy Court a motion seeking approval of this Agreement and the Sale Order, which motion and Sale Order will be acceptable to the Buyer in its reasonable discretion. The parties will use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court by December 29, 2023.

6.2 <u>Buyer's Cooperation</u>. Buyer shall promptly take all actions as are reasonably requested by Sellers to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order necessary in connection with the transactions contemplated hereunder, including furnishing affidavits, reasonable and customary financial information demonstrating wherewithal to perform under this Agreement or other documents or information for filing with the Bankruptcy Court, and making representatives of Buyer available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Buyer under this Agreement, and demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code, as well as demonstrating Buyer's ability to pay and perform or otherwise satisfy any assumed liabilities following the Closing.

6.3 <u>Appearances</u>. Each party shall (a) participate formally or informally in the Bankruptcy Court proceedings if reasonably requested by another party or required by the Bankruptcy Court in connection with the Agreement and (b) keep the other parties reasonably apprised of the status of material matters related to the Agreement, including, upon reasonable request, promptly furnishing Buyer with copies of notices or other communications received by a Seller with respect to the transactions contemplated hereunder.

6.4 <u>Sale by Trustee Remains Subject to Higher Bids</u>. The sale of the Assets by the Trustee is subject to overbid/ higher and better offers, notice to creditors and parties in interest and Bankruptcy Court approval. Sellers and Buyer acknowledge that, until entry of the Sale Order, the sale or assignment of the Assets are subject to higher and better bids. Buyer acknowledges that the Trustee must take reasonable steps to demonstrate that he has sought to obtain the highest or otherwise best price for the Assets, including giving notice thereof to the creditors of SFAI and other interested parties, providing information about the Assets to prospective bidders, and entertaining higher and better offers from such prospective bidders. Sellers will provide to Buyer copies of any higher or better offer received from prospective bidders and provide Buyer an opportunity to further bid for the Assets.

6.5 <u>Trustee's Obligations Subject to Bankruptcy Court Approval</u>. The Trustee's obligations under this Agreement are subject to entry of and the terms of any Orders of the Bankruptcy Court.

EXHIBIT A

7. <u>SELLERS' COVENANTS; CASUALTY</u>.

7.1     <u>Obligations concerning Real Property</u>.  During the period between the Effective Date and the earlier to occur of the Closing Date and the termination of this Agreement, Trustee shall safeguard, and preserve the Real Property in the same manner in which Trustee safeguarded and preserved the Real Property before the Effective Date pursuant to the Lease.  Sellers shall not terminate or amend the Lease other than as required to satisfy the condition set forth in Section 4.1.5.  Subject to Sections 6.4 and 6.5 hereof as to the Trustee, Sellers shall not enter into any new lease, license, occupancy agreement or other contract affecting any of the Assets that is outside the ordinary course or that is contrary to this Agreement.

7.2     <u>Insurance</u> .  Until the Closing, Sellers shall maintain their present insurance on the Assets, including all insurance required to be carried under the Lease.  Subject to the provisions of Section 7.3, the risk of loss in and to the Assets shall remain vested in Sellers as provided in the Lease until the Closing.

7.3     <u>Casualty Proceeds</u>.

7.3.1     <u>Real Property</u>.  If prior to the Closing, the Real Property or any material portion thereof is damaged or destroyed by fire or casualty and Buyer elects to not terminate the Agreement as a result of such damage or destruction, (a) Buyer shall proceed with the purchase of the Real Property without reduction or offset to that portion of the Purchase Price allocated to the Real Property pursuant to Section 2.1(a); (b) Trustee shall pay over or assign to Buyer all amounts received or due from, and all claims against, any insurance company as a result of such damage or destruction to the Real Property notwithstanding any provisions to the contrary contained in the Lease, including Section 12.6 of the Lease; and (c) Buyer shall be entitled to a credit against the Purchase Price equal to the deductible amount, if applicable, under Trustee's insurance policy, in an amount not to exceed $50,000.

7.3.2     <u>Trustee Property</u>.  If prior to the Closing, the Mural is damaged or destroyed by fire or casualty or any other covered loss, and Trustee elects to not sell the Mural to Buyer, but to instead pursue claims against any insurance company insuring the Mural, or any other party, and Buyer elects to not terminate the Agreement as a result of such damage or destruction of the Mural, (a) Buyer shall proceed with the purchase of the Real Property without reduction or offset to that portion of the Purchase Price allocated to the Real Property pursuant to Section 2.1(a) but with a reduction of the Purchase Price in the amount of $7,500,000, (b) Trustee shall retain all amounts received or due from, and all claims against, any insurance company or any other party as a result of such damage or destruction of the Mural, (c) the damaged or destroyed Mural shall be removed from the Real Property at Trustee's expense within a reasonable time period following the Closing if Trustee is not able to do so prior to the Closing, and (d) Trustee shall convey the remaining Trustee Property to Buyer at Closing in accordance with this Agreement.  For purposes of this Section 7.3.2 only, the parties agree to waive the allocation among Trustee Property in the last sentence of Section 2.1 and reduce the Purchase Price by the full amount allocated to the Trustee Property if the circumstances and elections described in this Section 7.3.2 shall have occurred.

7.4     <u>Cure Payment</u>.  Trustee shall pay the Cure Payment to UC Regents.

EXHIBIT A

7.5     Removal of Personal Property.  Prior to the Closing, Trustee shall remove all items of personal property located in the Real Property that are not included in the Assets without causing damage to the Assets as a result of such removal.

8.     SELLERS' REPRESENTATIONS AND WARRANTIES.

8.1     UC Regent's Representations.  UC Regents hereby makes the following representations and warranties as of the Effective Date and as of the Closing Date:

8.1.1     Leases and Contracts.  Other than the Lease, UC Regents has not entered into any other leases, license agreements, or occupancy agreements affecting the Real Property.

8.1.2     No Other Rights.  Other than the Option granted in the Lease, UC Regents has not granted any other person, firm or entity any right to acquire or lease all or any part of the Real Property.

8.1.3     Due Authorization.  (a) UC Regents have been duly authorized to execute and perform their obligations under this Agreement, (b) the persons signing this Agreement on behalf of UC Regents have the power and authority to do so and to bind UC Regent to this Agreement, and (c) this Agreement and all documents to be executed by UC Regents that are to be delivered to Buyer at the Closing are, or at the time of Closing will be, legal, valid and binding obligations of UC Regents , and do not, and at the time of Closing will not, violate any provisions of any agreement or judicial order to which UC Regents is a party or to which the Real Property is subject.

8.1.4     No Consents.  No consent to the sale and conveyance of the Real Property by UC Regents is required to be obtained from any governmental agency or public administrative body other than the consent by the UC Regents the process for which has commenced as of the Effective Date.

8.1.5     Non-Foreign.  UC Regents are not a foreign person as defined in Internal Revenue Code Section 1445(f)(3) and UC Regents are not subject to withholding under Section 26131 of the California Revenue and Taxation Code.

8.1.6     Hazardous Materials.  To UC Regents' actual knowledge with no duty to investigate or inquire with others, no governmental authority has notified UC Regents of the need to take corrective action regarding elimination or control of Hazardous Materials, defined below, on or about the Real Property.  The term "**Hazardous Materials**" shall mean any substance, material or waste which is regulated by any local governmental authority, the State of California, or the United States Government, including, but not limited to, any material or substance which is (a) petroleum, (b) asbestos, (c) polychlorinated biphenyls, (d) designated as a "hazardous substance" pursuant to Section 311 of the Clean Water Act, 33 U.S.C. 1251 et seq. (33 U.S.C. 1321) or listed pursuant to Section 307 of the Clean Water Act (33 U.S.C. 1317), (e) defined as a "hazardous waste" pursuant to Section 1004 of the Resource Conservation and Recovery Act, 42 U.S.C. 6901 et seq. (42 U.S.C. 6903) or (f) defined as a "hazardous substance" pursuant to Section 101 of the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601 et seq. (42 U.S.C. 9601).

EXHIBIT A

Case: 23-30250     Doc# 129-1     Filed: 11/22/23     Entered: 11/22/23 05:28:12     Page 29
of 101

8.1.7    Notices.  To UC Regents' actual knowledge with no duty to investigate or inquire with others, UC Regents have not received notices from any governmental authority of any material violation of any law, ordinance, regulation or order or of any litigation regarding the Real Property that would have a material adverse effect on the Assets, excluding notices relating to removal of nuisances (i.e. weeds, trash, graffiti) and repairs.

8.2    Trustee Representations.  Trustee hereby makes the following representations and warranties as of the Effective Date and as of the Closing Date:

8.2.1    Due Authorization.  Subject to entry of the Sale Order, and any other order necessary in connection with the transactions contemplated by this Agreement, (a) Trustee has been duly authorized to execute and perform its obligations under this Agreement, (b) the persons signing this Agreement on behalf of Trustee and SFAI's bankruptcy estate have the power and authority to do so and to bind Trustee and SFAI's bankruptcy estate to this Agreement; and (c) this Agreement and all documents to be executed by Trustee that are to be delivered to Buyer at the Closing are, or at the time of Closing will be, legal, valid and binding obligations of Trustee and SFAI's bankruptcy estate, and do not, and at the time of Closing will not, violate any provisions of any agreement or judicial order to which Trustee is a party or to which the Trustee Property is subject.

8.2.2    No Consents.  With regard to the Trustee Property, the only third-party consent that is required to consummate the sale of the Trustee Property is the entry of the Sale Order, and, to the extent not otherwise included in the Sale Order, one or more Bankruptcy Court orders extending the time for the Trustee to assume, assume and assign, or reject the Lease, and authorizing the Trustee to enter into any amendments to the Lease.

8.2.3    Non-Foreign Person.  Trustee is not a foreign person as defined in Internal Revenue Code Section 1445(f)(3) and Trustee is not subject to withholding under Section 26131 of the California Revenue and Taxation Code.

9.    SELLERS' DISCLAIMER.

9.1    Sellers' Disclaimer.  Except for the representations and warranties by Sellers set forth in Article 8 or in any of the documents to be delivered by Sellers at the Closing, Buyer acknowledges and agrees that the sale of the Assets to Buyer is made without any warranty or representation of any kind by Sellers, either express or implied, with respect to any aspect, portion or component of the Assets. Buyer agrees and acknowledges that, as of the Effective Date, Buyer shall have made such feasibility studies, investigations, environmental studies, engineering studies, inquiries of governmental officials, and all other inquiries and investigations, which Buyer shall deem necessary to satisfy itself as to the condition, nature and quality of the Assets and as to the suitability of the Assets for Buyer's purposes.  Buyer further agrees and acknowledges that, in purchasing the Assets, Buyer shall rely entirely on its own investigation, examination and inspection of the Assets and not upon any representation or warranty of Sellers, or any agent or representative of Sellers, which is not set forth in Article 8 or any of the documents to be delivered by Sellers at the Closing.  THEREFORE, BUYER AGREES THAT, IN CONSUMMATING THE PURCHASE OF THE ASSETS PURSUANT TO THIS AGREEMENT, BUYER SHALL ACQUIRE THE ASSETS IN THEIR THEN

EXHIBIT A

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 30 of 101

CONDITION, "AS IS, WHERE IS" AND WITH ALL FAULTS, SOLELY IN RELIANCE ON BUYER'S OWN INVESTIGATION, EXAMINATION, INSPECTION, ANALYSIS AND EVALUATION OF THE ASSETS.

9.2 <u>Buyer's Release of Sellers</u>. Without limiting the disclaimer in Section 9.1, Buyer waives, from and after the Closing, any and all right to recover from Sellers and forever releases and discharges Sellers from any and all damages, claims, losses, liabilities, actions, causes of action, penalties, fines, liens, judgments, costs or expenses whatsoever (including, without limitation, attorneys' fees and costs), whether direct or indirect, known or unknown, foreseen or unforeseen, that Buyer may have at the Closing or which may arise in the future on account of or in any way arising out of or connected with the Assets.

Buyer hereby waives the protection of California Civil Code Section 1542, which reads as follows:

> "A general release does not extend to claims that the creditor or releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the debtor or released party."

Buyer's
Initials: _____

However, the foregoing provisions of this Section 9.2 shall not serve to release Sellers from any breach of the express representations and warranties set forth in this Agreement or in any document delivered by Sellers at the Closing or from any claim for fraud against Sellers.

10. <u>BUYER'S REPRESENTATIONS AND WARRANTIES</u>. Buyer hereby makes the following representations and warranties to Sellers, as of the Effective Date and as of the Closing Date:

10.1 <u>Due Organization</u>. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware.

10.2 <u>Due Authorization</u>. Buyer has been duly authorized to execute and perform its obligations under this Agreement, The person signing this Agreement on behalf of Buyer has the power and authority to do so and to bind Buyer to this Agreement. This Agreement and all documents executed by Buyer that are to be delivered to Sellers at the Closing are, or at the time of Closing will be, legal, valid and binding obligations of Buyer, and do not, and at the time of Closing will not, violate any provisions of any agreement or judicial order to which such Buyer is a party.

11. <u>CLOSING</u>.

11.1 <u>Closing</u>.

11.1.1 <u>Closing and Closing Date</u>. The parties shall close escrow for the transactions contemplated hereunder (the "**Closing**") on or before February 29, 2024 (the "**Closing Date**"), provided that all conditions precedent set forth in Section 4.1 have been satisfied or waived.  The Closing Date will not be extended after February 29, 2024, except as permitted pursuant to Section 11.1.2 or as otherwise may be approved in written by all parties to this Agreement.

11.1.2 <u>Buyer's Right to Extend Closing Date</u>.  Buyer shall have a one-time option (the "**Extension Option**") to extend the Closing Date to a date that is one hundred (100) days after the effective date of the legislation creating the Special Use District (the "**Extended Closing Date**") to provide additional time to satisfy or waive the condition precedent set forth in Section 4.1.4.  Buyer shall exercise the Extension Option by delivering written notice to Sellers on or before February 14, 2024 and paying to Sellers an amount equal to $5,610.74 multiplied by the number of days for the period from the original Closing Date to the Extended Closing Date (excluding the original Closing Date and including the Extended Closing Date) (the "**Extended Closing Period**"), which amount is the actual amount of Sellers' carrying costs for the Property (*i.e.*, real property taxes, insurance premiums, security and utilities relating to the Property paid by Trustee and the debt service on a loan relating to SFAI assumed by UC Regents) for the Extended Closing Period. Such payment shall be divided so that UC Regents receives $3,166.67 for each day of the Extended Closing Period and Trustee receives for the benefit of SFAI's bankruptcy estate $2,444.07 for each day of the Extended Closing Period.  In addition, concurrent with delivery of the notice to extend, Buyer shall authorize the Title Company to release a portion of the Deposit to Sellers in the amount of $1,500,000 which, upon release, shall be nonrefundable to Buyer (except as provided in Section 3.4) but shall continue to be applicable to the Purchase Price.  The released portion of the Deposit shall be divided so that UC Regents receives $1,125,000 and the Trustee receives for the benefit of SFAI's bankruptcy estate $375,000. Upon Buyer's exercise of the Extension Option in accordance with this Section 11.1.2, all references in this Agreement to the Closing Date shall be deemed to refer to the Extended Closing Date.

11.2 <u>UC Regent's Delivery Into Escrow</u>.  UC Regents shall deliver the following items into escrow at the Closing:

11.2.1 <u>Deed</u>.  A grant deed, duly executed and acknowledged by UC Regents in the form of <u>Exhibit F</u> attached to this Agreement (the "**Deed**"), conveying fee title to the Real Property to the Buyer.

11.2.2 <u>Quit Claim Bill of Sale</u>.  A quit claim bill of sale duly executed and acknowledged by UC Regents  in the form of <u>Exhibit G</u> attached to this Agreement conveying to Buyer the rights and interest of UC Regents, if any, in the Trustee Property ("**Quit Claim Bill of Sale**").

11.2.3 <u>Non-Foreign Affidavit</u>.  An affidavit duly executed by UC Regents certifying that UC Regents is not a "foreign person" within the meaning of Section 1445(f)(3) of the Internal Revenue Code of 1986, as amended.

11.2.4 <u>Form 593</u>. A Withholding Exemption Certificate, Form 593 duly executed by UC Regents pursuant to California Revenue and Taxation Code Sections 18805 and 26131 or its equivalent stating that UC Regents is exempt from such withholding requirement.

11.2.5 <u>Officer's Certificate</u>. An officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of the UC Regents in the form of <u>Exhibit J</u> attached to this Agreement that the UC Regent's representations and warranties contained in this Agreement are true and correct as of the Closing Date.

11.2.6 <u>W-9</u>. A duly completed and executed IRS Form W-9 from the UC Regents.

11.2.7 <u>Owner's Affidavit</u>. An owner's affidavit and mechanic's lien indemnity duly executed by UC Regents in favor of the Title Company as required to issue the Title Policy in the form of <u>Exhibit K</u> attached to this Agreement.

11.2.8 <u>Other Documents</u>. Such other documents or instruments as may be reasonably required by the Title Company to consummate this transaction in accordance with the terms and conditions herein contained, including any transfer tax affidavit and termination of the Memorandum of Lease and Purchase Option.

11.3 <u>Trustee's Delivery Into Escrow</u>. Trustee shall deliver the following items into escrow:

11.3.1 <u>Assignment of Lease</u>. An assignment of the Lease, as amended by the Assignment of and Sixth Amendment to Lease, from Trustee to Buyer duly executed by Trustee, in the form set forth on <u>Exhibit H</u>, attached to this Agreement (the "**Lease Assignment**").

11.3.2 <u>Bill of Sale and Assignment of Intangibles</u>. A bill of sale and assignment of intangibles duly executed by Trustee, in the form set forth on <u>Exhibit I</u>, attached to this Agreement (the "**Bill of Sale and Assignment of Intangibles**").

11.3.3 <u>Officer's Certificate</u>. A certificate of Trustee, dated as of the Closing Date, in the form attached as <u>Exhibit J</u> certifying that Trustee's representations and warranties contained in this Agreement are true and correct as of Closing Date.

11.3.4 <u>Certified Copy of Sale Order</u>. A certified copy of the Sale Order as entered by the Bankruptcy Court.

11.3.5 <u>W-9</u>. A duly completed and executed IRS Form W-9 from Trustee.

11.3.6 <u>Other Documents</u>. Such other documents or instruments as may be reasonably required by the Title Company to consummate this transaction in accordance with the terms and conditions herein contained.

11.4 <u>Buyer's Delivery Into Escrow</u>. Buyer shall deliver the following items into escrow:

EXHIBIT A

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 33 of 101

11.4.1 <u>Cash</u>.  Immediately available funds in the following amounts:  (a) the balance of the Purchase Price; (b) such amount, if any, as is necessary for Buyer to pay Buyer's share of the prorations and closing costs specified in Sections 11.5, 11.6 and 12; and (c) any other amounts required to close escrow in accordance with the terms of this Agreement.

11.4.2 <u>Lease Assignment</u>.  The Lease Assignment duly executed by Buyer.

11.4.3 <u>Notice of Exercise of Option</u>.  A notice to UC Regents duly executed by Buyer exercising Buyer's Option to purchase the Real Property pursuant to the Lease (the "**Notice of Exercise**").

11.4.4 <u>Officer's Certificate</u> .  An officer's certificate, dated as of the Closing Date, executed by a duly authorized officer of Buyer in the form attached as <u>Exhibit J</u> certifying that each of Buyer's representations and warranties contained in this Agreement are true and correct as of the Closing Date.

11.4.5 <u>Other Documents</u>.  Such other documents or instruments as may be reasonably required by the Title Company to consummate this transaction in accordance with the terms and conditions herein contained, including the preliminary change of ownership report and termination of the Memorandum of Lease and Purchase Option.

11.5 <u>Closing Prorations</u>.  At the Closing, all expense of the Real Property shall be prorated as provided on the basis of a 360-day year, actual days elapsed for the month in which the Closing occurs, as of midnight on the day immediately preceding the Closing Date. Expenses attributable to the period prior to the Closing Date shall be for the account of Sellers, and expenses attributable to the period on and after the Closing Date shall be for the account of Buyer.  Property taxes and assessments shall be prorated through escrow, and all other items of expense shall be prorated outside of escrow on the Closing Date by the parties.  The parties acknowledge that there is no income from the Assets that will be prorated.

11.6 <u>Closing Costs</u>.  Trustee shall pay the following closing costs:  (a) all fees and costs for releasing all encumbrances, liens and security interests of record which are not included as permitted exceptions on the Title Policy; and (b) county and city transfer taxes payable upon recordation of the Deed in excess of $1,320,000.  Trustee and Buyer shall each pay one-half of any sales tax assessed against the transfer of any of the Trustee Property.  Buyer shall pay the following closing costs:  (i) the premium for the Title Policy; (ii) all escrow fees; (iii) all costs incurred in connection with Buyer's due diligence investigations of the Assets, including, without limitation, physical inspections and survey updates; (iv) county and city transfer taxes payable upon recordation of the Deed in an amount up to $1,320,000; and (v) any other customary closing costs.  Each party shall pay for the costs of their respective counsel in connection with the Closing.  If this Agreement is terminated pursuant to the terms hereof, the Trustee, on the one hand, and Buyer, on the other, shall pay one-half of any escrow cancellation fee charged by Title Company.

11.7 <u>Closing Procedure</u>.  Title Company shall close escrow when it is in a position to: (i) pay to Sellers, in immediately available funds, the amount of the Purchase Price, as such

**EXHIBIT A**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 34 of 101

amount may be increased or decreased as a result of the allocation of prorations and closing costs as specified in Sections 11.5 and 11.6; and (ii) issue to Buyer the Title Policy.

11.8    Escrow.  Upon mutual execution of this Agreement, Buyer and Sellers shall deposit an executed counterpart of this Agreement with the Title Company and this Agreement shall serve as instructions to the Title Company for consummation of the purchase and sale contemplated hereunder.  Sellers and Buyer shall execute such supplemental escrow instructions as may be appropriate to enable the Title Company to comply with the terms of this Agreement, provided such supplemental escrow instructions are not in conflict with this Agreement.  The supplemental escrow instructions shall provide that the Sixth Amendment to Lease, the Lease Assumption and the following conveyance documents deposited into escrow pursuant to Sections 11.2, 11.3 and 11.4 shall be deemed effective in the following order: (a) first, the Sixth Amendment to Lease, (b) second, the Lease Assumption, (c) third, the Lease Assignment, (d) fourth, the Notice of Exercise of Option, and (e) fifth, the Deed, the Quit Claim Bill of Sale and the Bill of Sale and Assignment of Intangibles.  In the event of any conflict between the provisions of this Agreement and any supplementary escrow instructions signed by Buyer and Sellers, the terms of this Agreement shall control.

11.9    Compliance.  The Title Company shall comply with all applicable federal, state and local reporting and withholding requirements relating to the close of the transactions contemplated hereunder.  Without limiting the generality of the foregoing, to the extent the transactions contemplated under this Agreement involve a real estate transaction within the purview of Section 6045 of the Internal Revenue Code of 1986, as amended (the "**Internal Revenue Code**"), Title Company shall have sole responsibility to comply with the requirements of Section 6045 of the Internal Revenue Code (and any similar requirements imposed by state or local law).  Title Company shall hold Buyer, Sellers and their counsel free and harmless from and against any and all liability, claims, demands, damages and costs, including reasonable attorney's fees and other litigation expenses, arising or resulting from the failure or refusal of Title Company to comply with such reporting requirements.

12.    BROKERS AND CONSULTANTS.  At Closing, Trustee shall be solely responsible for and shall pay the commission due Cushman & Wakefield.  Buyer shall be solely responsible for and shall pay any and all commissions or fees, if any, that may be due Buyer's consultant, JLL Capital Markets, whether such amount is determined by order of a Court, agreement of Buyer and JLL Capital Markets, or otherwise.

13.    MISCELLANEOUS.

13.1    Notices.  All notices, demands or other communications of any type given by any party to the other or to Title Company, whether required by this Agreement or in any way related to this transaction, shall be in writing and shall be sent (a) by personal delivery, in which case notice shall be deemed delivered upon receipt; (b) by Federal Express or other comparable overnight delivery courier, in which case notice shall be deemed delivered one (1) business day after deposit with such courier; or (c) by electronic mail, in which case notice shall be deemed delivered upon confirmation of delivery if sent prior to 5:00 p.m. Pacific Time on a business day (otherwise, the next business day, provided that a copy of any notice by email must also be sent

EXHIBIT A

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 35 of 101

via one of the other methods permitted in this Section 13.1). Each notice to a party shall be addressed as follows:

To Trustee:            Paul Mansdorf, as Trustee
                       Chapter 7 Trustee
                       1569 Solano Ave. #703
                       Berkeley, CA  94707
                       Email: paul@mansdorftrustee.com

and to:                Rincon Law LLP
                       268 Bush St., #3335
                       San Francisco, California 94104
                       Attn: Gregg S. Kleiner  and Charles P. Maher
                       Emails: gkleiner@rinconlawllp.com and cmaher@rinconlawllp.com

To UC Regents:         University of California, Regents of the University of California
                       The Regents of the University of California
                       1111 Franklin Street, 7th Floor
                       Oakland, California 94607
                       Attn:   Real Estate Services
                       Email:  jacob.lavin@ucop.edu

and to:                Fox Rothschild LLP
                       345 California Street, Ste. 2200
                       San Francisco, California 94104
                       Attn: Michael A. Sweet and Edward J. Tredinnick
                       Emails: msweet@foxrothschild.com and etredinnick@foxrothschild.com

To Buyer:              BM-AI, LLC
                       c/o Wilson Sonsini Goodrich & Rosati
                       650 Page Mill Road
                       Palo Alto, CA  94304-1050
                       Attn:  Larry Sonsini
                       Email: lsonsini@wsgr.com

and to:                Wilson Sonsini Goodrich & Rosati
                       222 Delaware Avenue, Suite 800
                       Wilmington, Delaware 19801-5225
                       Attn:  Erin Fay
                       Email: efay@wsgr.com

and to:                Coblentz Patch Duffy & Bass LLP
                       One Montgomery Street, Suite 3000
                       San Francisco, California 94104
                       Attn:  Danna Kozerski
                       Email:  dkozerski@coblentzlaw.com

EXHIBIT A

and by email to:    INFO@BMAINSTITUTE.ORG

To Title Company:    Chicago Title Company
3620 Happy Valley Road, # 100
Lafayette, California 94549
Attn:  Laurie Edwards
Email:  Laurie.Edwards@ctt.com

Any notice required or permitted by this Agreement may be given by counsel for the party giving notice in a form provided herein.  Any address or name specified above may be changed by notice given to the addressee by the other party in accordance with this Section 13.1 .

13.2    Survival of Provisions.  Each representation, warranty, covenant or agreement contained in this Agreement shall survive and be binding and enforceable following the Closing and shall not be deemed to be merged into, or waived by delivery or recordation of, the Deed or any other instruments delivered at the Closing.

13.3    Rules of Construction.  Where required for proper interpretation, words in the singular shall include the plural; the masculine gender shall include the neuter and the feminine, and vice versa.  The headings of the Articles, Sections, Subsections and paragraphs contained in this Agreement are included only for convenience of reference and shall be disregarded in the construction and interpretation of this Agreement.  References in this Agreement to Articles, Sections, Subsections and paragraphs are references to the Articles, Sections, Subsections and paragraphs contained in this Agreement.  Each reference in this Agreement to an Article shall be deemed a reference to all Sections and Subsections contained within such Article; each reference to a Section shall be deemed a reference to all Subsections contained within such Section.  This Agreement has been fully negotiated at arms' length between the parties, after advice by counsel and other representatives chosen by the parties, and the parties are fully informed with respect thereto.  No party shall be deemed the scrivener of this Agreement and, accordingly, the provisions of this Agreement shall be construed as a whole according to their common meaning and not strictly for or against any party.  Use in this Agreement of the words "including" or "such as", or words of similar import, following any general term, statement or matter shall not be construed to limit such term, statement or matter to the enumerated items, whether or not language of non-limitation (such as "without limitation" or "but not limited to") are used with reference thereto, but rather shall refer to all items or matters that could reasonably fall within the broadest scope of such term, statement or matter.

13.4    Amendment; Waivers.  This Agreement may not be modified or amended except by an agreement in writing signed by the parties hereto.  A party may waive any of the conditions contained herein or any of the obligations of the other party hereunder, but any such waiver shall be effective only if in writing and signed by the party waiving such conditions or obligations.

13.5    Time of Essence.  Time is of the essence of this Agreement and each provision hereof.  If the Closing Date or any other deadline hereunder should fall on a Saturday, Sunday or legal holiday, such date shall automatically be extended to the next normal business day.  For

purposes of this Agreement, a "business day" shall mean any calendar day not a Saturday, Sunday or legal holiday recognized by the State of California or the United States.

13.6 <u>Attorneys' Fees</u>. If any party brings an action or proceeding at law or in equity to interpret or enforce this Agreement or any provisions contained herein, or to seek damages or other redress for a breach, the prevailing party shall be entitled to recover, in addition to all other remedies or damages, reasonable attorneys' fees incurred in such action or proceeding.

13.7 <u>Governing Law</u>. This Agreement shall be construed and interpreted in accordance with the laws of the State of California, except to the extent that federal bankruptcy laws are applicable.

13.8 <u>Jurisdiction, Exclusive Venue and Waiver of Jury Trial</u>. Each of the parties irrevocably agrees that any action of any kind whatsoever, including a counterclaim, cross-claim, or defense, regardless of the legal theory under which any liability or obligation may be sought to be imposed, whether sounding in contract or in tort or under statute, or whether at law or in equity, or otherwise under any legal or equitable theory, that may be based upon, arising out of, or related to this Agreement or the negotiation, execution, or performance of this Agreement or the transactions contemplated hereunder and any questions concerning the construction, interpretation, validity and enforceability of this Agreement (each, an "**Agreement Dispute**") brought by any other party or its successors or assigns will be brought and determined only in (a) as to claims or actions by or against the Trustee, solely in the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken, (b) as to claims or actions not by or against the Trustee, the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (c) as to claims or actions not by or against the Trustee, if the Bankruptcy Court is unwilling or unable to hear such action, in the San Francisco Superior Court (or if such court lacks jurisdiction, any other state or federal court sitting in the State of California) (collectively (a)-(c), the "**Chosen Courts**"), and each of the parties hereby irrevocably submits to the exclusive jurisdiction of the Chosen Courts as set forth above for itself and with respect to its property, generally and unconditionally, with regard to any Agreement Dispute. Each of the parties agrees not to commence any Agreement Dispute except in the Chosen Courts as set forth above, other than actions in any court of competent jurisdiction to enforce any order, decree or award rendered by any Chosen Courts, and no party will file a motion to dismiss any Agreement Dispute filed in a Chosen Court on any jurisdictional or venue-related grounds, including the doctrine of *forum non conveniens*. The parties irrevocably agree that venue would be proper in any of the Chosen Court as to set forth above, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of any Agreement Dispute. Each of the parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in clauses (a) - (c) of Section 13.1. Nothing in this Agreement will affect the right of any party to serve process in any other manner permitted by law.

13.9 <u>Entire Agreement</u>. This Agreement, including the exhibits hereto, constitutes the entire agreement between the parties pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and understandings of the parties in connection therewith. No representation, warranty, covenant, agreement or condition not expressed in this Agreement shall be binding upon the parties hereto or shall affect or be effective to interpret,

change or restrict the provisions of this Agreement.   Provided, however, that (i) certain Revised Agreement Concerning Transfer of Real Property and Sale Proceeds, dated as of November ___, 2023, and (ii) Fourth Amendment to Triple Net Lease, dated as of October 30, 2023, between the Trustee and UC Regents shall govern the agreements between Sellers.

13.10   Assignment; Successors and Assigns.  Buyer and Sellers shall not have the right to assign this Agreement, without the prior written consent of the other parties.  Notwithstanding the foregoing, Buyer may assign is interests herein to an affiliate of Buyer upon prior written notice to the Sellers, which notice shall include proof that the assignee can and will close the sale contemplated by this Agreement. This Agreement will be binding upon and inure to the benefit of Sellers and Buyer and their respective successors and permitted assigns, and no other party will be conferred any rights by virtue of this Agreement or be entitled to enforce any of the provisions hereof.

13.11   Exhibits and Schedules.  Each exhibit and schedule to which reference is made in this Agreement is deemed incorporated into this Agreement in its entirety by such reference. The exhibits and schedules to this Agreement are the following:

| | |
|---|---|
| Exhibit A | Legal Description of Real Property |
| Exhibit B | Intentionally Deleted |
| Exhibit C | Form of Sixth Amendment to Lease |
| Exhibit D | Form of Assumption of Lease |
| Exhibit E | Title Commitment |
| Exhibit F | Form of Deed |
| Exhibit G | Form of Quit Claim Bill of Sale |
| Exhibit H | Form of Lease Assignment |
| Exhibit I | Form of Bill of Sale and Assignment of Intangibles |
| Exhibit J | Form of Closing Certificate |
| Exhibit K | Form of Owner's Affidavit |
| Schedule 1 | Personal Property to be Conveyed |

13.12   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which taken together shall constitute one and the same instrument.

[*signatures follow on next page*]

**EXHIBIT A**

Case: 23-30250   Doc# 129-1   Filed: 11/22/23   Entered: 11/22/23 05:28:12   Page 39 of 101

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth below.

TRUSTEE: _____

Paul Mansdorf, as Trustee appointed pursuant to chapter 7 of the Bankruptcy Code for The San Francisco Art Institute, a California non-profit public benefit corporation

Date: _____11/20/23_____

UC REGENTS: THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
a California public corporation

By: _____
Name: Nathan Brostrom
Its: Executive Vice President – Chief Financial Officer
Date: _____

BUYER: BM-AI, LLC
a Delaware limited liability company

By: BM-A Institute
a Delaware corporation
Its: Sole Member

By: _____
Name: _____
Its: _____
Date: _____

**EXHIBIT A**

DocuSign Envelope ID: D39AE361-00DE-4CAD-8003-732298E5A332

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth below.

TRUSTEE:      _____

Paul Mansdorf, as Trustee appointed pursuant to chapter 7
of the Bankruptcy Code for The San Francisco Art Institute, a California
non-profit public benefit corporation

Date: _____

UC REGENTS:     THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
a California public corporation

By: _Nathan Brostrom_____

Name: Nathan Brostrom

Its:      Executive Vice President – Chief Financial Officer

Date: _11/21/2023_____

BUYER:      BM-AI, LLC
a Delaware limited liability company

By:     BM-A Institute
a Delaware corporation
Its: Sole Member

By:     _____

Name: _____

Its:      _____

Date: _____

**EXHIBIT A**

IN WITNESS WHEREOF, the parties have executed this Agreement on the dates set forth below.

TRUSTEE:

_____
Paul Mansdorf, as Trustee appointed pursuant to chapter 7 of the Bankruptcy Code for The San Francisco Art Institute, a California non-profit public benefit corporation
Date: _____

UC REGENTS:

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
a California public corporation

By: _____
Name: Nathan Brostrom
Its: Executive Vice President – Chief Financial Officer
Date: _____

BUYER:

BM-AI, LLC
a Delaware limited liability company

By: BM-A Institute
a Delaware corporation
Its: Sole Member

By: _____
Name: Lynn Feintech
Its: Secretary / Treasurer
Date: 11/21/2023

EXHIBIT A

<u>JOINDER AND DEPOSIT RECEIPT</u>

The Deposit has been received by the Title Company on the _____ day of November, 2023, and the Title Company acknowledges the terms and conditions of this Agreement and agrees to perform as the escrow agent in accordance therewith.

**TITLE COMPANY:**

CHICAGO TITLE COMPANY


By: _____
Name: _____
Title _____

EXHIBIT A

**EXHIBIT A**

**LEGAL DESCRIPTION OF THE REAL PROPERTY**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN FRANCISCO, IN THE COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

BEGINNING at the point formed by the intersection of the Northerly line of Chestnut Street with the Westerly line of Jones Street; running thence Northerly, along said Westerly line of Jones Street 275 feet to the Southerly line of Francisco Street; thence at a right angle Westerly, along said Southerly line of Francisco Street, 275 feet; thence at a right angle Southerly 275 feet to the Northerly line of Chestnut Street; thence at a right angle Easterly, along said Northerly line of Chestnut Street, 275 feet to the point of beginning.

BEING a portion of 50 Vara Block No. 234

APN:  **Lot 001, Block 0049**

**EXHIBIT B**

**INTENTIONALLY DELETED**

EXHIBIT A

Case: 23-30250   Doc# 129-1   Filed: 11/22/23   Entered: 11/22/23 05:28:12   Page 45
of 101

<u>**EXHIBIT C**</u>

**FORM OF SIXTH AMENDMENT TO LEASE**

**SIXTH AMENDMENT TO TRIPLE NET LEASE**

This Sixth Amendment to Triple Net Lease (this "**Amendment**") is made as of
_____, 2024 [*date to be inserted is Closing Date*] by and between PAUL
MANSDORF, solely in his capacity as the Trustee appointed pursuant to Chapter 7 of the
Bankruptcy Code ("**Trustee**") for SAN FRANCISCO ART INSTITUTE, a California nonprofit
public benefit corporation ("**SFAI**" or "**Tenant**"), and THE REGENTS OF THE UNIVERSITY
OF CALIFORNIA, a California public corporation ("**Landlord**").

**Recitals**

A. Landlord and SFAI entered into that certain Triple Net Lease with an effective
date of October 30, 2020, as amended by that certain First Lease Amendment dated as of April
8, 2022, by that certain Second Amendment to Triple Net Lease dated as of August 31, 2022,
by that certain Third Amendment to Triple Net Lease dated as of October 1, 2022, and by that
certain Fourth Amendment to Triple Net Lease dated as of October 30, 2023  (the "**Existing
Lease**"). Terms used herein and not defined herein shall have the meanings given them in the
Existing Lease.

B. On April 19, 2023, SFAI filed a voluntary petition under chapter 7 of title 11
of the United States Bankruptcy Code in the United States Bankruptcy Court for the
Northern District of California (the "**Bankruptcy Court**"), which case is proceeding under
Case No. 23-30250 (HLB).

C. On November \_\_\_, 2023, Trustee and Landlord, as seller, and BM-AI LLC,
a Delaware limited liability company ("**BM-AI**"), as buyer, entered into that certain
Purchase and Sale Agreement and Escrow Instructions (the "**Purchase and Sale
Agreement**"), pursuant to which BM-AI will, *inter alia*, purchase or assume certain assets
of SFAI, including assuming the rights of Tenant under the Existing Lease, as amended
hereby.

D. On December \_\_, 2023, the Bankruptcy Court entered an order, *inter alia*,
permitting the Trustee to enter into and perform under this Amendment [Docket No. \_\_]
(the "**Bankruptcy Court Order**").

E. Concurrently herewith, Trustee will assume the obligations of Tenant under
the Existing Lease pursuant to that certain Assumption of Lease.

F. As a condition to BM-AI's obligations to consummate the transaction
contemplated by the Purchase and Sale Agreement, BM-AI requires Trustee and Landlord
to amend the Existing Lease to (i) acknowledge the cure by Tenant of any defaults of
Tenant under the Existing Lease or the waiver by Landlord of such defaults; (ii) revise the
terms and conditions of the Option; and (iii) approve the assignment of Tenant's interest

**EXHIBIT A**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 46
of 101

under the Existing Lease to BM-AI.

       G.      The parties desire to amend the Existing Lease.

**Amendment**

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants contained herein and in the Existing Lease and other good and valuable consideration, the adequacy of which is hereby acknowledged, the parties agree to amend the Existing Lease as follows:

      1.     <u>Tenant Default</u>.  Landlord acknowledges that any existing Event of Default or any default of Tenant that with the passage of time or notice may ripen into an Event of Default has been cured or is hereby waived by Landlord.  Any existing Events of Default or potential defaults under the Lease and any other amounts that may be due and owing to Landlord (including amounts relating to Claims under Section 11.2) have been cured or satisfied by payment of $1,500,000 ("**Cure Amount**") from Trustee to Landlord pursuant to the Purchase and Sale Agreement, provided the Cure Amount is received by Landlord on or before February 29, 2024.

      2.     <u>Purchase Option</u>. Section 54 of the Existing Lease is amended and restated as follows:

        **54.**   PURCHASE OPTION.

    (a) **Option**. Tenant shall have the exclusive option to purchase the Real Property (the "**Option**") from Landlord on the terms and conditions set forth herein and in the Purchase and Sale Agreement.

    (b) **Purchase Price**. In the event Tenant elects to exercise the Option, the purchase price for the Real Property shall be $22,500,000**.**

    (c) **Exercise of Option**.  To exercise the Option, Tenant shall provide Landlord with written notice of its intent to exercise the Option ("**Notice of Exercise**").

    (d) **Close of Escrow**.  Upon receiving the Notice of Exercise, closing shall occur through escrow pursuant to the terms and conditions of the Purchase and Sale Agreement.

    (e) **Grant Deed**.  At Closing, Landlord shall by grant deed convey fee title to the Real Property to Tenant, free and clear of all deeds of trust, mortgages and liens that result from Landlord's affirmative acts, except non-delinquent real property taxes.  Landlord shall have no responsibility for any other matters on title, other than any title matters caused to appear of record by Landlord during its period of

ownership of the Real Property.

(f) **Subordination**.  This Option shall not be subject to the subordination provisions of Section 21.2 of the Lease.

(g) **Termination of Lease**.  As of Closing, all rights and obligations of Landlord and Tenant under the Lease shall be terminated and the Landlord and Tenant shall execute a termination of the Memorandum of Lease and Purchase Option recorded in the Official Records of San Francisco County on October 30, 2020 as Document No. 2020041420.

3.      <u>Assignment of Lease to BM-AI</u>.  Pursuant to Section 17.1 of the Existing Lease, Landlord hereby consents to the assignment of the Lease by Trustee to BM-AI, and acknowledges that the terms of the Option are not personal to SFAI or Trustee and are assigned to and may be exercised by BM-AI.

4.      <u>Miscellaneous</u>. Except as amended by this Amendment, the Existing Lease remains unmodified and, as amended by this Amendment, remains in full force and effect. All references in this Amendment and in the Existing Lease to the "Lease" shall mean the Existing Lease as amended by this Amendment. This Amendment may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute a single instrument. This Amendment may be executed electronically by email delivery of .pdf signatures, DocuSign or other similar electronic means.

**EXHIBIT A**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 48 of 101

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date and year first above written.


TRUSTEE:            _____
                    Paul Mansdorf, as Trustee appointed pursuant to chapter 7
                    of the Bankruptcy Code for The San Francisco Art Institute, a California
                    non-profit public benefit corporation

                    Date:  _____


LANDLORD:           THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
                    a California public corporation

                    By:    _____
                    Name:  David Phillips
                    Its:   Associate Vice President Capital Programs,
                           Energy & Sustainability
                    Date:  _____

**EXHIBIT A**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 49
of 101

**EXHIBIT D**

**FORM OF ASSUMPTION OF LEASE**

**ASSUMPTION OF LEASE**

THIS ASSUMPTION OF LEASE (this "**Assumption**") dated as of _____, 2024 [*date to be inserted is Closing Date*] is made by PAUL MANSDORF, solely in his capacity as the Trustee appointed pursuant to Chapter 7 of the Bankruptcy Code ("**Trustee**") for SAN FRANCISCO ART INSTITUTE, a California nonprofit public benefit corporation ("**SFAI**" or "**Tenant**").

A.     The Regents of the University of California, a California public corporation ("**Landlord**"), and SFAI entered into that certain Triple Net Lease with an effective date of October 30, 2020 (the "**Original Lease**"), as amended by that certain First Lease Amendment dated as of April 8, 2022, by that certain Second Amendment to Triple Net Lease dated as of August 31, 2022,  by that certain Third Amendment to Triple Net Lease dated as of October 1, 2022.

B.     On April 19, 2023, SFAI filed a voluntary petition under chapter 7 of title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**"), which case is proceeding under Case No. 23-30250 (HLB).

C.     On November \_\_\_, 2023, Trustee and Landlord, as sellers, and BM-AI LLC, a Delaware limited liability company ("**BM-AI**"), as buyer, entered into that certain Purchase and Sale Agreement and Escrow Instructions (the "**Purchase and Sale Agreement**"), pursuant to which BM-AI will, *inter alia*, purchase or assume certain assets of SFAI.

D.     On December \_\_, 2023, the Bankruptcy Court entered an order, *inter alia,* permitting the Trustee to enter into and perform under the Purchase and Sale Agreement and this Assumption [Docket No. \_\_] (the "**Bankruptcy Court Order**").

E.     As required by the terms of the Purchase and Sale Agreement, (i) Landlord and Trustee further amended the Original Lease pursuant to that certain Fourth Amendment to Triple Net Lease dated as of October 30, 2023, that certain Fifth Amendment to Triple Net Lease dated as of November 16, 2023 and that certain Sixth Amendment to Triple Net Lease dated as of the date hereof (the Original Lease, as amended as described in Recital A and this Recital E, is hereinafter referred to as the "**Existing Lease**").

F.     In connection with the closing of the purchase and sale of applicable assets of SFAI and as further required by the Purchase and Sale Agreement, Trustee on behalf of Tenant elects to assume the Existing Lease on the terms and conditions below.

ACCORDINGLY, the parties hereby agree as follows:

**EXHIBIT A**

Case: 23-30250   Doc# 129-1   Filed: 11/22/23   Entered: 11/22/23 05:28:12   Page 50 of 101

Trustee on behalf of Tenant hereby assumes and agrees to perform and observe all of SFAI's rights and obligations as tenant under the Existing Lease arising from and after the date hereof.

IN WITNESS WHEREOF, the parties hereto have executed this Assumption as of the date and year first above written.

TRUSTEE:

_____
Paul Mansdorf, as Trustee appointed pursuant to chapter 7 of the Bankruptcy Code for The San Francisco Art Institute, a California non-profit public benefit corporation

EXHIBIT A

**<u>EXHIBIT E</u>**

**TITLE COMMITMENT**


**[to follow]**

019848.0001 4853-8869-3635.19
150287801.1                                        E-1

EXHIBIT A

# COMMITMENT FOR TITLE INSURANCE

*Issued by*

**Chicago Title Insurance Company**

## NOTICE

IMPORTANT—READ CAREFULLY: THIS COMMITMENT IS AN OFFER TO ISSUE ONE OR MORE TITLE INSURANCE POLICIES. ALL CLAIMS OR REMEDIES SOUGHT AGAINST THE COMPANY INVOLVING THE CONTENT OF THIS COMMITMENT OR THE POLICY MUST BE BASED SOLELY IN CONTRACT.

THIS COMMITMENT IS NOT AN ABSTRACT OF TITLE, REPORT OF THE CONDITION OF TITLE, LEGAL OPINION, OPINION OF TITLE, OR OTHER REPRESENTATION OF THE STATUS OF TITLE. THE PROCEDURES USED BY THE COMPANY TO DETERMINE INSURABILITY OF THE TITLE, INCLUDING ANY SEARCH AND EXAMINATION, ARE PROPRIETARY TO THE COMPANY, WERE PERFORMED SOLELY FOR THE BENEFIT OF THE COMPANY, AND CREATE NO EXTRACONTRACTUAL LIABILITY TO ANY PERSON, INCLUDING A PROPOSED INSURED.

THE COMPANY'S OBLIGATION UNDER THIS COMMITMENT IS TO ISSUE A POLICY TO A PROPOSED INSURED IDENTIFIED IN SCHEDULE A IN ACCORDANCE WITH THE TERMS AND PROVISIONS OF THIS COMMITMENT. THE COMPANY HAS NO LIABILITY OR OBLIGATION INVOLVING THE CONTENT OF THIS COMMITMENT TO ANY OTHER PERSON.

## COMMITMENT TO ISSUE POLICY

Subject to the Notice; Schedule B, Part I—Requirements; Schedule B, Part II—Exceptions; and the Commitment Conditions, Chicago Title Insurance Company, a Florida (the "Company"), commits to issue the Policy according to the terms and provisions of this Commitment. This Commitment is effective as of the Commitment Date shown in Schedule A for each Policy described in Schedule A, only when the Company has entered in Schedule A both the specified dollar amount as the Proposed Amount of Insurance and the name of the Proposed Insured.

If all of the Schedule B, Part I—Requirements have not been met within 180 days after the Commitment Date, this Commitment terminates and the Company's liability and obligation end.

## COMMITMENT CONDITIONS

1.   DEFINITIONS
    a.   "Discriminatory Covenant": Any covenant, condition, restriction, or limitation that is unenforceable under applicable law because it illegally discriminates against a class of individuals based on personal characteristics such as race, color, religion, sex, sexual orientation, gender identity, familial status, disability, national origin, or other legally protected class.
    b.   "Knowledge" or "Known": Actual knowledge or actual notice, but not constructive notice imparted by the Public Records.
    c.   "Land": The land described in Item 5 of Schedule A and improvements located on that land that by law constitute real property. The term "Land" does not include any property beyond that described in Schedule A, nor any right, title, interest, estate, or easement in any abutting street, road, avenue, alley, lane, right-of-way, body of water, or waterway, but does not modify or limit the extent that a right of access to and from the Land is to be insured by the Policy.

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

**Copyright ©2021 American Land Title Association. All rights reserved.**  The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

AMERICAN
LAND TITLE
ASSOCIATION

**EXHIBIT A**

d. "Mortgage": A mortgage, deed of trust, trust deed, security deed, or other real property security instrument, including one evidenced by electronic means authorized by law.

e. "Policy": Each contract of title insurance, in a form adopted by the American Land Title Association, issued or to be issued by the Company pursuant to this Commitment.

f. "Proposed Amount of Insurance": Each dollar amount specified in Schedule A as the Proposed Amount of Insurance of each Policy to be issued pursuant to this Commitment.

g. "Proposed Insured": Each person identified in Schedule A as the Proposed Insured of each Policy to be issued pursuant to this Commitment.

h. "Public Records": The recording or filing system established under state statutes in effect at the Commitment Date under which a document must be recorded or filed to impart constructive notice of matters relating to the Title to a purchaser for value without Knowledge. The term "Public Records" does not include any other recording or filing system, including any pertaining to environmental protection, planning, permitting, zoning, licensing, building, health, public safety, or national security matters.

i. "State": The state or commonwealth of the United States within whose exterior boundaries the Land is located. The term "State" also includes the District of Columbia, the Commonwealth of Puerto Rico, the U.S. Virgin Islands, and Guam.

j. "Title": The estate or interest in the Land identified in Item 3 of Schedule A.

2. If all of the Schedule B, Part I—Requirements have not been met within the time period specified in the Commitment to Issue Policy, this Commitment terminates and the Company's liability and obligation end.

3. The Company's liability and obligation is limited by and this Commitment is not valid without:
   a. the Notice;
   b. the Commitment to Issue Policy;
   c. the Commitment Conditions;
   d. Schedule A;
   e. Schedule B, Part I—Requirements; and
   f. Schedule B, Part II—Exceptions; and
   g. a counter-signature by the Company or its issuing agent that may be in electronic form.

4. COMPANY'S RIGHT TO AMEND
   The Company may amend this Commitment at any time. If the Company amends this Commitment to add a defect, lien, encumbrance, adverse claim, or other matter recorded in the Public Records prior to the Commitment Date, any liability of the Company is limited by Commitment Condition 5. The Company is not liable for any other amendment to this Commitment.

5. LIMITATIONS OF LIABILITY
   a. The Company's liability under Commitment Condition 4 is limited to the Proposed Insured's actual expense incurred in the interval between the Company's delivery to the Proposed Insured of the Commitment and the delivery of the amended Commitment, resulting from the Proposed Insured's good faith reliance to:
      i. comply with the Schedule B, Part I—Requirements;
      ii. eliminate, with the Company's written consent, any Schedule B, Part II—Exceptions; or
      iii. acquire the Title or create the Mortgage covered by this Commitment.
   b. The Company is not liable under Commitment Condition 5.a. if the Proposed Insured requested the amendment or had Knowledge of the matter and did not notify the Company about it in writing.
   c. The Company is only liable under Commitment Condition 4 if the Proposed Insured would not have incurred the expense had the Commitment included the added matter when the Commitment was first delivered to the Proposed Insured.
   d. The Company's liability does not exceed the lesser of the Proposed Insured's actual expense incurred in good faith and described in Commitment Condition 5.a. or the Proposed Amount of Insurance.

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

**Copyright ©2021 American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.




**EXHIBIT A**

e.  The Company is not liable for the content of the Transaction Identification Data, if any.
f.  The Company is not obligated to issue the Policy referred to in this Commitment unless all of the Schedule B, Part I—Requirements have been met to the satisfaction of the Company.
g.  The Company's liability is further limited by the terms and provisions of the Policy to be issued to the Proposed Insured.

6.  LIABILITY OF THE COMPANY MUST BE BASED ON THIS COMMITMENT
a.  Only a Proposed Insured identified in Schedule A, and no other person, may make a claim under this Commitment.
b.  Any claim must be based in contract and is restricted to the terms and provisions of this Commitment.
c.  This Commitment, as last revised, is the exclusive and entire agreement between the parties with respect to the subject matter of this Commitment and supersedes all prior commitment negotiations, representations, and proposals of any kind, whether written or oral, express or implied, relating to the subject matter of this Commitment.
d.  The deletion or modification of any Schedule B, Part II—Exception does not constitute an agreement or obligation to provide coverage beyond the terms and provisions of this Commitment or the Policy.
e.  Any amendment or endorsement to this Commitment must be in writing and authenticated by a person authorized by the Company.
f.  When the Policy is issued, all liability and obligation under this Commitment will end and the Company's only liability will be under the Policy.

7.  IF THIS COMMITMENT IS ISSUED BY AN ISSUING AGENT
The issuing agent is the Company's agent only for the limited purpose of issuing title insurance commitments and policies. The issuing agent is not the Company's agent for the purpose of providing closing or settlement services.

8.  PROFORMA POLICY
The Company may provide, at the request of a Proposed Insured, a proforma policy illustrating the coverage that the Company may provide. A proforma policy neither reflects the status of Title at the time that the pro-forma policy is delivered to a Proposed Insured, nor is it a commitment to insure.

9.  CLAIMS PROCEDURES
This Commitment incorporates by reference all Conditions for making a claim in the Policy to be issued to the Proposed Insured. This Commitment Condition does not modify the limitations of liability in Commitment Conditions 5 and 6.

10.  CLASS ACTION
ALL CLAIMS AND DISPUTES ARISING OUT OF OR RELATING TO THIS COMMITMENT, INCLUDING ANY SERVICE OR OTHER MATTER IN CONNECTION WITH ISSUING THIS COMMITMENT, ANY BREACH OF A COMMITMENT PROVISION, OR ANY OTHER CLAIM OR DISPUTE ARISING OUT OF OR RELATING TO THE TRANSACTION GIVING RISE TO THIS COMMITMENT, MUST BE BROUGHT IN AN INDIVIDUAL CAPACITY. NO PARTY MAY SERVE AS PLAINTIFF, CLASS MEMBER, OR PARTICIPANT IN ANY CLASS OR REPRESENTATIVE PROCEEDING. ANY POLICY ISSUED PURSUANT TO THIS COMMITMENT WILL CONTAIN A CLASS ACTION CONDITION.

11.  ARBITRATION
The Policy contains an arbitration clause. All arbitrable matters when the Proposed Amount of Insurance is $2,000,000 or less may be arbitrated at the election of either the Company or the Proposed Insured as the exclusive remedy of the parties. A Proposed Insured may review a copy of the arbitration rules at http://www.alta.org/arbitration.

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

72C170B ALTA Commitment for Title Insurance (Effective 7-1-21)                                                                 Page 3

Copyright ©2021 American Land Title Association. All rights reserved.  The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.

AMERICAN
LAND TITLE
ASSOCIATION

**EXHIBIT A**

*Transaction Identification Data, for which the Company assumes no liability as set forth in Commitment Condition 5.e.:*

| | |
|---|---|
| Issuing Agent: | Chicago Title Company |
| Issuing Office: | 1200 Concord Avenue, Suite 400, Concord, CA 94520 |
| ALTA® Universal ID: | |
| Loan ID Number: | |
| Commitment Number: | |
| Issuing Office File Number: | 36200889-362-LE4-JJ |
| Property Address: | 800 Chestnut Street, San Francisco, CA |
| Revision Number: | UPDATE A |

# SCHEDULE A

AMERICAN LAND TITLE ASSOCIATION COMMITMENT

1. Commitment Date: **November 3, 2023**

2. Policy to be issued:

   (a) **ALTA Extended Owner's Policy (7-1-21)**

   **ALTA Endorsements 8.2, 17, 17.2, 18, 22, 25, 26, 28.1 and SE-511**

   Proposed Insured: **BM-AI, LLC, a Delaware limited liability company**

   Proposed Amount of Insurance: **$0.00**

   The estate or interest to be insured: **A Fee**

3. The estate or interest in the Land at the Commitment Date is:

   **A Fee**

4. The Title is, at the Commitment Date, vested in:

   **The Regents of the University of California, a California public corporation**

5. The Land is described as follows:

   **See Exhibit A attached hereto and made a part hereof.**

Countersigned:

By:

Authorized Signature

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

**Copyright ©2021 American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**EXHIBIT A**

# EXHIBIT A
## LEGAL DESCRIPTION

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF SAN FRANCISCO, IN THE COUNTY OF SAN FRANCISCO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

BEGINNING at the point formed by the intersection of the Northerly line of Chestnut Street with the Westerly line of Jones Street; running thence Northerly, along said Westerly line of Jones Street 275 feet to the Southerly line of Francisco Street; thence at a right angle Westerly, along said Southerly line of Francisco Street, 275 feet; thence at a right angle Southerly 275 feet to the Northerly line of Chestnut Street; thence at a right angle Easterly, along said Northerly line of Chestnut Street, 275 feet to the point of beginning.

BEING a portion of 50 Vara Block No. 234

Parcel Numbers: **Lot 001, Block 0049**

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

**Copyright ©2021 American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

**EXHIBIT A**

# SCHEDULE B – PART I
# REQUIREMENTS

All of the following Requirements must be met:

1.  The Proposed Insured must notify the Company in writing of the name of any party not referred to in this Commitment who will obtain an interest in the Land or who will make a loan on the Land. The Company may then make additional Requirements or Exceptions.

2.  Pay the agreed amount for the estate or interest to be insured.

3.  Pay the premiums, fees, and charges for the Policy to the Company.

4.  Documents satisfactory to the Company that convey the Title or create the Mortgage to be insured, or both, must be properly authorized, executed, delivered, and recorded in the Public Records.

5.  Notice:  Please be aware that due to the conflict between federal and state laws concerning the cultivation, distribution, manufacture or sale of marijuana, the Company is not able to close or insure any transaction involving Land that is associated with these activities.

6.  Due to the special requirements of SB 50 (California Public Resources Code Section 8560 et seq.), any transaction that includes the conveyance of title by an agency of the United States must be approved in advance by the Company's State Counsel, Regional Counsel, or one of their designees.

7.  Prior to close of escrow, please contact the Tax Collector's Office to confirm all amounts owing, including current fiscal year taxes, supplemental taxes, escaped assessments and any delinquencies.

8.  The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance by the corporation named below:

    Name of Corporation:    The Regents of the University of California, a California public corporation

    a)    A Copy of the corporation By-laws and Articles of Incorporation

    b)    An original or certified copy of a resolution authorizing the transaction contemplated herein

    c)    If the Articles and/or By-laws require approval by a 'parent' organization, a copy of the Articles and By-laws of the parent

    The Company reserves the right to add additional items or make further requirements after review of the requested documentation.

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

71C170B ALTA Commitment for Title Insurance (Effective 7-1-21)                                    Page 3

**Copyright ©2021 American Land Title Association. All rights reserved.**  The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



EXHIBIT A

# SCHEDULE B
## PART I – REQUIREMENTS
(Continued)

9.  Any rights of the parties in possession of a portion of, or all of, said Land, which rights are not disclosed by the public records.

The Company will require, for review, a full and complete copy of any unrecorded agreement, contract, license and/or lease, together with all supplements, assignments and amendments thereto, before issuing any policy of title insurance without excepting this item from coverage.

The Company reserves the right to except additional items and/or make additional requirements after reviewing said documents.

10. The Company will require that an Owner's Affidavit be completed by the party(s) named below before the issuance of any policy of title insurance.

Party(s):                   The Regents of the University of California, a California public corporation

The Company reserves the right to add additional items or make further requirements after review of the requested Affidavit.

11. The Company will require the following documents for review prior to the issuance of any title insurance predicated upon a conveyance or encumbrance from the entity named below:

Limited Liability Company:        BM-AI, LLC, a Delaware limited liability company (Proposed Insured)

a)  A copy of its operating agreement, if any, and all amendments, supplements and/or modifications thereto, certified by the appropriate manager or member.

b)  If a domestic Limited Liability Company, a copy of its Articles of Organization and all amendments thereto with the appropriate filing stamps.

c)  If the Limited Liability Company is member-managed, a full and complete current list of members certified by the appropriate manager or member.

d)  A current dated certificate of good standing from the proper governmental authority of the state in which the entity is currently domiciled.

e)  If less than all members, or managers, as appropriate, will be executing the closing documents, furnish evidence of the authority of those signing.

f)  If Limited Liability Company is a Single Member Entity, a Statement of Information for the Single Member will be required.

g)  Each member and manager of the LLC without an Operating Agreement must execute in the presence of a notary public the Certificate of California LLC (Without an Operating Agreement) Status and Authority form.

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

Copyright ©2021 American Land Title Association. All rights reserved.  The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**EXHIBIT A**



Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 59 of 101

# SCHEDULE B
## PART I – REQUIREMENTS
(Continued)

12.    Requirement to provide for approval the resolution from UC Regents to sale property.

13.    Requirement for confirmation that there is no construction underway or completed within the last 120 days.

14.    Requirement to provide a copy of the rent roll, if any.

15.    Requirement to record a Termination for Memorandum of Lease and Purchase Option, recorded October 30, 2020, Instrument No. 2020041420, of Official Records.

16.    Requirement to supply a copy of the survey if any.

17.    For each policy to be issued as identified in Schedule A, Item 2; the Company shall not be liable under this commitment until it receives a designation for a Proposed Insured, acceptable to the Company. As provided in Commitment Condition 4, the Company may amend this commitment to add, among other things, additional exceptions or requirements after the designation of the Proposed Insured.

---

### END OF SCHEDULE B – Part I

---

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

**Copyright ©2021 American Land Title Association. All rights reserved.**  The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**EXHIBIT A**

## SCHEDULE B – PART II

## EXCEPTIONS

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This Commitment and the Policy treat any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document will be excepted from coverage.**

The Policy will not insure against loss or damage resulting from the terms and conditions of any lease or easement identified in Schedule A, and will include the following Exceptions unless cleared to the satisfaction of the Company:

A. Any defect, lien, encumbrance, adverse claim, or other matter that appears for the first time in the Public Records or is created, attaches, or is disclosed between the Commitment Date and the date on which all of the Schedule B, Part I—Requirements are met.

1. There were no taxes levied for the fiscal year 2023-2024 as the property was vested in a public entity.

2. Intentionally deleted

3. The lien of supplemental or escaped assessments of property taxes, if any, made pursuant to the provisions of Chapter 3.5 (commencing with Section 75) or Part 2, Chapter 3, Articles 3 and 4, respectively, of the Revenue and Taxation Code of the State of California as a result of the transfer of title to the vestee named in Schedule A or as a result of changes in ownership or new construction occurring prior to Date of Policy.

4. Intentionally deleted

5. The Land lies within the boundaries of a Mello Roos Community Facilities District ("CFD"), as follows:

   CFD No:              90-1
   For:                 School Facility Repair and Maintenance

   This property, along with all other parcels in the CFD, is liable for an annual special tax. This special tax is included with and payable with the general property taxes of the City of San Francisco and County of San Francisco. The tax may not be prepaid.

   Further information may be obtained by contacting:

   Chief Financial Officer
   San Francisco Unified School District
   135 Van Ness Ave. – Room 300
   San Francisco, CA 94102
   Phone (415) 241-6542

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

**Copyright ©2021 American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.




**EXHIBIT A**

**SCHEDULE B**
**PART II – EXCEPTIONS**
(Continued)

6.    Intentionally deleted

7.    A Notice of Designation of Landmark

|  |  |
|---|---|
| Recording Date: | October 4, 1977 |
| Recording No: | A031456, Book C446, Page 686, of Official Records |

Reference is made to said document for full particulars.

8.    Conditions and restrictions as set forth in a document recorded by the City and County of San Francisco, Department of Public Works.

|  |  |
|---|---|
| Type of Permit: | Minor Sidewalk Encroachment |
| Recording Date: | March 25, 1994 |
| Recording No: | 94-F574044-00, Book G96, Page 465, of Official Records |

Reference is made to said document for full particulars.

9.    Intentionally deleted

10.   Intentionally deleted

11.   Intentionally deleted

12.   Matters contained in that certain document

|  |  |
|---|---|
| Entitled: | Notice of Designation of a City Landmark |
| Dated: | December 8, 2021 |
| Executed by: | San Francisco Planning Department Historic Preservation Commission |
| Recording Date: | December 10, 2021 |
| Recording No: | 2021181069, of Official Records |

Reference is hereby made to said document for full particulars.

13.   Intentionally deleted

14.   Intentionally deleted

15.   Intentionally deleted

16.   Intentionally deleted

17.   Intentionally deleted

18.   Intentionally deleted

19.   Intentionally deleted

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

**Copyright ©2021 American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**EXHIBIT A**

# SCHEDULE B
## PART II – EXCEPTIONS
(Continued)

20.     Any rights, interests, or claims which may exist or arise by reason of the following matters disclosed by survey,

| | |
|---|---|
| Job No.: | TBD |
| Dated: | TBD |
| Prepared by: | TBD |
| Matters shown: | Any matters shown on current/updated survey |

**(SURVEY TO BE RECEIVED POST CLOSE OF ESCROW)**

21.     Intentionally deleted

---

**END OF SCHEDULE B – PART II**

---

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

**Copyright ©2021 American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



AMERICAN
LAND TITLE
ASSOCIATION

**EXHIBIT A**

# NOTES

1.  Note: The Company is not aware of any matters which would cause it to decline to attach CLTA Endorsement Form 116 indicating that there is located on said Land a Commercial Property, known as 800 Chestnut Street, San Francisco, CA, to an Extended Coverage Loan Policy.

2.  Note: The name(s) of the proposed insured(s) furnished with this application for title insurance is/are:

    Name(s) furnished:    BM-AI, LLC, a Delaware limited liability company

    If these name(s) are incorrect, incomplete or misspelled, please notify the Company.

3.  Note: There are NO conveyances affecting said Land recorded within 24 months of the date of this report.

4.  Note: The charge for a policy of title insurance, when issued through this title order, will be based on the Basic Title Insurance Rate.

5.  Requirement that a Transfer Tax Affidavit accompany every Deed (Grant Deed, Quitclaim Deed, Interspousal Deed) to be recorded in the City and County of San Francisco. This transfer Tax Affidavit is in addition to the change of ownership form (PCOR) and is required by the County Recorder. This item will not appear on any policy of title insurance.

6.  Effective December 27, 2016, as mandated through local ordinance, the transfer tax rates are as follows:

    More than $100 but Less than or Equal to $250,000 at $2.50 for each $500 or portion thereof ($5.00 per thousand)
    $250,001 but Less than $999,999 at $3.40 for each $500 or portion thereof ($6.80 per thousand)
    $1,000,000 or More but Less than $4,999,999 at $3.75 for each $500 or portion thereof ($7.50 per thousand)
    $5,000,000 or More but Less than $9,999,999 at $11.25 for each $500 or portion thereof ($22.50 per thousand)
    $10,000,000.00 or More but Less than $24,999,999 at $27.50 for each $500 or portion thereof ($55.00 per thousand)
    $25,000,0000 or More at $30.00 for each $500 or portion thereof ($60.00 per thousand)

    NOTE:        These rates are for documents recorded on or after December 27, 2016, regardless of when the instrument was executed.

7.  Note: Any documents being executed in conjunction with this transaction must be signed in the presence of an authorized Company employee, an authorized employee of a Company agent, an authorized employee of the insured lender, or by using Bancserv or other Company-approved third-party service. If the above requirement cannot be met, please call the Company at the number provided in this report.

8.  The application for title insurance was placed by reference to only a street address or tax identification number. The proposed Insured must confirm that the legal description in this report covers the parcel(s) of Land requested to be insured. If the legal description is incorrect, the proposed Insured must notify the Company and/or the settlement company in order to prevent errors and to be certain that the legal description for the intended parcel(s) of Land will appear on any documents to be recorded in connection with this transaction and on the policy of title insurance.

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

Copyright ©2021 American Land Title Association. All rights reserved. The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



EXHIBIT A



# NOTES
(Continued)

9.     Note:  If a county recorder, title insurance company, escrow company, real estate broker, real estate agent or association provides a copy of a declaration, governing document or deed to any person, California law requires that the document provided shall include a statement regarding any unlawful restrictions. Said statement is to be in at least 14-point bold face type and may be stamped on the first page of any document provided or included as a cover page attached to the requested document. Should a party to this transaction request a copy of any document reported herein that fits this category, the statement is to be included in the manner described.

10.    Note:  The policy of title insurance will include an arbitration provision. The Company or the insured may demand arbitration. Arbitrable matters may include, but are not limited to, any controversy or claim between the Company and the insured arising out of or relating to this policy, any service of the Company in connection with its issuance or the breach of a policy provision or other obligation. Please ask your escrow or title officer for a sample copy of the policy to be issued if you wish to review the arbitration provisions and any other provisions pertaining to your Title Insurance coverage.

11.    Pursuant to Government Code Section 27388.1, as amended and effective as of 1-1-2018, a Documentary Transfer Tax (DTT) Affidavit may be required to be completed and submitted with each document when DTT is being paid or when an exemption is being claimed from paying the tax. If a governmental agency is a party to the document, the form will not be required. DTT Affidavits may be available at a Tax Assessor-County Clerk-Recorder.

12.    The following Exclusion(s) are added to preliminary reports, commitments and will be included as an endorsement in the following policies:

   A.     2006 ALTA Owner's Policy (06-17-06).

      6.     Defects, liens, encumbrances, adverse claims, notices, or other matters not appearing in the Public Records but that would be disclosed by an examination of any records maintained by or on behalf of a Tribe or on behalf of its members.

   B.     2006 ALTA Loan Policy (06-17-06

      8.     Defects, liens, encumbrances, adverse claims, notices, or other matters not appearing in the Public Records but that would be disclosed by an examination of any records maintained by or on behalf of a Tribe or on behalf of its members.

      9.     Any claim of invalidity, unenforceability, or lack of priority of the lien of the Insured Mortgage based on the application of a Tribe's law resulting from the failure of the Insured Mortgage to specify State law as the governing law with respect to the lien of the Insured Mortgage.

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

Copyright ©2021 American Land Title Association. All rights reserved.  The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.




AMERICAN
LAND TITLE
ASSOCIATION

**EXHIBIT A**

## NOTES
(Continued)

C.    ALTA Homeowner's Policy of Title Insurance (12-02-13) and CLTA Homeowner's Policy of Title Insurance (12-02-13).

    10.    Defects, liens, encumbrances, adverse claims, notices, or other matters not appearing in the Public Records but that would be disclosed by an examination of any records maintained by or on behalf of a Tribe or on behalf of its members.

D.    ALTA Expanded Coverage Residential Loan Policy - Assessments Priority (04-02-15).

    12.    Defects, liens, encumbrances, adverse claims, notices, or other matters not appearing in the Public Records but that would be disclosed by an examination of any records maintained by or on behalf of a Tribe or on behalf of its members.

    13.    Any claim of invalidity, unenforceability, or lack of priority of the lien of the Insured Mortgage based on the application of a Tribe's law resulting from the failure of the Insured Mortgage to specify State law as the governing law with respect to the lien of the Insured Mortgage.

E.    CLTA Standard Coverage Policy 1990 (11-09-18).

    7.    Defects, liens, encumbrances, adverse claims, notices, or other matters not appearing in the Public Records but that would be disclosed by an examination of any records maintained by or on behalf of a tribe or on behalf of its members.

    8.    Any claim of invalidity, unenforceability, or lack of priority of the lien of the Insured Mortgage based on the application of a tribe's law resulting from the failure of the Insured Mortgage to specify state law as the governing law with respect to the lien of the Insured Mortgage.

---

**END OF NOTES**

---

This page is only a part of a 2021 ALTA Commitment for Title Insurance issued by Chicago Title Insurance Company. This Commitment is not valid without the Notice; the Commitment to Issue Policy; the Commitment Conditions; Schedule A; Schedule B, Part I—Requirements; and Schedule B, Part II—Exceptions; and a counter-signature by the Company or its issuing agent that may be in electronic form.

**Copyright ©2021 American Land Title Association. All rights reserved.** The use of this Form is restricted to ALTA licensees and ALTA members in good standing as of the date of use. All other uses are prohibited. Reprinted under license from the American Land Title Association.



**EXHIBIT A**





# Wire Fraud Alert

This Notice is not intended to provide legal or professional advice. If you have any questions, please consult with a lawyer.

All parties to a real estate transaction are targets for wire fraud and many have lost hundreds of thousands of dollars because they simply relied on the wire instructions received via email, without further verification. **If funds are to be wired in conjunction with this real estate transaction, we strongly recommend verbal verification of wire instructions through a known, trusted phone number prior to sending funds.**

In addition, the following non-exclusive self-protection strategies are recommended to minimize exposure to possible wire fraud.

- **NEVER RELY** on emails purporting to change wire instructions. Parties to a transaction rarely change wire instructions in the course of a transaction.

- **ALWAYS VERIFY** wire instructions, specifically the ABA routing number and account number, by calling the party who sent the instructions to you. DO NOT use the phone number provided in the email containing the instructions, use phone numbers you have called before or can otherwise verify. **Obtain the phone number of relevant parties to the transaction as soon as an escrow account is opened**. DO NOT send an email to verify as the email address may be incorrect or the email may be intercepted by the fraudster.

- **USE COMPLEX EMAIL PASSWORDS** that employ a combination of mixed case, numbers, and symbols. Make your passwords greater than eight (8) characters. Also, change your password often and do NOT reuse the same password for other online accounts.

- **USE MULTI-FACTOR AUTHENTICATION** for email accounts. Your email provider or IT staff may have specific instructions on how to implement this feature.

For more information on wire-fraud scams or to report an incident, please refer to the following links:

*Federal Bureau of Investigation:*
*http://www.fbi.gov*

*Internet Crime Complaint Center:*
*http://www.ic3.gov*

Original Effective Date: 5/11/2017
Current Version Date: 5/11/2017
WIRE0016 (DSI Rev. 12/07/17)

*TM and © Fidelity National Financial, Inc. and/or an affiliate. All rights reserved*

**EXHIBIT A**

# Notice of Available Discounts

Pursuant to Section 2355.3 in Title 10 of the California Code of Regulations Fidelity National Financial, Inc. and its subsidiaries ("FNF") must deliver a notice of each discount available under our current rate filing along with the delivery of escrow instructions, a preliminary report or commitment.  Please be aware that the provision of this notice does not constitute a waiver of the consumer's right to be charged the filed rate.  As such, your transaction may not qualify for the below discounts.

You are encouraged to discuss the applicability of one or more of the below discounts with a Company representative.  These discounts are generally described below; consult the rate manual for a full description of the terms, conditions and requirements for such discount.  These discounts only apply to transactions involving services rendered by the FNF Family of Companies.  This notice only applies to transactions involving property improved with a one-to-four family residential dwelling.

Not all discounts are offered by every FNF Company. The discount will only be applicable to the FNF Company as indicated by the named discount.

| **FNF Underwritten Title Company** | **Underwritten by FNF Underwriters** |
| --- | --- |
| CTC – Chicago Title company | CTIC – Chicago Title Insurance Company |
| CLTC – Commonwealth Land Title Company | CLTIC - Commonwealth Land Title Insurance Company |
| FNTC – Fidelity National Title Company of California | FNTIC – Fidelity National Title Insurance Company |
| FNTCCA - Fidelity National Title Company of California | FNTIC - Fidelity National Title Insurance Company |
| TICOR – Ticor Title Company of California | CTIC – Chicago Title Insurance Company |
| LTC – Lawyer's Title Company | CLTIC – Commonwealth Land Title Insurance Company |
| SLTC – ServiceLink Title Company | CTIC – Chicago Title Insurance Company |

## Available Discounts

**DISASTER LOANS (CTIC, CLTIC, FNTIC)**
The charge for a Lender's Policy (Standard or Extended coverage) covering the financing or refinancing by an owner of record, within twenty-four (24) months of the date of a declaration of a disaster area by the government of the United States or the State of California on any land located in said area, which was partially or totally destroyed in the disaster, will be fifty percent (50%) of the appropriate title insurance rate.

**CHURCHES OR CHARITABLE NON-PROFIT ORGANIZATIONS (CTIC, FNTIC)**
On properties used as a church or for charitable purposes within the scope of the normal activities of such entities, provided said charge is normally the church's obligation the charge for an owner's policy shall be fifty percent (50%) to seventy percent (70%) of the appropriate title insurance rate, depending on the type of coverage selected. The charge for a lender's policy shall be forty (40%) to fifty percent (50%) of the appropriate title insurance rate, depending on the type of coverage selected.

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 68
of 101

**FIDELITY NATIONAL FINANCIAL, INC.**
**PRIVACY NOTICE**

**Effective January 1, 2023**

Fidelity National Financial, Inc. and its majority-owned subsidiary companies (collectively, "FNF," "our," or "we") respect and are committed to protecting your privacy. This Privacy Notice explains how we collect, use, and protect personal information, when and to whom we disclose such information, and the choices you have about the use and disclosure of that information.

A limited number of FNF subsidiaries have their own privacy notices. If a subsidiary has its own privacy notice, the privacy notice will be available on the subsidiary's website and this Privacy Notice does not apply.

**Collection of Personal Information**
FNF may collect the following categories of Personal Information:
- contact information (e.g., name, address, phone number, email address);
- demographic information (e.g., date of birth, gender, marital status);
- identity information (e.g. Social Security Number, driver's license, passport, or other government ID number);
- financial account information (e.g. loan or bank account information); and
- other personal information necessary to provide products or services to you.

We may collect Personal Information about you from:
- information we receive from you or your agent;
- information about your transactions with FNF, our affiliates, or others; and
- information we receive from consumer reporting agencies and/or governmental entities, either directly from these entities or through others.

**Collection of Browsing Information**
FNF automatically collects the following types of Browsing Information when you access an FNF website, online service, or application (each an "FNF Website") from your Internet browser, computer, and/or device:
- Internet Protocol (IP) address and operating system;
- browser version, language, and type;
- domain name system requests; and
- browsing history on the FNF Website, such as date and time of your visit to the FNF Website and visits to the pages within the FNF Website.

Like most websites, our servers automatically log each visitor to the FNF Website and may collect the Browsing Information described above. We use Browsing Information for system administration, troubleshooting, fraud investigation, and to improve our websites. Browsing Information generally does not reveal anything personal about you, though if you have created a user account for an FNF Website and are logged into that account, the FNF Website may be able to link certain browsing activity to your user account.

**Other Online Specifics**
Cookies. When you visit an FNF Website, a "cookie" may be sent to your computer. A cookie is a small piece of data that is sent to your Internet browser from a web server and stored on your computer's hard drive. Information gathered using cookies helps us improve your user experience. For example, a cookie can help the website load properly or can customize the display page based on your browser type and user preferences. You can choose whether or not to accept cookies by changing your Internet browser settings. Be aware that doing so may impair or limit some functionality of the FNF Website.

Web Beacons. We use web beacons to determine when and how many times a page has been viewed. This information is used to improve our websites.

Do Not Track. Currently our FNF Websites do not respond to "Do Not Track" features enabled through your browser.

Links to Other Sites. FNF Websites may contain links to unaffiliated third-party websites. FNF is not responsible for the privacy practices or content of those websites. We recommend that you read the privacy policy of every website you visit.

**Use of Personal Information**
FNF uses Personal Information for three main purposes:
- To provide products and services to you or in connection with a transaction involving you.
- To improve our products and services.
- To communicate with you about our, our affiliates', and others' products and services, jointly or independently.

**When Information Is Disclosed**
We may disclose your Personal Information and Browsing Information in the following circumstances:
- to enable us to detect or prevent criminal activity, fraud, material misrepresentation, or nondisclosure;
- to affiliated or nonaffiliated service providers who provide or perform services or functions on our behalf and who agree to use the information only to provide such services or functions;

Copyright © 2023. Fidelity National Financial, Inc. All Rights Reserved
Order No. 36200889-362-LE4-JJ

**EXHIBIT A**

- to affiliated or nonaffiliated third parties with whom we perform joint marketing, pursuant to an agreement with them to jointly market financial products or services to you;
- to law enforcement or authorities in connection with an investigation, or in response to a subpoena or court order; or
- in the good-faith belief that such disclosure is necessary to comply with legal process or applicable laws, or to protect the rights, property, or safety of FNF, its customers, or the public.

The law does not require your prior authorization and does not allow you to restrict the disclosures described above. Additionally, we may disclose your information to third parties for whom you have given us authorization or consent to make such disclosure. We do not otherwise share your Personal Information or Browsing Information with nonaffiliated third parties, except as required or permitted by law.

We reserve the right to transfer your Personal Information, Browsing Information, and any other information, in connection with the sale or other disposition of all or part of the FNF business and/or assets, or in the event of bankruptcy, reorganization, insolvency, receivership, or an assignment for the benefit of creditors. By submitting Personal Information and/or Browsing Information to FNF, you expressly agree and consent to the use and/or transfer of the foregoing information in connection with any of the above described proceedings.

## Security of Your Information
We maintain physical, electronic, and procedural safeguards to protect your Personal Information.

## Choices With Your Information
Whether you submit Personal Information or Browsing Information to FNF is entirely up to you. If you decide not to submit Personal Information or Browsing Information, FNF may not be able to provide certain services or products to you.

For California Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties, except as permitted by California law. For additional information about your California privacy rights, please visit the "California Privacy" link on our website (https://fnf.com/pages/californiaprivacy.aspx) or call (888) 413-1748.

For Nevada Residents: We are providing this notice pursuant to state law. You may be placed on our internal Do Not Call List by calling FNF Privacy at (888) 714-2710 or by contacting us via the information set forth at the end of this Privacy Notice. For further information concerning Nevada's telephone solicitation law, you may contact: Bureau of Consumer Protection, Office of the Nevada Attorney General, 555 E. Washington St., Suite 3900, Las Vegas, NV 89101; Phone number: (702) 486-3132; email: aginquiries@ag.state.nv.us.
For Oregon Residents: We will not share your Personal Information or Browsing Information with nonaffiliated third parties for marketing purposes, except after you have been informed by us of such sharing and had an opportunity to indicate that you do not want a disclosure made for marketing purposes.

For Vermont Residents: We will not disclose information about your creditworthiness to our affiliates and will not disclose your personal information, financial information, credit report, or health information to nonaffiliated third parties to market to you, other than as permitted by Vermont law, unless you authorize us to make those disclosures.

For Virginia Residents: For additional information about your Virginia privacy rights, please email privacy@fnf.com or call (888) 714-2710.

## Information From Children
The FNF Websites are not intended or designed to attract persons under the age of eighteen (18).We do not collect Personal Information from any person that we know to be under the age of thirteen (13) without permission from a parent or guardian.

## International Users
FNF's headquarters is located within the United States. If you reside outside the United States and choose to provide Personal Information or Browsing Information to us, please note that we may transfer that information outside of your country of residence. By providing FNF with your Personal Information and/or Browsing Information, you consent to our collection, transfer, and use of such information in accordance with this Privacy Notice.

## FNF Website Services for Mortgage Loans
Certain FNF companies provide services to mortgage loan servicers, including hosting websites that collect customer information on behalf of mortgage loan servicers (the "Service Websites"). The Service Websites may contain links to both this Privacy Notice and the mortgage loan servicer or lender's privacy notice. The sections of this Privacy Notice titled When Information is Disclosed, Choices with Your Information, and Accessing and Correcting Information do not apply to the Service Websites. The mortgage loan servicer or lender's privacy notice governs use, disclosure, and access to your Personal Information. FNF does not share Personal Information collected through the Service Websites, except as required or authorized by contract with the mortgage loan servicer or lender, or as required by law or in the good-faith belief that such disclosure is necessary: to comply with a legal process or applicable law, to enforce this Privacy Notice, or to protect the rights, property, or safety of FNF or the public.

## Your Consent To This Privacy Notice; Notice Changes
By submitting Personal Information and/or Browsing Information to FNF, you consent to the collection and use of the information in accordance with this Privacy Notice. We may change this Privacy Notice at any time. The Privacy Notice's effective date will show the last date changes were made. If you provide information to us following any change of the Privacy Notice, that signifies your assent to and acceptance of the changes to the Privacy Notice.

Copyright © 2023. Fidelity National Financial, Inc. All Rights Reserved
Order No. 36200889-362-LE4-JJ

**EXHIBIT A**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 70 of 101

**Accessing and Correcting Information; Contact Us**

If you have questions or would like to correct your Personal Information, visit FNF's Privacy Inquiry Website or contact us by phone at (888) 714-2710, by email at privacy@fnf.com, or by mail to:

Fidelity National Financial, Inc.
601 Riverside Avenue
Jacksonville, Florida 32204
Attn: Chief Privacy Officer

EXHIBIT A

# ATTACHMENT ONE

### CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE POLICY – 1990 (11-09-18)

### EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy and the Company will not pay loss or damage, costs, attorneys' fees or expenses which arise by reason of:

1. (a) Any law, ordinance or governmental regulation (including but not limited to building or zoning laws, ordinances, or regulations) restricting, regulating, prohibiting or relating (i) the occupancy, use, or enjoyment of the land; (ii) the character, dimensions or location of any improvement now or hereafter erected on the land; (iii) a separation in ownership or a change in the dimensions or area of the land or any parcel of which the land is or was a part; or (iv) environmental protection, or the effect of any violation of these laws, ordinances or governmental regulations, except to the extent that a notice of the enforcement thereof or a notice of a defect, lien, or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

   (b) Any governmental police power not excluded by (a) above, except to the extent that a notice of the exercise thereof or notice of a defect, lien or encumbrance resulting from a violation or alleged violation affecting the land has been recorded in the public records at Date of Policy.

2. Rights of eminent domain unless notice of the exercise thereof has been recorded in the public records at Date of Policy, but not excluding from coverage any taking which has occurred prior to Date of Policy which would be binding on the rights of a purchaser for value without knowledge.

3. Defects, liens, encumbrances, adverse claims or other matters:
   (a) whether or not recorded in the public records at Date of Policy, but created, suffered, assumed or agreed to by the insured claimant;
   (b) not known to the Company, not recorded in the public records at Date of Policy, but known to the insured claimant and not disclosed in writing to the Company by the insured claimant prior to the date the insured claimant became an insured under this policy;
   (c) resulting in no loss or damage to the insured claimant;
   (d) attaching or created subsequent to Date of Policy; or
   (e) resulting in loss or damage which would not have been sustained if the insured claimant had paid value for the insured mortgage or for the estate or interest insured by this policy.

4. Unenforceability of the lien of the insured mortgage because of the inability or failure of the insured at Date of Policy, or the inability or failure of any subsequent owner of the indebtedness, to comply with the applicable doing business laws of the state in which the land is situated.

5. Invalidity or unenforceability of the lien of the insured mortgage, or claim thereof, which arises out of the transaction evidenced by the insured mortgage and is based upon usury or any consumer credit protection or truth in lending law.

6. Any claim, which arises out of the transaction vesting in the insured the estate of interest insured by this policy or the transaction creating the interest of the insured lender, by reason of the operation of federal bankruptcy, state insolvency or similar creditors' rights laws.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART I

This policy does not insure against loss or damage (and the Company will not pay costs, attorneys' fees or expenses) which arise by reason of:

1. Taxes or assessments which are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the public records.
   Proceedings by a public agency which may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the public records.

2. Any facts, rights, interests, or claims which are not shown by the public records but which could be ascertained by an inspection of the land or which may be asserted by persons in possession thereof.

3. Easements, liens or encumbrances, or claims thereof, not shown by the public records.

4. Discrepancies, conflicts in boundary lines, shortage in area, encroachments, or any other facts which a correct survey would disclose, and which are not shown by the public records.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b) or (c) are shown by the public records.

6. Any lien or right to a lien for services, labor or material unless such lien is shown by the public records at Date of Policy.

### EXCEPTIONS FROM COVERAGE - SCHEDULE B, PART II
(Variable exceptions such as taxes, easements, CC&R's, etc., are inserted here)


# CALIFORNIA LAND TITLE ASSOCIATION
### STANDARD COVERAGE OWNER'S POLICY (02-04-22)

### EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
   i. the occupancy, use, or enjoyment of the Land;
   ii. the character, dimensions, or location of any improvement on the Land;
   iii. the subdivision of land; or
   iv. environmental remediation or protection.
   b. any governmental forfeiture, police, regulatory, or national security power.
   c. the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b. Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.

2. Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.

3. Any defect, lien, encumbrance, adverse claim, or other matter:

**EXHIBIT A**

a. created, suffered, assumed, or agreed to by the Insured Claimant;

b. not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;

c. resulting in no loss or damage to the Insured Claimant;

d. attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or

e. resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.

4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction vesting the Title as shown in Schedule A is a:

a. fraudulent conveyance or fraudulent transfer;

b. voidable transfer under the Uniform Voidable Transactions Act; or

c. preferential transfer:

   i. to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or

   ii. for any other reason not stated in Covered Risk 9.b.

5. Any claim of a PACA-PSA Trust. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.

6. Any lien on the Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due and payable after the Date of Policy. Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.

7. Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

## EXCEPTIONS FROM COVERAGE

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This policy treats any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document are excepted from coverage.**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

## PART I

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.

2. Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land, or (b) asserted by persons or parties in possession of the Land.

3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.

4. Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.

5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.

6. Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.

7. Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

## PART II

(Variable exceptions such as taxes, easements, CC&R's, etc., are inserted here)

## CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (07-01-2021)

## EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy and We will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:

   i. the occupancy, use, or enjoyment of the Land;

   ii. the character, dimensions, or location of any improvement on the Land;

   iii. the subdivision of land; or

   iv. environmental remediation or protection.

   b. any governmental forfeiture, police, or regulatory, or national security power.

   c. the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b. Exclusion 1 does not modify or limit the coverage provided under Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23, or 27.

2. Any power to take the Land by condemnation. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 17.

3. Any defect, lien, encumbrance, adverse claim, or other matter:

   a. created, suffered, assumed, or agreed to by You;

   b. not Known to Us, but recorded in the Public Records at the Date of Policy, but Known to You and not disclosed in writing to Us by You prior to the date You became an Insured under this policy;

   c. resulting in no loss or damage to You;

   d. attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 5, 8.f., 25, 26, 27, 28, or 32); or

EXHIBIT A

e. resulting in loss or damage that would not have been sustained if You paid consideration sufficient to qualify You as a bona fide purchaser of the Title at the Date of Policy.
4. Lack of a right:
   a. to any land outside the area specifically described and referred to in Item 3 of Schedule A; and
   b. in any street, road, avenue, alley, lane, right-of-way, body of water, or waterway that abut the Land.
   Exclusion 4 does not modify or limit the coverage provided under Covered Risk 11 or 21.
5. The failure of Your existing structures, or any portion of Your existing structures, to have been constructed before, on, or after the Date of Policy in accordance with applicable building codes. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 14 or 15.
6. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transfer of the Title to You is a:
   a. fraudulent conveyance or fraudulent transfer;
   b. voidable transfer under the Uniform Voidable Transactions Act; or
   c. preferential transfer:
      i. to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
      ii. for any other reason not stated in Covered Risk 30.
7. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
8. Negligence by a person or an entity exercising a right to extract or develop oil, gas, minerals, groundwater, or any other subsurface substance.
9. Any lien on Your Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due and payable after the Date of Policy. Exclusion 9 does not modify or limit the coverage provided under Covered Risk 8.a. or 27.
10. Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
   • For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $10,000.00 |
| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $5,000.00 |

## CLTA/ALTA HOMEOWNER'S POLICY OF TITLE INSURANCE (12-02-13)

## EXCLUSIONS

In addition to the Exceptions in Schedule B, You are not insured against loss, costs, attorneys' fees, and expenses resulting from:
1. Governmental police power, and the existence or violation of those portions of any law or government regulation concerning:
   a. building;
   b. zoning;
   c. land use;
   d. improvements on the Land;
   e. land division; and
   f. environmental protection.
   This Exclusion does not limit the coverage described in Covered Risk 8.a., 14, 15, 16, 18, 19, 20, 23 or 27.
2. The failure of Your existing structures, or any part of them, to be constructed in accordance with applicable building codes.  This Exclusion does not limit the coverage described in Covered Risk 14 or 15.
3. The right to take the Land by condemning it.  This Exclusion does not limit the coverage described in Covered Risk 17.
4. Risks:
   a. that are created, allowed, or agreed to by You, whether or not they are recorded in the Public Records;
   b. that are Known to You at the Policy Date, but not to Us, unless they are recorded in the Public Records at the Policy Date;
   c. that result in no loss to You; or
   d. that first occur after the Policy Date - this does not limit the coverage described in Covered Risk 7, 8.e., 25, 26, 27 or 28.
5. Failure to pay value for Your Title.
6. Lack of a right:
   a. to any land outside the area specifically described and referred to in paragraph 3 of Schedule A; and
   b. in streets, alleys, or waterways that touch the Land.
   This Exclusion does not limit the coverage described in Covered Risk 11 or 21.
7. The transfer of the Title to You is invalid as a preferential transfer or as a fraudulent transfer or conveyance under federal bankruptcy, state insolvency, or similar creditors' rights laws.
8. Contamination, explosion, fire, flooding, vibration, fracturing, earthquake, or subsidence.
9. Negligence by a person or an Entity exercising a right to extract or develop minerals, water, or any other substances.

## LIMITATIONS ON COVERED RISKS

Your insurance for the following Covered Risks is limited on the Owner's Coverage Statement as follows:
   • For Covered Risk 16, 18, 19, and 21 Your Deductible Amount and Our Maximum Dollar Limit of Liability shown in Schedule A.
The deductible amounts and maximum dollar limits shown on Schedule A are as follows:

|  | Your Deductible Amount | Our Maximum Dollar Limit of Liability |
|---|---|---|
| Covered Risk 16: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $10,000.00 |

**EXHIBIT A**

| Covered Risk 18: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 19: | 1.00% of Policy Amount Shown in Schedule A or $5,000.00 (whichever is less) | $25,000.00 |
| Covered Risk 21: | 1.00% of Policy Amount Shown in Schedule A or $2,500.00 (whichever is less) | $5,000.00 |

## ALTA OWNER'S POLICY (07-01-2021)

## EXCLUSIONS FROM COVERAGE

The following matters are excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. a. any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) that restricts, regulates, prohibits, or relates to:
      i. the occupancy, use, or enjoyment of the Land;
      ii. the character, dimensions, or location of any improvement on the Land;
      iii. the subdivision of land; or
      iv. environmental remediation or protection.
   b. any governmental forfeiture, police, regulatory, or national security power.
   c. the effect of a violation or enforcement of any matter excluded under Exclusion 1.a. or 1.b. Exclusion 1 does not modify or limit the coverage provided under Covered Risk 5 or 6.
2. Any power of eminent domain. Exclusion 2 does not modify or limit the coverage provided under Covered Risk 7.
3. Any defect, lien, encumbrance, adverse claim, or other matter:
   a. created, suffered, assumed, or agreed to by the Insured Claimant;
   b. not Known to the Company, not recorded in the Public Records at the Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
   c. resulting in no loss or damage to the Insured Claimant;
   d. attaching or created subsequent to the Date of Policy (Exclusion 3.d. does not modify or limit the coverage provided under Covered Risk 9 or 10); or
   e. resulting in loss or damage that would not have been sustained if consideration sufficient to qualify the Insured named in Schedule A as a bona fide purchaser had been given for the Title at the Date of Policy.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights law, that the transaction vesting the Title as shown in Schedule A is a:
   a. fraudulent conveyance or fraudulent transfer;
   b. voidable transfer under the Uniform Voidable Transactions Act; or
   c. preferential transfer:
      i. to the extent the instrument of transfer vesting the Title as shown in Schedule A is not a transfer made as a contemporaneous exchange for new value; or
      ii. for any other reason not stated in Covered Risk 9.b.
5. Any claim of a PACA-PSA Trust. Exclusion 5 does not modify or limit the coverage provided under Covered Risk 8.
6. Any lien on the Title for real estate taxes or assessments imposed or collected by a governmental authority that becomes due and payable after the Date of Policy. Exclusion 6 does not modify or limit the coverage provided under Covered Risk 2.b.
7. Any discrepancy in the quantity of the area, square footage, or acreage of the Land or of any improvement to the Land.

## EXCEPTIONS FROM COVERAGE

**Some historical land records contain Discriminatory Covenants that are illegal and unenforceable by law. This policy treats any Discriminatory Covenant in a document referenced in Schedule B as if each Discriminatory Covenant is redacted, repudiated, removed, and not republished or recirculated. Only the remaining provisions of the document are excepted from coverage.**

This policy does not insure against loss or damage and the Company will not pay costs, attorneys' fees, or expenses resulting from the terms and conditions of any lease or easement identified in Schedule A, and the following matters:

*NOTE: The 2021 ALTA Owner's Policy may be issued to afford either Standard Coverage or Extended Coverage. In addition to variable exceptions such as taxes, easements, CC&R's, etc., the Exceptions from Coverage in a Standard Coverage policy will also include the Western Regional Standard Coverage Exceptions listed as 1 through 7 below:*

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land or (b) asserted by persons or parties in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.
4. Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.
7. Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B

## 2006 ALTA OWNER'S POLICY (06-17-06)

EXHIBIT A

## EXCLUSIONS FROM COVERAGE

The following matters are expressly excluded from the coverage of this policy, and the Company will not pay loss or damage, costs, attorneys' fees, or expenses that arise by reason of:

1. (a) Any law, ordinance, permit, or governmental regulation (including those relating to building and zoning) restricting, regulating, prohibiting, or relating to
    (i) the occupancy, use, or enjoyment of the Land;
    (ii) the character, dimensions, or location of any improvement erected on the Land;
    (iii) the subdivision of land; or
    (iv) environmental protection;
    or the effect of any violation of these laws, ordinances, or governmental regulations. This Exclusion 1(a) does not modify or limit the coverage provided under Covered Risk 5.
   (b) Any governmental police power. This Exclusion 1(b) does not modify or limit the coverage provided under Covered Risk 6.
2. Rights of eminent domain. This Exclusion does not modify or limit the coverage provided under Covered Risk 7 or 8.
3. Defects, liens, encumbrances, adverse claims, or other matters
    (a) created, suffered, assumed, or agreed to by the Insured Claimant;
    (b) not Known to the Company, not recorded in the Public Records at Date of Policy, but Known to the Insured Claimant and not disclosed in writing to the Company by the Insured Claimant prior to the date the Insured Claimant became an Insured under this policy;
    (c) resulting in no loss or damage to the Insured Claimant;
    (d) attaching or created subsequent to Date of Policy (however, this does not modify or limit the coverage provided under Covered Risk 9 and 10); or
    (e) resulting in loss or damage that would not have been sustained if the Insured Claimant had paid value for the Title.
4. Any claim, by reason of the operation of federal bankruptcy, state insolvency, or similar creditors' rights laws, that the transaction vesting the Title as shown in Schedule A, is
    (a) a fraudulent conveyance or fraudulent transfer; or
    (b) a preferential transfer for any reason not stated in Covered Risk 9 of this policy.
5. Any lien on the Title for real estate taxes or assessments imposed by governmental authority and created or attaching between Date of Policy and the date of recording of the deed or other instrument of transfer in the Public Records that vests Title as shown in Schedule A.

## EXCEPTIONS FROM COVERAGE

This policy does not insure against loss or damage, and the Company will not pay costs, attorneys' fees or expenses, that arise by reason of:

*NOTE: The 2006 ALTA Owner's Policy may be issued to afford either Standard Coverage or Extended Coverage. In addition to variable exceptions such as taxes, easements, CC&R's, etc., the Exceptions from Coverage in a Standard Coverage policy will also include the Western Regional Standard Coverage Exceptions listed below as 1 through 7 below:*

1. (a) Taxes or assessments that are not shown as existing liens by the records of any taxing authority that levies taxes or assessments on real property or by the Public Records; (b) proceedings by a public agency that may result in taxes or assessments, or notices of such proceedings, whether or not shown by the records of such agency or by the Public Records.
2. Any facts, rights, interests, or claims that are not shown by the Public Records at Date of Policy but that could be (a) ascertained by an inspection of the Land, or (b) asserted by persons or parties in possession of the Land.
3. Easements, liens or encumbrances, or claims thereof, not shown by the Public Records at Date of Policy.
4. Any encroachment, encumbrance, violation, variation, easement, or adverse circumstance affecting the Title that would be disclosed by an accurate and complete land survey of the Land and not shown by the Public Records at Date of Policy.
5. (a) Unpatented mining claims; (b) reservations or exceptions in patents or in Acts authorizing the issuance thereof; (c) water rights, claims or title to water, whether or not the matters excepted under (a), (b), or (c) are shown by the Public Records.
6. Any lien or right to a lien for services, labor, material or equipment unless such lien is shown by the Public Records at Date of Policy.
7. Any claim to (a) ownership of or rights to minerals and similar substances, including but not limited to ores, metals, coal, lignite, oil, gas, uranium, clay, rock, sand, and gravel located in, on, or under the Land or produced from the Land, whether such ownership or rights arise by lease, grant, exception, conveyance, reservation, or otherwise; and (b) any rights, privileges, immunities, rights of way, and easements associated therewith or appurtenant thereto, whether or not the interests or rights excepted in (a) or (b) appear in the Public Records or are shown in Schedule B.

**EXHIBIT A**

This map/plat is being furnished as an aid in locating the herein described Land in relation to adjoining streets, natural boundaries and other land, and is not a survey of the land depicted.Except to the extent a policy of title insurance is expressly modified by endorsement, if any, the Company does not insure dimensions, distances, location of easements, acreage or other matters shown thereon.

**EXHIBIT A**

© COPYRIGHT SAN FRANCISCO
CITY & COUNTY ASSESSOR 1995

lot6 into lots23/25 for 2002 roll
lot3 into lots18to20 for 2004 roll
lot5 into lots31&32 for 2009 roll
lot2 into lots33to35 for 2014 roll

REVISED '77
'79
'94

Revised 2002
Revised 2004
Revised 2009
Revised 2014

N
W E
S



769 - 771 FRANCISCO ST.
A CONDOMINIUM

| LOT | UNIT | % COMM. AREA |
|-----|------|--------------|
| 21 | 769 | 33.04 |
| 22 | 771 | 66.96 |

FRANCISCO

LOTS 12/14 '77

REGENTS OF U.C.

**PIQ**

LEAVENWORTH

JONES

CHESTNUT

876-880 CHESTNUT ST.
A CONDOMINIUM

| LOT | UNIT | % COMM. AREA |
|-----|------|--------------|
| 18 | 876 | 31.982 |
| 19 | 878 | 32.263 |
| 20 | 880 | 35.755 |

894-898 CHESTNUT ST.
A CONDOMINIUM

| LOT | UNIT | % COMM. AREA |
|-----|------|--------------|
| 23 | 894 | 36.00 |
| 24 | 896 | 34.00 |
| 25 | 898 | 30.00 |

BAY VIEW NORTH
A CONDOMINIUM

| LOT NO. | UNIT NO. | % COMMON AREA |
|---------|----------|---------------|
| 12 | 1 | 36.748 |
| 13 | 2 | 33.692 |
| 14 | 3 | 29.560 |

882,884,886 CHESTNUT
A CONDOMINIUM

| LOT NO. | UNIT NO. | % COMMON AREA |
|---------|----------|---------------|
| 15 | 1 | .333 |
| 16 | 2 | .333 |
| 17 | 3 | .333 |

This map/plat is being furnished as an aid in locating
the herein described Land in relation to adjoining
streets, natural boundaries and other land, and is
not a survey of the land depicted. Except to the
extent a policy of title insurance is expressly
modified by endorsement, if any, the Company
does not insure dimensions, distances, location of
easements, acreage or other matters shown
thereon.

| | |
|---|---|
| ASSESSED | 37,813 SQ. FT. |
| REGENTS U.C. | 75,625 |
| BLK. TOTAL | 113,438 SQ. FT. |

EXHIBIT A

**EXHIBIT F**

**FORM OF DEED**

RECORDING REQUESTED BY
and WHEN RECORDED RETURN
TO and MAIL TAX STATEMENTS
TO:

APN:

SPACE ABOVE THIS LINE FOR RECORDER'S USE

Document is exempt from the fee imposed by the Building Homes and Jobs Act - SB2 (Government Code §27388.1) as it is recorded in connection with a transfer subject to Documentary Transfer Tax.

Documentary transfer tax is $
☐ computed on full value of property conveyed, or
☐ computed on full value less value of liens and encumbrances remaining at the time of sale.
☐ Unincorporated area: _____ ☐ City of _____
☐ Realty not sold:

GRANT DEED

For valuable consideration, the receipt and sufficiency of which are hereby acknowledged, THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a California public corporation ("**Grantor**") hereby grants to _____, a _____ ("**Grantee**") that certain real property located in the City and County of San Francisco County, more particularly described in Exhibit A attached hereto and incorporated herein by this reference ("**Real Property**").

The conveyance by Grantor to Grantee pursuant to this Grant Deed is subject to all matters, liens, and encumbrances of record.

IN WITNESS WHEREOF, Grantor has executed this Grant Deed this _____ day of ____, 2024.

"**Grantor**"

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
a California public corporation

By: _____
Name: David Phillips
Its:   Associate Vice President Capital Programs,
      Energy & Sustainability

**EXHIBIT A**

F-2

EXHIBIT A

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

State of California            )
County of _____          )


On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.


Signature     _____

EXHIBIT A

# EXHIBIT G

## FORM OF QUIT CLAIM BILL OF SALE

THIS QUIT CLAIM BILL OF SALE is made as of _____, 2024 [*date to be inserted is Closing Date*] from THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a California public corporation ("**UC Regents**") to _____, _____ ("**Buyer**").

## RECITALS:

A.        Contemporaneously with the execution and delivery of this Quit Claim Bill of Sale, UC Regents has sold and conveyed to Buyer the real property described in <u>Exhibit A</u> attached hereto and made a part hereof and all buildings, structures and improvements located thereon by Grant Deed of even date herewith (all of such buildings, structures, improvements and real property collectively hereinafter referred to as the "**Real Property**").

B.        The Real Property is subject to that certain Triple Net Lease with an effective date of October 30, 2020 by and between San Francisco Art Institute, a California nonprofit public benefit corporation ("**SFAI**"), as tenant, and the UC Regents, as landlord, as amended by that certain First Lease Amendment dated as of April 8, 2022, by that certain Second Amendment to Triple Net Lease dated as of August 31, 2022, by that certain Third Amendment to Triple Net Lease dated as of October 1, 2022, by that certain Fourth Amendment to Triple Net Lease dated as of October 30, 2023, that certain that certain Fifth Amendment to Triple Net Lease dated November 16, 2023 and that certain Sixth Amendment to Triple Net Lease dated concurrently herewith (as amended, the "**Lease**").

C.        As a part of the consideration for the conveyance of the Real Property, UC Regents has agreed to convey to Buyer (i) UC Regents' right, title and interest in the items of personal property, if any, that are owned by UC Regents and located in and on and used in connection with the Real Property and (ii) UC Regents' right, title and interest, if any, in the items of personal property owned by SFAI and located in and on and used in connection with the Real Property (collectively, the "**Personal Property**").

NOW, THEREFORE, for good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, UC Regents does hereby sell, assign, and convey to Buyer, without any representation or warranty whatsoever, UC Regents' right, title and interest, if any, in and to the Personal Property.

TO HAVE AND TO HOLD the same unto Buyer, its successors and assigns, forever.

THIS BILL OF SALE IS MADE WITHOUT RECOURSE OR WARRANTY WHATSOEVER, INCLUDING WITHOUT LIMITATION, WARRANTIES OF CONDITION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Buyer acknowledges and agrees that UC Regents has not made and does not make any representations or warranties of any kind whatsoever, either express or implied, with respect to the Personal Property and that the Personal Property and is sold to Buyer in an "AS IS, WHERE IS" condition.

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 82
of 101

This Quit Claim Bill of Sale shall in all respects be governed by, and construed in accordance with the laws of the State of California, including all matters of construction, validity and performance.

THE REGENTS OF THE UNIVERSITY OF CALIFORNIA
a California public corporation

By: _____
Name: David Phillips
Its:    Associate Vice President Capital Programs,
      Energy & Sustainability

EXHIBIT A

**EXHIBIT H**

**FORM OF LEASE ASSIGNMENT**

THIS ASSIGNMENT OF LEASE (this "**Assignment**") dated as of _____, 2024 [*date to be inserted is Closing Date*] is made by and between PAUL MANSDORF, solely in his capacity as the Trustee appointed pursuant to Chapter 7 of the Bankruptcy Code ("**Trustee**") for SAN FRANCISCO ART INSTITUTE, a California nonprofit public benefit corporation ("**SFAI**" or "**Tenant**") and _____, _____ ("**BM-AI**" or "**Assignee**").

  A.  SFAI, as tenant, and The Regents of the University of California, a California public corporation ("**UC Regents**"), as landlord, entered into that certain Triple Net Lease with an effective date of October 30, 2020, as amended by that certain Second Amendment to Triple Net Lease dated as of August 31, 2022, by that certain Third Amendment to Triple Net Lease dated as of October 1, 2022, by that certain Fourth Amendment to Lease dated as of October 30, 2023, that certain that certain Fifth Amendment to Triple Net Lease dated November 16, 2023 and that certain Sixth Amendment to Lease dated concurrently herewith (as amended, the "**Lease**").

  B.  On April 19, 2023, SFAI filed a voluntary petition under chapter 7 of title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**"), which case is proceeding under Case No. 23-30250 (HLB).

  C.  Trustee and UC Regents, as sellers, and BM-AI LLC, a Delaware limited liability company ("**BM-AI**"), as buyer (the "**Purchase and Sale Agreement**") entered into that certain Agreement of Sale and Purchase dated as of November ___, 2023 (the "**Purchase and Sale Agreement**"), pursuant to which, *inter alia*, BM-AI agreed to acquire or assume certain assets of SFAI and Trustee agreed to sell or assign certain assets of SFAI, including the rights under the Lease. [*add recital if BM-AI has assigned to an affiliate*]

  D.  On December __, 2023, the Bankruptcy Court entered an order, *inter alia*, permitting the Trustee to enter into and perform under the Purchase and Sale Agreement and this Assignment [Docket No. __] (the "**Bankruptcy Court Order**").

  E.  Also pursuant to the Bankruptcy Court Order and the Purchase and Sale Agreement, on even date herewith, Trustee assumed the Lease.

  F.  As required by the terms of the Purchase and Sale Agreement, as approved by the Bankruptcy Court Order, Trustee, on behalf of Tenant, desires to assign the rights, title, interests and obligations of Tenant in the Lease to Assignee, and Assignee desires to accept the assignment thereof, on the terms and conditions below.

  ACCORDINGLY, the parties hereby agree as follows:

  1.  Trustee hereby assigns to Assignee all of Tenant's right, title, interest and obligations in and to the Lease, and Assignee hereby accepts such assignment and assumes and

**EXHIBIT A**

Case: 23-30250 Doc# 129-1 Filed: 11/22/23 Entered: 11/22/23 05:28:12 Page 84 of 101

agrees to perform and observe all of Tenant's obligations under the Lease arising from and after the date hereof.

2.　　This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

3.　　This Assignment shall be governed and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the parties hereto have executed this Assignment as of the date and year first above written.


TRUSTEE:

_____
Paul Mansdorf, as Trustee appointed pursuant to chapter 7
of the Bankruptcy Code for The San Francisco Art Institute, a California
non-profit public benefit corporation


ASSIGNEE:

_____
a California public corporation

By:　　_____
Name: _____
Its:　　_____

EXHIBIT A

# EXHIBIT I

## FORM OF BILL OF SALE AND ASSIGNMENT OF INTANGIBLES

THIS BILL OF SALE AND ASSIGNMENT OF INTANGIBLES is made as of _____, 2024 [*date to be inserted is Closing Date*] from PAUL MANSDORF, solely in his capacity as the Trustee appointed pursuant to Chapter 7 of the Bankruptcy Code ("**Trustee**") for SAN FRANCISCO ART INSTITUTE, a California nonprofit public benefit corporation ("**SFAI**" or "**Tenant**"), and _____, _____ ("**BM-AI**" or "**Assignee**").

RECITALS:

A.     On April 19, 2023, SFAI filed a voluntary petition under chapter 7 of title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California (the "**Bankruptcy Court**"), which case is proceeding under Case No. 23-30250 (HLB).

B.     On November ___, 2023, Trustee and the Regents of the University of California, a California public corporation ("**UC Regents**"), as sellers, and BM-AI , as buyer, entered into that certain Purchase and Sale Agreement and Escrow Instructions (the "**Purchase and Sale Agreement**") pursuant to which BM-AI will purchase or assume certain assets of SFAI comprised of the personal property and intangibles listed on Exhibit A[1] attached hereto (the "**Trustee Property**").

C.     On December __, 2023, the Bankruptcy Court entered an order, *inter alia*, permitting the Trustee to enter into and perform under the Purchase and Sale Agreement [Docket No. __] (the "**Bankruptcy Court Order**").

D.     Trustee desires to convey and assign to Assignee all of SFAI's right, title and interest in the Trustee Property and Assignee desires to accept the conveyance and assignment thereof, on the terms and conditions below.

ACCORDINGLY, the parties hereby agree as follows:

1.     Trustee hereby sells, conveys and assigns, to Assignee, all of SFAI's right, title and interest in and to the Trustee Property, from and after the date hereof.

2.     Assignee hereby accepts the foregoing sale, conveyance and assignment by Trustee of the Trustee Property and assumes any obligations of SFAI with respect to the Trustee Property first arising from and after the date hereof.

3.     THIS BILL OF SALE AND ASSIGMENT OF INTANGIBLES IS MADE WITHOUT RECOURSE OR WARRANTY WHATSOEVER, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF CONDITION, MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. Assignee acknowledges and agrees that Trustee has not made and

---

[1] Exhibit A will track definition of Trustee Property in the Purchase Agreement.

**EXHIBIT A**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 86 of 101

does not make any representations or warranties of any kind whatsoever, either express or implied, with respect to the Trustee Property except as set forth in the Purchase and Sale Agreement and the Trustee Property is sold to Assignee in an "AS IS, WHERE IS" condition.

4.      This Bill of Sale and Assignment of Intangibles shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

5.      This Bill of Sale and Assignment of Intangibles shall be governed and construed in accordance with the laws of the State of California.

IN WITNESS WHEREOF, the parties hereto have executed this Bill of Sale and Assignment of Intangibles as of the date and year first above written.


TRUSTEE:

_____
Paul Mansdorf, as Trustee appointed pursuant to chapter 7
of the Bankruptcy Code for The San Francisco Art Institute, a California
non-profit public benefit corporation

ASSIGNEE:

_____
a _____

By:     _____
Name:   _____
Its:    _____

EXHIBIT A

**<u>EXHIBIT J</u>**

**FORM OF SELLER/BUYER OFFICER CERTIFICATE**

OFFICER CERTIFICATE

This OFFICER CERTIFICATE is made as of _____, 2024 [*date to be inserted is Closing Date*] by _____ in favor of _____.

In accordance with the terms of that certain Purchase and Sale Agreement and Escrow Instructions dated as of November ___, 2023, by and between Paul Mansdorf, solely in his capacity as the duly appointed Chapter 7 Trustee (the "**Trustee**") for The San Francisco Art Institute, a California non-profit public benefit corporation (the "**SFAI**"), The Regents of the University of California, a California public corporation (the "**UC Regents**" and together with Trustee on behalf of SFAI, the "**Sellers**") and BM-AI LLC, a Delaware limited liability company ("**Buyer**") (the "**Purchase and Sale Agreement**"), [Seller/Buyer] hereby certifies to [Buyer/Seller] that each of [Seller's/Buyer's] representations and warranties set forth in the Purchase and Sale Agreement are true and correct of the date hereof.

_____

a _____

By:     _____

Name:   _____

Its:    _____

**EXHIBIT A**

Case: 23-30250   Doc# 129-1   Filed: 11/22/23   Entered: 11/22/23 05:28:12   Page 88 of 101

# EXHIBIT K

## FORM OF OWNER'S AFFIDAVIT

## ALTA EXTENDED COVERAGE OWNER'S DECLARATION

To:     Chicago Title Company

Re:     Title/Escrow No.:   **36200889-362-LE4**
        Property:           800 Chestnut Street, San Francisco, CA

1.      The undersigned has reviewed Title Commitment.

2a.     Is the property vacant?   ☐ Yes   ☐ No

2b.     Declarant knows of no unrecorded leases except as shown on the attached Certified Rent Roll:

        (Rent Roll attached ☐ Yes ☐ No)   Note: Please check "Yes" if there are such unrecorded leases and attach Exhibit A – Certified Rent Roll.

2c.     If there are unrecorded leases, do any of said unrecorded leases provide for any Options to Purchase and/or Rights of First Refusal.   ☐Yes   ☐ No

        If "YES" is checked, please clarify which particular lease(s) contain either an Option to Purchase and/or Right of First Refusal.

3.      That the Declarant knows of no unrecorded claims against the property, nor any set of facts by reason of which title to the property might be disputed or questioned, and has been in peaceable and undisputed possession of the premises since title was acquired.

4.      That there has not been any construction, repairs, alterations or improvements made, ordered or contracted to be made on or to the premises, nor materials ordered therefore within the last six months which has not been paid for; nor are there any fixtures attached to the premises which have not been paid for in full; that there are no outstanding or disputed claims for any such work or item; and that there have not been any improvements erected upon the property  during the current year subject to any taxes for the current year which may hereafter be assessed or levied by virtue of new construction completed or partially completed during the current year except as shown on attached Exhibit B.

        **(Exhibit B attached ☐ Yes ☐ No)**   Note: Please check "Yes" if there are construction works in progress and attach Exhibit B describing the works in progress

5.      That to the best of my knowledge there has been no violation of any covenants, conditions or restrictions of record affecting the premises and that there are no disputes with any adjoining property owners as to the location of property lines, or the encroachment of any improvements, and there are no outstanding assessments of liens, except as identified in the Title Commitment.

This Declaration is made for the purpose of aiding Chicago Title Company in determining the insurability of title to the property and to induce said Company to issue its policy(ies) of title and the declarant avers the foregoing statements are true and correct to the best of his or her knowledge and belief.

Executed on this _____ day of _____.

**DECLARANT:**

**The Regents of The University of California, a California public corporation**

_____

By:  David Phillips
Its:  Associate Vice President Capital Programs, Energy & Sustainability

**EXHIBIT A**

## SCHEDULE 1

## PERSONAL PROPERTY TO BE CONVEYED

1.      All easels, stools, kilns and art carts throughout.
2.      All items in Studio 13
3.      All items in Studio 20a
4.      All items in Studio 21
5.      All items in Photo Studio
6.      All items in Studio 21 alley
7.      All items in Studio 21 [2]
8.      All items in Lab 25
9.      All items in Studio 26
10.     All items in Capture Suite and Animation Suite
11.     All items in Computer Room with large printers
12.     All items in Security Office
13.     All items in Server Room
14.     All Items in Room 8 next to server room
15.     All items in Printmaking Studio (excluding debris)
16.     All items in landing area below Library (left of restroom) (with possible exclusion of printer)
17.     All items in the Library
18.     All items in Tool Room
19.     Machinery in Wood Shop
20.     All items in Allan Stone Painting Studio
21.     All items in Room 114
22.     Photo-related Items in Rooms16 a b c (and excluding all other items in Room 16)

---

[2] Buyer may elect to delete the items in the rooms identified in 7, 8, 9 and 21 above after a physical inspection of the same.

**EXHIBIT A**

# FOURTH AMENDMENT TO TRIPLE NET LEASE

This Fourth Amendment to Triple Net Lease (this "Amendment") is made as of October 30, 2023, by and between PAUL MANSDORF, solely in his capacity as the Trustee appointed pursuant to Chapter 7 of the Bankruptcy Code ("Trustee") for SAN FRANCISCO ART INSTITUTE, a California nonprofit public benefit corporation ("SFAI" or "Tenant"), and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a California public corporation ("Landlord").

## Recitals

A. Landlord and SFAI entered into that certain Triple Net Lease with an effective date of October 30, 2020, as amended by that certain First Lease Amendment dated as of April 8, 2022, by that certain Second Amendment to Triple Net Lease dated as of August 31, 2022, and by that certain Third Amendment to Triple Net Lease dated as of October 1, 2022 (the "Existing Lease"). The Existing Lease concerns real property commonly referred to as 800 Chestnut Street, San Francisco, California ("Real Property"). Terms used herein and not defined herein shall have the meanings given them in the Existing Lease.

B. On April 19, 2023, SFAI filed a voluntary petition under chapter 7 of title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California, which case is proceeding under Case No. 23-30250 (HLB). The Trustee is the duly appointed, qualified and acting trustee of the bankruptcy estate of SFAI.

C. The Landlord has cooperated with the Trustee's marketing efforts to sell the Real Property and the personal property of SFAI therein. The Landlord and Trustee intend to enter into a tri-party Purchase and Sale Agreement (PSA) with a buyer identified through those marketing efforts.

D. The Parties desire to modify the terms of the Existing Lease as more particularly set forth in this Amendment.

## Amendment

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants contained herein and in the Existing Lease and other good and valuable consideration, the adequacy of which is hereby acknowledged, the Parties agree to amend the Existing Lease as follows:

1. <u>Term</u>. Section 3.1 of the Existing Lease is amended and restated as follows;

   **Term**. The terms and provisions of this Lease shall be effective as of the Effective Date. The term of this Lease (the "Lease Term" or "Term") shall expire on February 29, 2024, provided (i) that by January 12, 2024, the Bankruptcy Court shall have entered an order or orders authorizing the sale or assignment of Lease, and any necessary amendments to the Lease, and (ii) the Trustee shall

**EXHIBIT B**

promptly procure insurance coverage required under Section 12.2 of the Lease, and provide evidence to the Landlord that the insurance is effective by November 28, 2023.  If the Bankruptcy Court has not entered orders authorizing the sale or assignment of Lease by January 12, 2024, the deadline for the Trustee to assume, assume and assign, or reject the Lease shall be January 31, 2024.

2. <u>Miscellaneous</u>. Except as amended by this Amendment, the Existing Lease remains unmodified and, as amended by this Amendment, remains in full force and effect. All references in this Amendment and in the Existing Lease to the "Lease" shall mean the Existing Lease as amended by this Amendment. This Amendment may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute a single instrument. This Amendment may be executed electronically by email delivery of .pdf signatures, DocuSign or other similar electronic means.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date and year first above written.

**LANDLORD**                                                   **TENANT**

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**

**PAUL MANSDORF, as Trustee appointed pursuant to chapter 7 of the Bankruptcy Code for THE SAN FRANCISCO ART INSTITUTE, a California non-profit public benefit corporation**

DocuSigned by:

*David Phillips*

B8387EA3736E44F...

Name: David Phillips                                      By:_____
Its: Associate Vice President Capital Programs,          Name: Paul Mansdorf
Energy & Sustainability                                   Its: Chapter 7 Trustee

promptly procure insurance coverage required under Section 12.2 of the Lease, and provide evidence to the Landlord that the insurance is effective by November 28, 2023. If the Bankruptcy Court has not entered orders authorizing the sale or assignment of Lease by January 12, 2024, the deadline for the Trustee to assume, assume and assign, or reject the Lease shall be January 31, 2024.

2. <u>Miscellaneous</u>. Except as amended by this Amendment, the Existing Lease remains unmodified and, as amended by this Amendment, remains in full force and effect. All references in this Amendment and in the Existing Lease to the "Lease" shall mean the Existing Lease as amended by this Amendment. This Amendment may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute a single instrument. This Amendment may be executed electronically by email delivery of .pdf signatures, DocuSign or other similar electronic means.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date and year first above written.

**LANDLORD**

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**

By:_____
Name: Nathan Brostrom
Its: EVP-CFO

**TENANT**

**PAUL MANSDORF, as Trustee appointed pursuant to chapter 7 of the Bankruptcy Code for THE SAN FRANCISCO ART INSTITUTE, a California non-profit public benefit corporation**

By:_____
Name: Paul Mansdorf
Its: Chapter 7 Trustee

**EXHIBIT B**

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 93 of 101

DocuSign Envelope ID: 70E43422-7EF9-4CE7-806C-42740707F166

## FIFTH AMENDMENT TO TRIPLE NET LEASE

This Fifth Amendment to Triple Net Lease (this "Amendment") is made as of November 16, 2023, by and between PAUL MANSDORF, solely in his capacity as the Trustee appointed pursuant to Chapter 7 of the Bankruptcy Code ("Trustee") for SAN FRANCISCO ART INSTITUTE, a California nonprofit public benefit corporation ("SFAI" or "Tenant"), and THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, a California public corporation ("Landlord").

### Recitals

A. Landlord and SFAI entered into that certain Triple Net Lease with an effective date of October 30, 2020, as amended by that certain First Lease Amendment dated as of April 8, 2022, by that certain Second Amendment to Triple Net Lease dated as of August 31, 2022, by that certain Third Amendment to Triple Net Lease dated as of October 1, 2022, and by that certain Fourth Amendment to Triple Net Lease dated as of October 30, 2023 (the "Existing Lease"). The Existing Lease concerns real property commonly referred to as 800 Chestnut Street, San Francisco, California ("Real Property"). Terms used herein and not defined herein shall have the meanings given them in the Existing Lease.

B. On April 19, 2023, SFAI filed a voluntary petition under chapter 7 of title 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Northern District of California, which case is proceeding under Case No. 23-30250 (HLB). The Trustee is the duly appointed, qualified and acting trustee of the bankruptcy estate of SFAI.

C. The Landlord has cooperated with the Trustee's marketing efforts to sell the Real Property and the personal property of SFAI therein. The Landlord and Trustee intend to enter into a tri-party Purchase and Sale Agreement (PSA) with a buyer identified through those marketing efforts.

D. The Landlord and Tenant expect a condition of closing in the PSA to be the City of San Francisco's approval of a certain Special Use District (SUD) and for the PSA to provide the buyer with the option to extend the closing date (Extended Closing Date) to allow for expiration of appeal periods following the effective date of the approval of the SUD.

E. The Parties desire to modify the terms of the Existing Lease as more particularly set forth in this Amendment.

### Amendment

NOW, THEREFORE, in consideration of the foregoing recitals, the mutual covenants contained herein and in the Existing Lease and other good and valuable consideration, the adequacy of which is hereby acknowledged, the Parties agree to amend the Existing Lease as follows:

EXHIBIT C

Case: 23-30250    Doc# 129-1    Filed: 11/22/23    Entered: 11/22/23 05:28:12    Page 94
of 101

1.    <u>Term</u>. Section 3.1 of the Existing Lease is amended and restated as follows;

**Term**. The terms and provisions of this Lease shall be effective as of the Effective Date. The term of this Lease (the "Lease Term" or "Term") shall expire on February 29, 2024, provided (i) that by January 12, 2024, the Bankruptcy Court shall have entered an order or orders authorizing the sale or assignment of Lease, and any necessary amendments to the Lease. If the Bankruptcy Court has not entered orders authorizing the sale or assignment of Lease by January 12, 2024, the deadline for the Trustee to assume, assume and assign, or reject the Lease shall be January 31, 2024. If the Bankruptcy Court has entered orders authorizing the sale or assignment of Lease by January 12, 2024, and buyer subsequently exercises the option for the Extended Closing Date as described in the PSA, then the Term shall be extended to five (5) business days after the Extended Closing Date contingent on the PSA remaining in effect. If the PSA is terminated for any reason, the Term shall expire on the later of February 29, 2024, or five (5) business days following the termination of the PSA.

2.    <u>Miscellaneous</u>. Except as amended by this Amendment, the Existing Lease remains unmodified and, as amended by this Amendment, remains in full force and effect. All references in this Amendment and in the Existing Lease to the "Lease" shall mean the Existing Lease as amended by this Amendment. This Amendment may be executed in counterparts, each of which shall be deemed an original and all of which together shall constitute a single instrument. This Amendment may be executed electronically by email delivery of .pdf signatures, DocuSign or other similar electronic means.

IN WITNESS WHEREOF, the parties hereto have executed this Amendment as of the date and year first above written.

**LANDLORD**

**THE REGENTS OF THE UNIVERSITY OF CALIFORNIA**

By: _David Phillips_ _____
Name: David Phillips
Its: Associate Vice President Capital Programs, Energy & Sustainability

**TENANT**

**PAUL MANSDORF, as Trustee appointed pursuant to chapter 7 of the Bankruptcy Code for THE SAN FRANCISCO ART INSTITUTE, a California non-profit public benefit corporation**

By: _____
Name: Paul Mansdorf
Its: Chapter 7 Trustee

**EXHIBIT C**

DocuSign Envelope ID: 5CDAF3A9-0CAD-4380-86EC-E5E93917C157

## REVISED AGREEMENT CONCERNING TRANSFER
## OF REAL PROPERTY AND SALE PROCEEDS

      This Revised Agreement Concerning Transfer of Real Property and Sale Proceeds ("Agreement") is made this 20th day of November 2023, by and between: (i) Paul Mansdorf, solely in his capacity as the duly appointed and acting Chapter 7 Trustee ("Trustee") for the bankruptcy estate of The San Francisco Art Institute, a California nonprofit public benefit corporation, as Case No. 23-30250 HLB ("Estate"), pending in the United States Bankruptcy Court for the Northern District of California, San Francisco Division ("Bankruptcy Court"); and (ii) The Regents of the University of California, a California public corporation ("UC Regents"). The Trustee and the UC Regents are each a "Party" and, collectively, the "Parties."

## RECITALS

      A.     The debtor filed a voluntary petition under Chapter 7 of the Bankruptcy Code on April 19, 2023 ("Petition Date"). Through July 2022, the debtor operated for over 150 years as an arts education institution and that real property commonly referred to as 800 Chestnut Street, San Francisco, California ("Premises") was the debtor's main campus and administrative office for almost 100 years.

      B.     The debtor occupies the Premises as the tenant under a multi-year triple net lease dated on or about October 30, 2020, with the UC Regents as landlord. The lease has been amended by that certain First Lease Amendment dated as of April 8, 2022, by that certain Second Amendment to Triple Net Lease dated as of August 31, 2022, by that certain Third Amendment to Triple Net Lease dated as of October 1, 2022, by that certain Fourth Amendment dated as of October 30, 2023, and by that Fifth Amendment dated November 16, 2023 (collectively, the "Lease").[1]

      C.     The debtor owns unencumbered personal property located at the Premises, including the mural painted by Diego Rivera entitled "The Making of a Fresco Showing the Building of a City" (1931) ("Mural"). Under the provisions of the Lease, the Mural is personal property of the debtor. The Mural has an appraised value of approximately $50 million.

      D.     Prior to the Petition Date, the debtor was in default under its Lease obligations. Among other things, the debtor owes the UC Regents, as of the Petition Date, rental arrears and other fees and costs in the approximate amount of $495,178. Following the filing of the debtor's petition, the debtor has continued to incur rent and other arrears and expenses under the Lease in the estimated amount of $662,603 through September 30, 2023. The UC Regents estimate that, through February 29, 2024, the sum necessary to cure the debtor's pre and post-petition arrears under the Lease will total at least $1,500,000 ("Cure Amount").

      E.     The Lease includes an option by which the debtor can purchase the Premises from the UC Regents. Subject to certain prorations and adjustments, the option could be exercised under the Lease in two ways: (i) a restricted option, which would require the debtor to pay to the UC

---

[1] Capitalized terms not defined in this Agreement shall have the meanings ascribed to them in the Lease.

Regents an amount equal to the UC Regents' bank debt on the Premises, $18,943,756.48, plus 8% annual interest from October 30, 2020 to the date of closing, plus rental arrears and other fees (the "Restricted Option"); or (ii) an unrestricted option, which would require the debtor to pay to the UC Regents the sum of $40 million (the "Unrestricted Option"). The Restricted Option would require the transfer and conveyance of the Premises from the UC Regents to the debtor to be subject to a grant deed that includes covenants and restrictions that run with the land, which, among other things, require the Premises to be operated as a school for the instruction in and illustration of fine arts ("Restrictions").

F.      On May 23, 2023, Trustee entered into a listing agreement for the Premises with Cushman & Wakefield.

G.      Following a noticed motion served on creditors and parties in interest, on August 18, 2023, the Bankruptcy Court entered an order authorizing the Parties to enter into a stipulation to extend the deadline for the Trustee to extend the deadline to assume/reject/ or assume and assign the Lease to and including October 30, 2023.

H.      Following the Petition Date, the Trustee and representatives of the UC Regents have conducted arms-length negotiations with regard to the Premises, the Lease and the purchase options available under the Lease and have agreed, subject to the approval of the UC Regents and the Bankruptcy Court, to authorize the Trustee, on behalf of the Estate, to market and sell the Premises, as provided in this Agreement.

I.      The Trustee and the UC Regents have reached a tentative agreement with BM-AI (BM-AI) for the purchase of the Premises and other assets of SFAI, including, the Mural, under which the Trustee will assign its right to purchase the Premises from the UC Regents under the Lease to BM-AI.  The agreement is set forth in that certain Purchase and Sale Agreement dated as of November __, 2023 (the "BM-AI PSA") among the Trustee and the UC Regents as Sellers and BM-AI, as Buyer.  The proposed sale is subject to Bankruptcy Court approval and subject to overbids prior to the hearing on the proposed sale.


**AGREEMENT**


NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, it is hereby agreed as follows:

1.      The foregoing Recital paragraphs are incorporated by this reference.

2.      UC Regents acknowledge that any existing Event of Default or potential defaults under the Lease and any other amounts that may be due and owing to Landlord (including amounts relating to Claims under Section 11.2) will be cured or satisfied by payment the Cure Amount from the Trustee (on behalf of Estate) paid to the UC Regents, provided the Cure Amount is received by Landlord on or before the later of (i) February 29, 2024 or (ii) the Extended Closing Date and pursuant to the terms of the BM-AI PSA or  such other Purchase and Sale Agreement as described in Paragraph 5 of this Agreement.  If the Bankruptcy Court has not entered an order approval

EXHIBIT D

DocuSign Envelope ID: 5CDAF3A9-0CAD-4380-86EC-E5E93917C157

approving the sale or assignment of the Premises by January 31, 2024 the Cure Amount would be payable upon the Trustee deciding to assume the Lease.

3. The Trustee shall be authorized to arrange for the sale of the Premises to BM-AI or any qualified overbidder, which sale shall not be subject to any Restrictions ("Premises Sale"), subject to: (i) the Trustee securing Bankruptcy Court authorization to enter into this Agreement; (ii) the provisions in paragraph 4 in this Agreement; (iii) Trustee securing Bankruptcy Court approval to enter into the BM-AI PSA for the Premises, or such other Purchase and Sale Agreement as described in Paragraph 5, and (iv) Trustee securing Bankruptcy Court approval to enter into the BM-AI PSA for the Premises, or such other Purchase and Sale Agreement as described in Paragraph 5. The Trustee's authorization with respect to the sale of the Premises under this Agreement shall expire on the Lease Expiration Date, unless extended in writing by the Trustee and the UC Regents.

4. From the proceeds of the Premises Sale to BM-AI pursuant to the BM-AI PSA, the UC Regents shall be paid the sum of $22,500,000 ("UC Allocation"), plus payment of the Cure Amount.

5. If the gross proceeds generated from the Premises Sale is approved by the Bankruptcy Court to BM-AI or to any other party upon an overbid in excess of the $30,000,000 Purchase Price as set forth in Section 2.1 of the BM-AI PSA, the UC Allocation set forth in Paragraph 4 above, shall be adjusted as follows: eighty percent (80%) of the excess overbid amount shall be paid to the UC Regents as an additional UC Allocation in an amount not to exceed $1,000,000, provided that the terms of any Purchase and Sale Agreement with an overbidder are materially the same as the BM-AI PSA in the reasonable and prompt determination of the UC Regents. UC Regents shall cooperate with the Trustee to execute such Purchase and Sale Agreement with an overbidder and any documents reasonably necessary to consummate a sale of the Premises.

6. As additional consideration for its receipt of the UC Allocation and the Cure Amount, the UC Regents acknowledge and agree that: (i) its receipt of the UC Allocation and Cure Payment prior to the Lease Expiration Date shall constitute payment, in full, of any and all sums it is owed, or could assert it is owed, by the debtor, the Estate, the Trustee or the buyer of the Premises for all purposes, both pre-petition and post-petition; (ii) upon its receipt of the UC Allocation and Cure Payment the Lease shall be terminated and that no party, including but not limited to the debtor, the Estate, the Trustee or buyer of the Premises shall have any obligation to the UC Regents or its successors or assigns; and (iii) all claims it has filed against the Estate or could file or assert against the Estate shall be deemed withdrawn and unenforceable.

7. The Trustee and the UC Regents represent and warrant that each Party has full authority to bind himself and itself to the terms of this Agreement; that he or it has not assigned, transferred, conveyed, hypothecated or otherwise disposed of any interest in any property that is the subject of this Agreement.

8. The Parties warrant and represent that they have read and understand this Agreement, that they have had a free and unfettered opportunity to consult individually and jointly

151695512.1

EXHIBIT D

with an independent attorney of their choosing regarding this Agreement and its effect, and that they execute this Agreement voluntarily and without duress or undue influence.

9.    Neither this Agreement, nor any provision within it, shall be construed against any Party or its attorney because it was drafted in full or in part by such Party or its attorney. The Agreement shall be accordingly construed equally against all Parties. In this regard, the Parties waive any and all benefits and rights he, she, it, or they may have under California Civil Code Section 1654, which provides as follows:

> IN CASES OF UNCERTAINTY NOT REMOVED BY THE PRECEDING RULES, THE LANGUAGE OF A CONTRACT SHOULD BE INTERPRETED MOST STRONGLY AGAINST THE PARTY WHO CAUSED THE UNCERTAINTY TO EXIST.

10.    This Agreement contains the sole and entire agreement and understanding of the Parties with respect to the matters described herein, and any and all prior and contemporaneous agreements, representations, discussions, negotiations, commitments, and understandings are merged into and superseded by this Agreement. No representations, oral or otherwise, express or implied, other than those written and contained herein have been made or relied upon by any of the Parties.  This Agreement shall be binding on each Party's successors and assigns.

11.    The Parties agree that the Bankruptcy Court shall have exclusive jurisdiction over any dispute arising out of this Agreement, including, but not limited to the interpretation and enforcement of this Agreement, and, if necessary to effect the Bankruptcy Court's jurisdiction, and by their signature to this Agreement, hereby stipulate to an order providing for such jurisdiction. The Parties waive any and all rights that they may have to a jury trial.

12.    This Agreement shall be construed in accordance with the laws of the State of California, except to the extent it is controlled by the federal bankruptcy laws.

13.    This Agreement may be executed in one or more counterparts for the convenience of the Parties hereto, all of which together shall constitute one and the same instrument. Facsimile signatures, or signatures transferred in pdf format, shall be treated as original signatures for all purposes.

151695512.1

**EXHIBIT D**

IN WITNESS WHEREOF, the Parties have each approved and executed this Agreement.

DATED: November 2̲2̲ 2023    ESTATE OF THE SAN FRANCISCO ART INSTITUTE,
a California nonprofit public benefit corporation,
Case No. 23-30250 HLB

By: _____
PAUL MANSDORF
Trustee

DATED: November __, 2023    THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA, a California public corporation

By: _____
DAVID PHILLIPS
Associate Vice President

5

151695512.1

IN WITNESS WHEREOF, the Parties have each approved and executed this Agreement.

DATED: November ___, 2023     ESTATE OF THE SAN FRANCISCO ART INSTITUTE,
a California nonprofit public benefit corporation,
Case No. 23-30250 HLB

By: _____
     PAUL MANSDORF
     Trustee

DATED: November 21, 2023     THE REGENTS OF THE UNIVERSITY OF
CALIFORNIA, a California public corporation

By: _____
     _____IPS
     Associate Vice President

5